# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| OZ ELS MASTER FUND, LTD., OZ SPECIAL FUNDING (OZMD), L.P., OZ ENHANCED MASTER FUND, LTD., GORDEL CAPITAL LIMITED, OZ GLOBAL EQUITY OPPORTUNITIES MASTER FUND, LTD., OZ MASTER FUND, LTD., and OZ GLOBAL SPECIAL INVESTMENTS MASTER FUND, L.P., <br><br> Plaintiffs, <br><br> v. <br><br> TEVA PHARMACEUTICAL INDUSTRIES LIMITED, EREZ VIGODMAN, EYAL DESHEH, YAACOV "KOBI" ALTMAN, and SIGURDUR OLAFSSON, <br><br> Defendants. | Civ. A. No. <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> **ECF CASE** |

This action is brought by OZ ELS Master Fund, Ltd., OZ Special Funding (OZMD), L.P., OZ Enhanced Master Fund, Ltd., Gordel Capital Limited, OZ Global Equity Opportunities Master Fund, Ltd., OZ Master Fund, Ltd., and OZ Global Special Investments Master Fund, L.P. (collectively, "Plaintiffs") under the Securities Exchange Act of 1934 ("Exchange Act") against Teva Pharmaceutical Industries Limited ("Teva" or the "Company") and certain of its former and current officers (collectively, "Defendants") to recover damages for losses Plaintiffs have suffered in connection with their purchases of Teva American Depositary Shares ("ADSs") and call options on Teva ADSs, and sales of put options on Teva ADSs, between February 10, 2014 and November 2, 2016, inclusive (the "Relevant Period"). This action is also brought under the Securities Act of 1933 ("Securities Act") against Teva and certain of its former and current officers in connection with Plaintiffs' purchases of securities in or traceable to the Company's public offering of ADSs and 7.00% Mandatory Convertible Preferred Shares ("Preferred Shares") conducted on or about

December 3, 2015 (the "2015 Offering").[1]   Plaintiffs allege the following upon personal knowledge as to their own acts and upon information and belief as to all other matters.   Their information and belief are based on, among other things, the investigation conducted by their counsel.

## NATURE OF THE ACTION

1.      Teva is the largest generic drug manufacturer in the world.   This case arises from Teva's role in an unlawful price-fixing scheme to inflate the price of generic drugs sold in the United States.

2.      Founded in 1901 and headquartered in Israel, Teva develops, manufactures, markets, and distributes generic drugs.   Among other generic drugs, Teva manufacturers and sells Pravastatin, which is prescribed to lower cholesterol, Divalproex, which is used to prevent migraines and certain types of seizures, Doxycycline, a common antibiotic, Lidex, a corticosteroid, and Glyburide, an antidiabetic drug.   Over the past several years, the prices of these generic drugs have increased substantially, despite the fact that many of the drugs have been on the market for decades with relatively stagnant pricing.   In one of the most dramatic examples, over a six month period from October 2013 to April 2014, the average market price of Doxycycline increased by a staggering 8,281%.

3.      These significant price increases were the result of an illegal, well-coordinated, and long-running series of schemes to fix the prices and allocate markets for numerous generic drugs in the United States.   Specifically, Teva and its competitors entered into contracts, combinations, and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and

---

[1] Teva ADSs, call options on Teva ADSs, put options on Teva ADSs, and Preferred Shares are collectively referred to herein as "Teva Securities."

maintaining prices, and reducing competition in the markets for a variety of generic drugs.  The scheme had its intended effect, boosting Teva's revenue and earnings throughout the Relevant Period.

4.     Throughout the Relevant Period, Defendants falsely attributed the Company's strong performance to legitimate business practices, including Teva's significant "improvement in the profit of the global generic business, driven by the performance of the US market," Teva's "global leadership in generics," as well as meeting cost-reduction goals and other "efficiency targets."  Defendants also falsely "warned" investors that the Company's generics business was "subject to intense competition," and that it combats this competition through a "focused and competitive pricing strategy."  As a result of these and other misrepresentations, Teva Securities traded at artificially inflated prices throughout the Relevant Period.

5.     The truth concerning Defendants' fraudulent scheme began to be revealed on August 4, 2016, when Teva disclosed that its U.S. subsidiary—Teva Pharmaceuticals USA, Inc. ("Teva USA")—had received a subpoena from the Antitrust Division of the United States Department of Justice ("DOJ") relating to the marketing and pricing of certain of Teva's generic drugs and related communications with its competitors.  The Company also disclosed on August 4, 2016 that on July 12, 2016, Teva USA had received a subpoena from the Connecticut Attorney General relating to potential state antitrust law violations.  These disclosures caused the prices of Teva Securities to decline.  For example, as a result of these disclosures, the price of the Company's ADSs declined by $1.24 per ADS, or 2.2%.

6.     Then, on November 3, 2016, media outlets reported that U.S. prosecutors were preparing to file criminal charges against Teva and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices in violation of the federal antitrust laws.  This

disclosure caused the prices of Teva Securities to decline.   For example, as a result of this disclosure, the price of Teva's ADSs declined by $4.13, or 9.53%.

7.      In the aftermath of these disclosures, the Company announced that its senior-most executives were leaving the Company amid the scandal.   On December 5, 2016, Teva revealed that Sigurdur "Siggi" Olafsson, the Company's President and Chief Executive Officer of its generics segment, would "step down from his role" at the Company and formally retire at the end of the first quarter of 2017.   Two months later, on February 6, 2017, Teva disclosed that its President and Chief Executive Officer, Erez Vigodman, was leaving the Company, effectively immediately.

8.      Defendants have destroyed billions of dollars in shareholder value through their false statements and concealment of Teva's role in the illegal price-fixing scheme, and are liable to Plaintiffs for damages under the federal securities laws.   Through this action, Plaintiffs assert claims under the Exchange Act and Securities Act to recover their damages due to Defendants' misconduct.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

10.      Venue is properly laid in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

11.      In connection with these acts, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange, namely, the New York Stock Exchange ("NYSE").

## PARTIES

12.     Oz Management LP and Oz Management II LP (collectively, "Oz Management") are global, diversified alternative asset advisors based in New York, New York.  The following investment funds and accounts that are managed and/or advised by Oz Management are Plaintiffs in this action: OZ ELS Master Fund, Ltd., OZ Special Funding (OZMD), L.P., OZ Enhanced Master Fund, Ltd., Gordel Capital Limited, OZ Global Equity Opportunities Master Fund, Ltd., OZ Master Fund, Ltd., and OZ Global Special Investments Master Fund, L.P. Plaintiffs acquired and/or sold Teva Securities during the Relevant Period, including ADSs and Preferred Shares acquired in or traceable to the 2015 Offering, and were damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Teva is incorporated in Israel, and the Company's principal executive offices are located at 5 Basel Street, P.O. Box 3190, Petach Tikva 4951033, Israel.  The Company's U.S. wholly-owned subsidiary Teva USA's headquarters are located at 1090 Horsham Road, North Wales, Pennsylvania.  Teva's Level III sponsored ADSs representing the Company's common stock are listed on the NYSE, trading under the ticker symbol "TEVA."  There are currently over 840 million ADSs issued and outstanding.

14.     Defendant Erez Vigodman ("Vigodman") served as Teva's President and Chief Executive Officer ("CEO") from February 11, 2014 to February 6, 2017, and as a member of Teva's Board of Directors from June 22, 2009 to February 6, 2017.

15.     Defendant Eyal Desheh ("Desheh") served as Teva's Chief Financial Officer ("CFO") from July 2008 to June 30, 2017, with the exception of October 30, 2013 to February 11, 2014, during which time he served as the Company's Interim CEO and Interim President.  Desheh also served as Teva's Group Executive Vice President from 2012 to June 30, 2017.

16.     Defendant Yaacov "Kobi" Altman ("Altman") served as Teva's Acting CFO from October 31, 2013 to February 11, 2014.

17.     Defendant Sigurdur "Siggi" Olafsson ("Olafsson") served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016.

18.     The Defendants referenced above in ¶¶14-17 are sometimes referred to herein as the "Officer Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Teva develops, manufactures, markets, and distributes generic medicines and a portfolio of specialty medicines worldwide.  Teva is the largest generic drug manufacturer in the world and one of the 15 largest pharmaceutical companies worldwide.

20.     In 1984, U.S. Congress enacted the Hatch-Waxman Act to expedite the entry of generic drugs to the market.  These generic drugs were intended to serve as less expensive competitors to their name-brand equivalents, thereby reducing healthcare expenses in the U.S. This is a critical function given that generic drugs are the only form of direct price competition for identical, therapeutically-equivalent branded drugs.  The Hatch-Waxman Act was a success and substantially advanced the rate of generic product launches in the U.S.  Specifically, in 1983, before the Hatch-Waxman Act, only 35% of top-selling drugs had generic alternatives.  By 1998, nearly all branded drugs had generic competitors.  Generics are now dispensed 95% of the time when a generic form is available.  As the U.S. Food and Drug Administration's Director of the Office of Generic Drugs stated to Congress in July 2006, "[t]he Hatch-Waxman Amendments have been very successful and have provided for the approval of over 8,000 generic drug products. These products are lower cost, high quality products that have saved the American public and the

6

government billions of dollars."

21.     Although the Hatch-Waxman Act has successfully fostered generic competition and reduced prices, Teva and other pharmaceutical companies have frustrated the goals of the Act by entering into anti-competitive arrangements that delay or impair generic competition.

22.     Teva manufactures several generic drugs whose prices have skyrocketed over the past several years.  These drugs include Pravastatin, Doxycycline, Divalproex, and Lidex, among others.  In fact, Teva increased the prices of its drugs so much—and in such synchronization with the prices of its competitors—that the only reasonable explanation is that Teva and its purported competitors entered into illegal arrangements to increase the prices of generic drugs.  As stated by industry analyst Richard Evans at Sector & Sovereign Research in an April 21, 2015 report, the "plausible explanation is that generic manufacturers, having fallen to near historic low levels of financial performance, are cooperating to raise the prices of products."  Evans further stated that "[a]ll of the manufacturers," including Teva, "appear to be participating in the inflation."  Stephen W. Schondelmeyer, a pharmaceutical economist at the University of Minnesota, echoed that sentiment and compared the generic market to the "[w]ild, Wild West of drug pricing," adding, "I believe in markets, but this market is broken; it's failing."

23.     For example, the cholesterol-lowering drug Pravastatin, manufactured by Teva, has been available in the U.S. since 1991.  Prior to July 2013—*i.e.*, for over 20 years—Pravastatin sold for approximately $0.11 per pill, or less.  In mid-2013, however, the average price for all dosages for Pravastatin increased by 573%, and patients refilling prescriptions suddenly found themselves paying four to five times more for their monthly prescriptions.  There was no innocent explanation for the price increases—there were no supply problems or impurity issues.  Rather, the most apparent explanation was that Teva and other drug manufacturers stopped competing and entered

into an unlawful agreement to inflate the price of Pravastatin.

24.     Significantly, the increase in prices of Pravastatin coincided with increases in the prices of several other generic drugs manufactured by Teva, including Divalproex, which is used to prevent migraines and certain types of seizures.  In fact, between 2013 and 2014, the average market price of Divalproex—set by Teva and its purported competitors—increased between 566% and 736% depending on the package size and dosages of the drug.

25.     At the same time, the price of Doxycycline, a common antibiotic which Teva manufactures, rose a staggering 8,281% between October 2013 and April 2014.  Again, there appears to be no reasonable explanation for the increasing price of this drug.

26.     Data from the Centers for Medicare & Medicaid Services reveals a similar trend with regard to the pricing of Doxycycline, and strongly suggests that manufacturers of the drug engaged in an improper scheme to fix the price of the drug.  Indeed, around February 2013 the price of a 50mg dosage of Doxycycline increased from approximately $0.02 per pill to roughly $1.60 per pill, almost overnight.

27.     In addition, Teva and other drug manufacturers more than doubled their prices of the corticosteroid named Lidex during a single week in the summer of 2014—with certain product offerings increasing in price by more than 600%.

28.     The situation grew so alarming that several government entities took note of these extraordinary price increases and commenced investigations.  In July 2014, Connecticut Attorney General George Jepsen began an investigation into the industry and, on July 12, 2016, issued a subpoena to Teva relating to state antitrust law violations.

29.     Further, on October 2, 2014, U.S. Representative Elijah Cummings, the Ranking Member of the House Committee on Oversight and Government Reform, and U.S. Senator Bernie

Sanders, Chairman of the Subcommittee on Primary Health and Retirement Security, sent joint letters to 14 drug manufacturers, including Teva, requesting information about the escalating prices of 10 different generic drugs.  The letter to Teva was sent to CEO Erez Vigodman and requested information relating to the Company's pricing of Pravastatin and Divalproex.  Specifically, the letter sought from Teva documents and other information relating to, among other things: the identity of the Company officials responsible for setting the prices of these drugs; a description of the specific factors that contributed to Teva's decisions to increase the prices of the drugs; profit projections relating to the Company's future sales of the drugs; and purchase agreements for the active pharmaceutical ingredients for these drugs, including any agreements relating to exclusivity.

30.     After Senator Sanders and Representative Cummings sent their letters and requests for documents to Teva and other generic drug manufacturers, Congress held a hearing on November 20, 2014 to further investigate the price increases.  According to the Congressional testimony, over half of generic medications increased in price between 2013 and 2014, and 10% of those drugs more than doubled in price in that time, with the price of some common medicines increasing by over 500%.  These include Doxycycline and asthma drug Albuterol (both manufactured by Teva), and several other drugs.  While Congress invited high-level officials from Teva and other generic drug companies to appear at the hearing, none of them agreed to do so.

31.     These significant price increases were the result of a vast, well-coordinated scheme to inflate and manipulate the prices for a variety of generic drugs in the United States.  Specifically, Teva and its purported competitors entered into contracts, combinations, and conspiracies that had the intended effect of restraining trade, artificially inflating and maintaining prices, and reducing competition in the markets for numerous generic drugs.

32.     Despite Teva's participation in the scheme, throughout the Relevant Period, the Company repeatedly touted the strength of its generics business and attributed its strong financial results to a variety of legitimate business practices.

### Materially False and Misleading Statements Issued During the Relevant Period

33.     The Relevant Period begins on February 10, 2014, when Teva filed an Annual Report for the year ended December 31, 2013 on Form 20-F with the SEC (the "2013 20-F").  For the year, Teva reported revenues in its generic drug segment of $9.906 billion, including $4.181 billion in revenues from the U.S. market.   The Company also reported annual "segment profitability" for its generics business of $1.656 billion.[2]

34.     In the 2013 20-F, Teva also discussed the competitive landscape in the U.S. market, which the Company described as intensely competitive.  Specifically, the 2013 20-F states, in relevant part:

> *Competitive Landscape.* In the United States, ***we are subject to intense competition in the generic drug market*** from other domestic and foreign generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. ***We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality and cost-effective production, our customer service and the breadth of our product line. We believe we have a focused and competitive pricing strategy.***[3]

35.     The Company also stated in the 2013 20-F that the primary factors driving earnings and growth in its generics segment were "aging population, an increase in global spending on healthcare, [and] economic pressure on governments to provide less expensive healthcare

---

[2] "Segment profitability" refers to the gross profit for the segment, less sales and marketing expenses and research and development expenses attributed to that segment.

[3] All emphasis is added unless otherwise noted.

solutions."

36.     The 2013 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Desheh and Altman, stating that the financial information contained in the 2013 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.     The statements and omissions set forth in ¶¶33-36 were materially false and misleading because Teva and the Officer Defendants knew or should have known that: (1) the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs; and (2) as a result of the scheme, the Company was not "subject to intense competition in the generic drug market."   Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

38.     On May 2, 2014, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 6-K").   For the quarter, Teva reported revenues in its generic drug segment of $2.398 billion, including $1.048 billion in revenues from the U.S. market.   The Company also reported quarterly segment profitability for its generics business of $499 million.

39.     In the Q1 2014 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance.   In particular, the Company stated:

***United States Generic Medicine Revenues***

In the first quarter of 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 512 million, representing 15.0% of total U.S. generic prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and

customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and cost-effective production.

40.    The statements and omissions set forth in ¶¶38-39 were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs.  It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme. Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

41.    On July 31, 2014, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 6-K").  For the quarter, Teva reported revenues in its generic drug segment of $2.515 billion, including $1.068 billion in revenues from the U.S. market.  The Company also reported quarterly segment profitability for its generics business of $532 million.

42.    In the Q2 2014 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance.  In particular, the Company stated:

### United States Generic Medicine Revenues

In the second quarter of 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 508 million, representing 14.7% of total U.S. generic prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and

customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and cost-effective production.

43.     The statements and omissions set forth in ¶¶41-42 were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs.  It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme. Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

44.     On October 30, 2014, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 6-K").  For the quarter, Teva reported revenues in its generic drug segment of $2.432 billion, including $1.124 billion in revenues from the U.S. market.  The Company also reported quarterly segment profitability for its generics business of $556 million.

45.     In the Q3 2014 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance.  In particular, the Company stated:

***United States Generic Medicine Revenues***

In the third quarter of 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 504 million, representing 14.4% of total U.S. generic prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and

customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and cost-effective production.

46.    The statements and omissions set forth in ¶¶44-45 were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs.  It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme.  Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

47.    On February 9, 2015, Teva filed an Annual Report for the year ended December 31, 2014 on Form 20-F with the SEC (the "2014 20-F").  For the year, Teva reported revenues in its generic drug segment of $9.814 billion, including $4.418 billion in revenues from the U.S. market.  The Company also reported annual segment profitability for its generics business of $2.148 billion.

48.    In the 2014 20-F, Teva also discussed the competitive landscape in the U.S. market, which the Company described as intensely competitive.  Specifically, the 2014 20-F states, in relevant part:

> In the United States, **we are subject to intense competition in the generic drug market** from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. **We believe that our primary competitive**

*advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.*

49.     The Company also stated in the 2014 20-F that the primary factors driving earnings and growth in its generics segment were "aging population, an increase in global spending on healthcare, [and] economic pressure on governments to provide less expensive healthcare solutions."

50.     The 2014 20-F contained signed certifications pursuant to SOX by Defendants Vigodman and Desheh, stating that the financial information contained in the 2014 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

51.     The statements and omissions set forth in ¶¶47-50 were materially false and misleading because Teva and the Officer Defendants knew or should have known that: (1) the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs; and (2) as a result of the scheme, the Company was not "subject to intense competition in the generic drug market."  Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

52.     On April 30, 2015, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 6-K").  For the quarter, Teva reported revenues in its generic drug segment of $2.621 billion, including $1.439 billion in revenues from the U.S. market.  The Company also reported quarterly segment profitability for its generics business of $799 million.

53.     In the Q1 2015 6-K, Teva also touted its competitive position in the U.S. generics

market, as well as its commitment to regulatory compliance.  In particular, the Company stated:

> ### United States Generic Medicines Revenues
>
> In the first quarter of 2015, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 488 million, representing 13.7% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production.

54.     The statements and omissions set forth in ¶¶52-53 were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs.  It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme. Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

55.     On July 26, 2015, Teva entered into an agreement to purchase Allergan plc's global generic drugs business ("Actavis").

56.     On July 30, 2015, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 6-K").  For the quarter, Teva reported revenues in its generic drug segment of $2.466 billion, including $1.326 billion in revenues from the U.S. market.  The Company also reported quarterly

segment profitability for its generics business of $729 million.

57.     In the Q2 2015 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance.  In particular, the Company stated:

### United States Generic Medicines Revenues

In the second quarter of 2015, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 483 million, representing 13.5% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, our broad product line, our commitment to quality and regulatory compliance and our cost-effective production.

58.     The statements and omissions set forth in ¶¶56-57 were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs.  It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme.  Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

59.     On October 29, 2015, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 6-K").  For the quarter, Teva reported revenues in its generic drug segment of $2.202 billion, including $1.032 billion in revenues from the U.S. market.  The Company also reported quarterly segment profitability for its generics business of $578 million.

60.     In the Q3 2015 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance.  In particular, the Company stated:

***United States Generic Medicines Revenues***

In the third quarter of 2015, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with approximately 481 million total prescriptions, representing 13.4% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, our broad product line, our commitment to quality and regulatory compliance and our cost-effective production.

61.     Also on October 29, 2015, Teva held a conference call with analysts and investors to discuss the Company's earnings and operations.   During the conference call, Defendant Olafsson touted the previously announced Actavis acquisition as "highly synergetic and accretive."  Olafsson cautioned, however, that Teva could not begin the integration of the two companies prior to the acquisition closing because Teva was "competing with [Actavis] in the market on a day-to-day" basis.

62.     The statements and omissions set forth in ¶¶59-61 were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs.  It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme. Similarly, Teva's generics segment revenues and profitability were also materially false and

misleading because they were artificially inflated by the undisclosed price-fixing scheme.

63.     On November 30, 2015, Teva announced the commencement of concurrent offerings totaling approximately $6.75 billion, consisting of approximately $3.375 billion of its ADSs and approximately $3.375 billion of its Preferred Shares.  Among other things, the purpose of these offerings was to fund, in part, the previously announced acquisition of Allergan plc's worldwide generic pharmaceuticals business, Actavis.  Teva conducted the Offerings pursuant to a shelf registration statement and prospectus, filed with the SEC on Form F-3 on November 30, 2015 (the "Registration Statement").   The Registration Statement was supplemented through Preliminary Prospectus Supplements, filed with the SEC on Forms 424B5 on November 30, 2015, and Final Prospectus Supplements, filed with the SEC on Forms 424B5 on December 3, 2015 (the "Prospectus Supplements," and collectively with the Registration Statement, the "2015 Offering Materials").

64.     On December 8, 2015, the Company announced that it had closed its previously announced offerings totaling $6.75 billion, consisting of 54 million ADSs at $62.50 per ADS and 3,375,000 of its Preferred Shares at $1,000.00 per share.

65.     The 2015 Offering Materials incorporated by reference the 2014 20-F, the Q1 2015 6-K, the Q2 2015 6-K, and the Q3 2015 6-K.  For all of the reasons stated above, ¶¶47-54, 56-60, 62, Teva, Vigodman, and Desheh made materially false and misleading statements and omissions in the 2015 Offering Materials.

66.     On February 11, 2016, Teva filed an Annual Report for the year ended December 31, 2015 on Form 20-F with the SEC (the "2015 20-F"). For the year, Teva reported revenues in its generic drug segment of $9.546 billion, including $4.793 billion in revenues from the U.S. market. The Company also reported annual segment profitability for its generics business of $2.682 billion.

67.     In the 2015 20-F, Teva also discussed the competitive landscape in the U.S. market, which the Company described as intensely competitive.  Specifically, the 2013 20-F states, in relevant part:

> In the United States, ***we are subject to intense competition in the generic drug market*** from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. ***We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.***

68.     The Company also stated in the 2015 20-F that the primary factors driving earnings and growth in its generics segment were "aging population, an increase in global spending on healthcare, [and] economic pressure on governments to provide less expensive healthcare solutions."

69.     In the 2015 20-F the Company also touted the prospects of its previously announced acquisition of Actavis and its impact on the Company's ability to market and distribute generic drugs at competitive prices.  Specifically, Teva stated that "[u]pon consummation of our acquisition of Actavis Generics, the Actavis Generics portfolio and pipeline, combined with our strong existing generics portfolio, will further enhance our goals of delivering the highest quality generic medicines at competitive prices."

70.     The 2015 20-F contained signed certifications pursuant to SOX by Defendants Vigodman and Desheh, stating that the financial information contained in the 2015 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

71.     The statements and omissions set forth in ¶¶66-70 were materially false and misleading because Teva and the Officer Defendants knew or should have known that: (1) the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs; and (2) as a result of the scheme, the Company was not "subject to intense competition in the generic drug market" or focused on "delivering the highest quality generic medicines at competitive prices."  Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

72.     On May 9, 2016, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 6-K").  For the quarter, Teva reported revenues in its generic drug segment of $2.170 billion, including $976 million in revenues from the U.S. market.  The Company also reported quarterly segment profitability for its generics business of $584 million.

73.     In the Q1 2016 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance.  In particular, the Company stated:

*United States Generic Medicines Revenues*

In the first quarter of 2016, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with approximately 463 million total prescriptions, representing 12.7% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production, including through our pending acquisition of Actavis Generics.

74.     The statements and omissions set forth in ¶¶72-73 were materially false and misleading because Teva and the Officer Defendants knew or should have known that the

Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs.  It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme. Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

75.     On August 4, 2016, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 6-K"). For the quarter, Teva reported revenues in its generic drug segment of $2.294 billion, including $892 million in revenues from the U.S. market.  The Company also reported quarterly segment profitability for its generics business of $614 million.

76.     In the Q2 2016 6-K, Teva stated, in part:

***United States Generic Medicine Revenues***

In the second quarter of 2016, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with approximately 446 million total prescriptions, representing 12.1% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production, including through our recent acquisition of Actavis Generics, which will substantially expand our generics operations and pipeline.

77.     The statements and omissions set forth in ¶¶75-76 were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of

generic drugs.  It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme. Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

### The Truth Emerges

78.     On August 4, 2016, Teva disclosed that on June 21, 2015, its U.S. subsidiary, Teva USA, received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva's generic products and communications with competitors about such products.  The Company also revealed that a month earlier, on July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations.

79.     As a result of these disclosures, the prices of Teva Securities declined, including Teva's ADSs, which declined by $1.24 per ADS, or 2.23%, to close at $54.21 per ADS on August 5, 2016.

80.     Then, on November 3, 2016, media outlets reported that U.S. prosecutors were contemplating criminal charges by the end of 2016 against Teva and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices.  Specifically, the *Wall Street Journal* reported, in relevant part, that "Federal prosecutors, after a lengthy probe, are nearing possible criminal charges for price-collusion in the generic-drug industry."  The news report went on to

identify Teva as one of the companies that was in the government's crosshairs.

81.     As a result of these disclosures, the prices of Teva Securities declined, including Teva's ADSs, which declined by $4.13 per ADS, or 9.53%, to close at $39.20 on November 3, 2016.

82.     On December 5, 2016, after the market closed, Teva revealed that Sigurdur "Siggi" Olafsson, the Company's President and Chief Executive Officer of its generics segment, would "step down from his role" at the Company and formally retire at the end of the first quarter of 2017.  Two months later, on February 6, 2017, after the market closed, Teva disclosed that its President and Chief Executive Officer, Erez Vigodman, was leaving the Company, effectively immediately.

83.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs have suffered significant losses and damages.

## PLAINTIFFS' RELIANCE

84.     During the Relevant Period, Plaintiffs relied on the materially false and misleading statements alleged herein when purchasing Teva ADSs, Preferred Shares, call options on Teva ADSs, and selling put options on Teva ADSs.

85.     There is a presumption of reliance established by the fraud-on-the-market doctrine in this case because, among other things:

(a)     The Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

(b)     The misrepresentations and omissions were material;

(c)     The Company's ADSs traded in an efficient market;

24

(d)     The misrepresentations and omissions alleged would induce a reasonable investor to misjudge the value of Teva Securities; and

(e)     Plaintiffs purchased Teva ADSs, Preferred Shares, call options on Teva ADSs, and sold put options on Teva ADSs between the time Defendants misrepresented or failed to disclose material facts, and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

86.     At all relevant times, the markets for Teva Securities were efficient for the following reasons, among others: (a) Teva's ADSs were listed, and actively traded, on the NYSE, a highly efficient and automated market; (b) Teva filed periodic reports with the SEC; (c) Teva regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and (d) Teva was followed by numerous analysts who wrote reports that were published, distributed and entered the public market.  As a result of the foregoing, the market for Teva Securities promptly digested current information with respect to the Company and reflected such information in the prices of Teva Securities.  Plaintiffs relied on the prices of Teva Securities which reflected all the information in the market, including the misstatements by Defendants.

87.     Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are also predicated upon omissions of material fact which there was a duty to disclose.

88.     In addition, Plaintiffs directly relied on Defendants' false and misleading statements alleged herein when deciding whether to purchase Teva Securities.

25

89.     During the Relevant Period, Plaintiffs' investments were managed by their investment advisor, Oz Management, which employed a research-driven, bottom-up, fundamental-based investment strategy when selecting securities to purchase on behalf of their managed funds and accounts, including Plaintiffs.  As part of its active and dynamic investment approach, OZ Management monitored risks in its securities portfolios via a rigorous top-down approach, with a combination of quantitative and qualitative tools, in order to assess the portfolios' exposure to various market shocks, factor dynamics, and other variables.

90.     Specifically, Oz Management's Head of U.S. Equities made the decisions whether to buy, sell, or hold Teva Securities based on analysis provided by Oz Management's lead Managing Director and Equity Analyst for the healthcare industry.  Factors considered by the Managing Director and Equity Analyst included, among other things, qualitative and quantitative analyses of the Company and evaluations of relative risk/reward, including statements from the Company about its compliance with applicable laws, and a review of the Company's strengths, weaknesses, and opportunities.  The Head of U.S. Equities thereby relied on the Managing Director and Equity Analyst's reports regarding Teva as an important factor in deciding whether to purchase, sell, or hold shares.

91.     Throughout the Relevant Period, both the Head of U.S. Equities and the Managing Director and Equity Analyst undertook comprehensive qualitative and quantitative analyses and performed rigorous independent and fundamental research regarding the Company, including reading and relying upon publicly available information concerning Teva from the following sources, among others: (a) Teva's periodic securities filings with the SEC and NYSE, including every Form 20-F issued by Teva during the Relevant Period; (b) Teva's public statements, plans, and news releases; (c) Teva's corporate website and materials posted on its website; (d) securities

analysts' reports; (e)  other regulatory filings and reports regarding Teva; and (f) conference calls and conference call transcripts regarding Teva.

92.     In particular, and among other things, the Head of U.S. Equities and the Managing Director and Equity Analyst read and relied on statements from the foregoing sources, including Teva's Forms 20-F and other securities filings with the SEC, concerning Teva's compliance with applicable laws.  The Head of U.S. Equities and the Managing Director and Equity Analyst used the Company's assurances regarding its generic drugs business and its compliance with antitrust laws as a metric to analyze Teva's current and future operations and associated risks in making decisions whether to invest in Teva or its competitors.  In so doing, the Head of U.S. Equities and the Managing Director and Equity Analyst also read and relied on statements from these sources attesting to the effectiveness of the Company's internal financial and disclosure controls.

93.     In addition, throughout the Relevant Period, the Managing Director and Equity Analyst met directly with Teva representatives, including the Officer Defendants.  During these meetings, Teva representatives made numerous representations about the Company, including, but not limited to, its compliance with laws governing pricing.  Information collected at these meetings with Teva representatives informed the recommendations of the Managing Director and Equity Analyst, and ultimately informed the investment decisions of the Head of U.S. Equities and was therefore a factor in Plaintiffs' decisions to purchase, sell, or hold Teva Securities.

94.     On or about February 10, 2014, the Managing Director and Equity Analyst read and reviewed the 2013 20-F, including, specifically, the false and misleading statements identified in ¶¶33-37.  In reliance on these false in misleading statements, including those regarding Teva's generic drugs business and its purported compliance with antitrust laws, Plaintiffs purchased or otherwise acquired a significant amount of Teva Securities.

95.     On or about February 9, 2015, the Managing Director and Equity Analyst read and reviewed the 2014 20-F, including, specifically, the false and misleading statements identified in ¶¶47-51. In reliance on these false in misleading statements, including those regarding Teva's generic drugs business and its purported compliance with antitrust laws, Plaintiffs purchased or otherwise acquired a significant amount of Teva Securities.

96.     On or about February 11, 2016, the Managing Director and Equity Analyst read and reviewed the 2015 20-F, including, specifically, the false and misleading statements identified in ¶¶66-71.  In reliance on these false in misleading statements, including those regarding Teva's generic drugs business, the impact of the Actavis acquisition on Teva's generics business, and the Company's purported compliance with antitrust laws, Plaintiffs purchased or otherwise acquired a significant amount of Teva Securities.

97.     Defendants' false and misleading statements alleged herein had a material influence and were a substantial factor in bringing about the Managing Director and Equity Analyst, the Head of U.S. Equities, and therefore Plaintiffs' investment decisions with respect to Teva Securities.  Plaintiffs did not know, and in the exercise of reasonable diligence could not, have known of Defendants' false and misleading statements alleged herein when deciding that the Plaintiffs should purchase, sell, or hold Teva Securities during the Relevant Period.

### COUNT I

**Violation Of Section 10(b) Of The Exchange Act**
**And SEC Rule 10b-5 Promulgated Thereunder**
**(Against Teva and the Officer Defendants)**

98.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

99.     This claim is brought by Plaintiffs against Teva and the Officer Defendants for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

thereunder.

100.     As alleged above, during the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

101.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs related to the purchase and/or acquisition of Teva Securities.

102.     Plaintiffs have suffered damages in that, in reliance on the integrity of the market, as well as their direct reliance on Defendants false and misleading statements alleged herein, Plaintiffs paid artificially inflated prices for Teva Securities.  Plaintiffs would not have purchased or acquired Teva Securities at the prices they paid, or at all, if they had been aware that those prices had been inflated by Defendants' misleading statements and omissions.

103.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and acquisitions of Teva Securities during the Relevant Period.

104.     By reason of the foregoing, Teva and the Officer Defendants are liable to Plaintiffs for violations of Section 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation Of Section 18(a) Of The Exchange Act
**(Against Teva and the Officer Defendants)**

105.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

106.    This claim is brought by Plaintiffs against Teva and the Officer Defendants for violation of Section 18(a) of the Exchange Act, 15 U.S.C. § 78r.

107.    As alleged above, during the Relevant Period, Defendants filed or caused to be filed with the SEC Forms 20-F and other documents regarding the Company that contained misrepresented material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108.    Prior to purchasing Teva Securities, Plaintiffs read and relied upon Teva's 2013, 2014, and 2015 Forms 20-F and the statements contained therein.  Plaintiffs' actual "eyeball" reliance on Teva's 2013, 2014, and 2015 Forms 20-F and the representations contained therein specifically includes statements concerning the Company's compliance with antitrust laws and internal financial and disclosure controls.   In accordance with Defendants' representations, Plaintiffs relied upon Defendants statements and assurances regarding the Company's compliance with antitrust laws and internal financial and disclosure controls as metrics to analyze Teva's current and future operations and associated risks in making decisions whether to invest in Teva or its competitors.  Plaintiffs' reliance was therefore reasonable.

109.    Plaintiffs read and relied upon these documents not knowing that they contained materially false statements and omissions.  Had Plaintiffs known the true facts, they would not have purchased Teva Securities or would not have purchased the securities at the inflated price they paid.

110.    Defendants' materially false or misleading statements artificially inflated the prices of Teva Securities.

111.    When the truth began to emerge about the false and misleading statements and omissions, the prices of Teva Securities declined significantly and Plaintiffs were damaged.

112.    At the time of their purchases and acquisitions of Teva Securities, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

113.    As to this Count, Plaintiffs expressly disclaims any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made.  Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

114.    By reason of the foregoing, Teva and the Officer Defendants are liable to Plaintiffs for violations of Section 18(a) of the Exchange Act.

## COUNT III

### Violation Of Section 20(a) Of The Exchange Act
### (Against the Teva and the Officer Defendants)

115.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

116.    This claim is brought by Plaintiffs pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Officer Defendants for their control of Teva, and also against Teva for its control of the Officer Defendants (and all of its officers and employees) in connection with the controlled persons' violations of Sections 10(b) of the Exchange Act.

117.    By reason of their high-level positions of control and authority as the Company's

most senior executive officers, the Officer Defendants had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.

118.   The Officer Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Teva during the Relevant Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.  The Officer Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.  In addition, throughout the Relevant Period, the Officer Defendants each signed SEC filings which contained false and misleading information as set forth above, demonstrating that they possessed the power to control, and did control, the contents of those filings.

119.   Teva exercised control over and directed the actions of its senior managers, directors and agents, including the Officer Defendants, and all of its employees.  Teva and the Officer Defendants had the ability to influence, and direct and did so influence and direct, the activities of one another in each's violations of Sections 10(b) of the Exchange Act as alleged herein.

120.   By virtue of their positions as controlling persons of Teva and as a result of their own aforementioned conduct, Teva and the Officer Defendants violated Section 20(a) of the Exchange Act and are liable to Plaintiffs.

## COUNT IV

### Violations Of Section 11 Of The Securities Act
**(Against Teva, Vigodman, and Desheh)**

121.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This Count is based solely on claims of strict liability and/or negligence.  For purposes of this claim, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made.  Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

122.    This claim is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k against Teva, Vigodman, and Desheh.

123.    At the time of the 2015 Offering, the 2015 Offering Materials and the documents incorporated by reference therein contained false statements of material fact and/or omitted material facts that were required to be disclosed or necessary to make the statements contained therein not misleading.

124.    Teva is the issuer of the ADS and Preferred Shares purchased by Plaintiffs pursuant to the 2015 Offering Materials.  Teva is, therefore, strictly liable to these Plaintiffs under Section 11 for the materially untrue statements and omissions contained in the 2015 Offering Materials.

125.    Vigodman and Desheh, among others, were responsible for the contents and dissemination of the 2015 Offering Materials, including the Registration Statement and Prospectus Supplements for the 2015 Offering.  Vigodman and Desheh each signed or authorized the signing of such Registration Statement and Prospectus Supplements, and participated in the preparation and dissemination of the Registration Statements and Prospectus Supplements.  As a signatory to

such documents, Vigodman and Desheh are liable to Plaintiffs for the misstatements and omissions contained within the Registration Statements and Prospectus Supplements pursuant to Section 11 of the Securities Act.

126.     Vigodman and Desheh did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the 2015 Offering Materials and did not possess reasonable grounds for believing that the statements made therein were not false and/or misleading.

127.     The facts misstated in or omitted from the 2015 Offering Materials at issue herein would have been material to a reasonable person reviewing the 2015 Offering Materials.

128.     Plaintiffs purchased or acquired Teva ADSs and Preferred Shares in or traceable to the 2015 Offering pursuant to the materially false and misleading 2015 Offering Materials.  As a direct and proximate result of the misrepresentations and omissions contained in the 2015 Offering Materials, including in the applicable Registration Statements and Prospectus Supplements, Plaintiffs suffered damages.

129.     At the time of their purchases and acquisitions of the Teva ADSs and Preferred Shares, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

130.     By reason of the foregoing, Teva, Vigodman, and Desheh are liable to Plaintiffs for violations of Section 11 of the Securities Act.

## COUNT V

### Violation Of Section 12(a)(2) Of The Securities Act
**(Against Teva, Vigodman, and Desheh)**

131.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly disclaim any allegation of fraud

or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made.  Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

132.    This claim is brought by Plaintiffs pursuant to Section 12 of the Securities Act, 15 U.S.C. § 77l(a)(2), against Teva, Vigodman, and Desheh.

133.    The Registration Statements and Prospectus Supplements issued in connection with the 2015 Offering were false and misleading and omitted to state material facts required to be stated therein, contained untrue statements of material facts, and omitted to state facts necessary to make the statements made therein not misleading.

134.    Teva, Vigodman, and Desheh were statutory sellers who sold and assisted in the sale of securities to Plaintiffs by means of the defective Prospectus Supplements used in the 2015 Offering and did so for personal gain.

135.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths contained in and/or omissions from the Prospectus Supplements at the time they acquired Teva ADSs and Preferred Shares.

136.    As a direct and proximate result of Defendants' violation of Section 12(a)(2) of the Securities Act, Plaintiffs sustained damages in connection with their purchases of securities pursuant to the Prospectus Supplements.

137.    Plaintiffs have the right to rescind and recover the consideration paid for their securities, upon tender of their securities to the Defendants named in this Count.  Plaintiffs that have sold their securities seek damages to the extent permitted by law.

138.    At the time of their purchases and acquisitions of Teva ADSs and Preferred Shares,

Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

139.    By reason of the foregoing, Teva, Vigodman, and Desheh are liable to Plaintiffs for violations of Section 12(a)(2) of the Securities Act.

## COUNT VI

### Violation Of Section 15 Of The Securities Act
### (Against Teva, Vigodman, and Desheh)

140.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made.  Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

141.    This claim is brought by Plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against Vigodman and Desheh for their control of Teva, and also against Teva for its control of Vigodman and Desheh (and all of its officers and employees) in connection with the controlled persons' violations of Sections 11 and 12(a)(2) of the Securities Act relating to the 2015 Offering.

142.    Plaintiffs purchased Teva ADSs and Preferred Shares in the 2015 Offering.

143.    During the Relevant Period, Vigodman and Desheh each signed SEC filings which contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made, demonstrating that each of these persons possessed the power to control, and did control, the contents of those filings.

36

144.   Vigodman and Desheh possessed the power to control, and did control, directly and/or indirectly, the actions of Teva throughout the Relevant Period.  Vigodman and Desheh held executive and/or director positions at Teva, as detailed above.  By their positions, Vigodman and Desheh possessed the power and authority to control the contents of Teva's offering materials, financial reports, press releases, and presentations to securities analysts and institutional investors, *i.e.*, the market, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Vigodman and Desheh were also responsible for the running of the Company and the management of its affairs, including decisions to raise and deploy capital, conduct securities offerings and hire underwriters for the offerings.

145.   Teva exercised control over and directed the actions of its senior managers, directors and agents, including Vigodman and Desheh, and all of its employees.  Teva, Vigodman, and Desheh had the ability to influence, and direct and did so influence and direct, the activities of one another in each's violations of Sections 11 and 12(a)(2) of the Securities Act in connection with the offer and sale of Teva securities in the 2015 Offering.

146.   By reason of the foregoing, Teva, Vigodman, and Desheh violated Section 15 of the Securities Act and are liable to Plaintiffs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Awarding Plaintiffs compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including all interest thereon;

B.   Awarding Plaintiffs punitive damages against Defendants;

C.   Awarding Plaintiffs injunctive and other equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the

circumstances;

D.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Awarding such other relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury.

DATED: August 3, 2017                          Respectfully submitted,

                                               **BERNSTEIN LITOWITZ BERGER**
                                                 **& GROSSMANN LLP**


                                               *s/  Adam Hollander*
                                               _____

                                               Gerald H. Silk (*pro hac vice* forthcoming)
                                               Adam Hollander (ct28069)
                                               Scott R. Foglietta (*pro hac vice* forthcoming)
                                               1251 Avenue of the Americas
                                               New York, New York 10020
                                               Telephone: (212) 554-1400
                                               Facsimile:  (212) 554-1444
                                               jerry@blbglaw.com
                                               adam.hollander@blbglaw.com
                                               scott.foglietta@blbglaw.com

                                               -and-

                                               Blair A. Nicholas (*pro hac vice* forthcoming)
                                               Jonathan D. Uslaner (*pro hac vice* forthcoming)
                                               David R. Kaplan (*pro hac vice* forthcoming)
                                               12481 High Bluff Drive, Suite 300
                                               San Diego, CA 92130
                                               Telephone: (858) 793-0070
                                               Facsimile: (858) 793-0323
                                               blairn@blbglaw.com
                                               jonathanu@blbglaw.com
                                               davidk@blbglaw.com

                                               *Counsel for Plaintiffs*