# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| OZ ELS MASTER FUND, LTD., OZ SPECIAL FUNDING (OZMD), L.P., OZ ENHANCED MASTER FUND, LTD., GORDEL CAPITAL LIMITED, OZ GLOBAL EQUITY OPPORTUNITIES MASTER FUND, LTD., OZ MASTER FUND, LTD., and OZ GLOBAL SPECIAL INVESTMENTS MASTER FUND, L.P., <br><br> Plaintiffs, <br><br> v. <br><br> TEVA PHARMACEUTICAL INDUSTRIES LIMITED, EREZ VIGODMAN, EYAL DESHEH, YAACOV "KOBI" ALTMAN, and SIGURDUR OLAFSSON, <br><br> Defendants. | Civ. A. No. 3:17-cv-1314 (SRU) <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> **ECF CASE** |

## TABLE OF CONTENTS

GLOSSARY OF TERMS ............................................................................................... vi

I.   NATURE OF THE ACTION ............................................................................. 2

II.  JURISDICTION AND VENUE ......................................................................... 8

III. EXCHANGE ACT ALLEGATIONS ................................................................ 8

    A.   Exchange Act Parties ........................................................................... 8

    B.   Substantive Securities Fraud Allegations .......................................... 10

        1.   Pre-Relevant Period Allegations ............................................ 10

            a)   ADS Price Suffers;  Transaction Intention Announced .............. 10

        2.   Teva Adopted Undisclosed Price-Hike Strategy ..................... 11

        3.   Teva Began To Implement The Price-Hike Strategy............... 13

        4.   2014 - Relevant Period Begins; Fraudulent Attribution Of Profits; ADS Price Jumps; Law Enforcement Scrutiny.......................................... 14

        5.   Third And Fourth Quarter 2014 – Direct Questions; Explicit Denials Of Price Hikes........................................................ 18

        6.   The First Half Of 2015 – Teva ADS Price Soars To Become "Currency" For "Transformational" Actavis Acquisition ...................... 22

        7.   The Second Half Of 2015 -  Motivation Shifts; Paying For Actavis........ 25

        8.   First Half 2016 – Price-Hike Strategy Screeches To A Halt; Pricing Pressure Denied; Subpoenas Concealed; $20 Billion Debt Offering And Close Of Actavis Deal........................................................ 29

        9.   Third Quarter 2016 – Disclosure Of Declining Performance And Subpoenas; Generics Day ........................................................ 36

        10.  Fourth Quarter 2016 – Teva Reported As Target Of Investigations; Disastrous Results; DOJ And State AG Charges; Executives Fired......... 38

        11.  January – August 3, 2017, The End Of The Relevant Period.................. 40

    C.   False And Misleading Statements And Omissions ................................ 42

        1.   Defendants Violated Their Statutory Duty To Disclose Pricing Trends ...................................................................... 43

2.      The Exchange Act Defendants' False And Misleading Statements That Teva Operated In A Competitive Market With Respect To Price .................................................................................................. 46

      a)     False Statements On Conference Calls ........................................... 46

      b)     False Statements In Teva's SEC Filings ....................................... 48

3.      False And Misleading Statements And Omissions Regarding Pricing ................................................................................................. 49

      a)     Fourth Quarter And Full Year 2013 False And Misleading Financial Disclosures ..................................................... 50

      b)     First Quarter 2014 False And Misleading Financial Disclosures .................................................................................... 51

      c)     Second Quarter 2014 False And Misleading Financial Disclosures .................................................................................... 53

      d)     Third Quarter 2014 False And Misleading Financial Disclosures .................................................................................... 54

      e)     December 11, 2014 False And Misleading Statements ................ 57

      f)     Fourth Quarter and Full Year 2014 False And Misleading Financial Disclosures ..................................................... 58

      g)     First Quarter 2015 False And Misleading Financial Disclosures .................................................................................... 60

      h)     June 11, 2015 False And Misleading Statements ........................ 62

      i)     Second Quarter 2015 False And Misleading Financial Disclosures .................................................................................... 63

      j)     Third Quarter 2015 False And Misleading Financial Disclosures .................................................................................... 64

      k)     November 19, 2015 False And Misleading Statements ............... 67

      l)     Teva's Registration Documents For Its Secondary ADS And Preferred Share Offerings Contained False And Misleading Statements ................................................................. 68

      m)     January 11, 2016 False and Misleading Statements .................... 68

      n)     Fourth Quarter And Full Year 2015 False And Misleading Financial Disclosures ..................................................... 69

      o)     March 8, 2016 False And Misleading Statements ....................... 73

      p)     First Quarter 2016 False And Misleading Financial Disclosures .................................................................................... 75

      q)     False And Misleading Statements On Conference Calls In The Build Up To The $20 Billion Debt Offering ....................... 78

r)     False July 13, 2016 Guidance Assumption ................................... 79

s)     The False And Misleading Registration Statement and Prospectus .................................................................. 81

t)     Second Quarter 2016 False And Misleading Financial Disclosures ............................................................... 81

u)     In the Third Quarter 2016, Exchange Act Defendants Continue To Deny Price Inflation And Increased Pricing Pressure In Statements To Investors ................................ 83

v)     Third Quarter 2016 False And Misleading Financial Disclosures ................................................................ 85

w)     The January 6, 2017 Guidance Call ................................ 88

x)     Fourth Quarter and Full Year 2016 False And Misleading Financial Disclosures ...................................... 88

D.     Additional Allegations Of Scienter ......................................................... 89

     1.     Former Employee Allegations ................................................. 90

     2.     The Exchange Act Defendants Were Motivated To Use Teva's ADS As "Currency" For A "Transformational" Acquisition ................. 92

     3.     Conscious Misbehavior Or Recklessness .................................... 94

        a)     Implementation Of The Price-Hike Strategy ............................... 94

        b)     Only Senior Executives Could Make Price Increases .................. 95

        c)     Continuous Access To Documents And Information Tracking Profits From Price Increases .......................................... 97

        d)     The Exchange Act Defendants Spoke Repeatedly About The Pricing Of Generic Drugs ...................................... 98

        e)     Exchange Act Defendants' And Analysts' Focus On Generics ................................................................ 100

        f)     The Magnitude, Importance And Duration Of The Fraud .......... 101

        g)     Contemporaneous Red Flags Indicated That The Exchange Act Defendants' Statements Were False Or Misleading ........... 102

        h)     Officer Terminations Support Scienter ....................................... 103

        i)     Other Facts Supporting Scienter ................................................. 104

     4.     Corporate Scienter ................................................................. 104

E.     Teva Engaged In Collusion, Rendering The Statements False And Misleading And Further Supporting A Strong Inference Of Scienter ............... 105

1. Teva Colluded With Other Manufacturers To Fix Prices ...................... 106

2. Evidence of Collusion Further Supports A Strong Inference Of Scienter ............................................................................................ 112

3. The Undisclosed Fact Of Teva's Collusion Constitutes An Independent Basis For Falsity ................................................................ 114

F. Loss Causation ......................................................................................... 115

1. August 4-5, 2016 ........................................................................... 116

2. November 3, 2016, December 13-16, 2016 .................................. 117

3. November 15, 2016 ....................................................................... 119

4. December 5-6, 2016 ...................................................................... 120

5. January 6, 2017 ............................................................................. 121

6. February 6-7, 2017 ....................................................................... 122

7. August 3-7, 2017 .......................................................................... 123

G. Presumption Of Reliance And Fraud-On-The-Market Doctrine ....................... 124

IV. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................................... 126

COUNT I ............................................................................................................. 126

Violation Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5 Promulgated Thereunder (Against Teva and the Officer Defendants) .......................... 126

COUNT II ............................................................................................................ 127

Violation Of Section 18(a) Of The Exchange Act (Against Teva and the Officer Defendants) ................................................................................................. 127

COUNT III ........................................................................................................... 128

Violation Of Section 20(a) Of The Exchange Act (Against the Teva and the Officer Defendants) ..................................................................................................... 128

V. INFLATED PROFIT ANALYSIS ............................................................................. 130

VI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE ........................................................................................... 131

VII. SECURITIES ACT ALLEGATIONS ........................................................................ 132

A. Securities Act Parties ............................................................................... 133

iv

B.     The Relevant Offerings ....................................................................... 134

    1.     The ADS/Preferred Offerings .................................................. 134

    2.     The Notes Offering .................................................................. 135

C.     Teva Filings Incorporated Into The Offering Materials ...................... 136

D.     The Offering Materials Contained Material Misstatements And Omissions ...... 137

    1.     Material Misstatements And Omissions Concerning The Price-Hike Strategy And The Benefits And Risks Stemming Therefrom ........ 137

    2.     Material Misstatements And Omissions Concerning Known Trends Required To Be Disclosed Pursuant To Item 5 Of Form 20-F ............. 138

    3.     Material Misstatements And Omissions Concerning Competition In The U.S. Generics Market .................................................... 139

    4.     Material Misstatements And Omissions Concerning Teva's Participation In A Price-Fixing Conspiracy ............................................. 139

VIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................................... 140

COUNT IV .................................................................................................... 140

Violations Of Section 11 Of The Securities Act (Against Teva, Vigodman, and Desheh) ....................................................................................................... 140

COUNT V ..................................................................................................... 142

Violation Of Section 12(a)(2) Of The Securities Act (Against Teva, Vigodman, and Desheh) ................................................................................................. 142

COUNT VI .................................................................................................... 143

Violation Of Section 15 Of The Securities Act (Against Teva, Vigodman, and Desheh) ....................................................................................................... 143

IX.    JURY DEMAND ........................................................................................... 144

X.     PRAYER FOR RELIEF .................................................................................. 144

**GLOSSARY OF TERMS**

| Term | Definition |
|---|---|
| Exchange Act Defendants | Defendants Teva Pharmaceutical Industries Ltd., Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, and Yaacov "Kobi" Altman. References to the Exchange Act Defendants include only those individuals then employed by Teva at the referenced time. |
| Actavis | Allergan Generics, acquired by Teva on or around August 2, 2016 |
| ADS | Teva's American Depository Shares |
| ADS Final Prospectus | The final prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on December 3, 2015 at 5:19 p.m. ET |
| ADS Offering | The public offering of ADS completed on or about December 3, 2015 and January 6, 2016 |
| ADS/Preferred Offering Materials | The ADS/Preferred Registration Statement, along with the base and preliminary prospectuses and related prospectus supplements constituting part of the ADS/Preferred Registration Statement including the ADS Final Prospectus and Preferred Final Prospectus, and the documents incorporated by reference therein |
| ADS/Preferred Offerings | The ADS Offering and the Preferred Offering |
| ADS/Preferred Registration Statement | The shelf registration statement on Form F-3 Teva filed with the SEC on November 30, 2015. |
| ADS/Preferred and Notes Registration Statements | The shelf registration statement on Form F-3 Teva filed with the SEC on November 30, 2015 (for the ADS/Preferred Offering), and the Post-Effective Amendment No. 1 to its shelf registration statement on the Form F-3 Teva filed with the SEC on July 13, 2016 (for the Notes Offering). |
| Altman | Defendant Yaacov "Kobi" Altman ("Altman") served as Teva's Acting CFO from October 31, 2013 to February 11, 2014. |
| ANDA | Abbreviated New Drug Application, an application submitted by a generic drug manufacturer to the U.S. Food and Drug Administration seeking approval for a drug the FDA has already approved |
| API | Active Pharmaceutical Ingredient use to make pharmaceutical products |
| Board | Teva's Board of Directors |
| Cavanaugh | Maureen Cavanaugh, Teva USA's Senior VP and Chief Operating Officer, North America Generics during the Relevant Period. |
| CAO | Chief Accounting Officer |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| The Class Action | The federal securities class action against Teva and certain of its current and former officers, styled: *Ontario Teachers' Pension Plan Board, et al v. Teva Pharmaceutical Industries Ltd. et al*, No. 3:17-cv-00558 (D. Conn.) |

| Term | Definition |
|---|---|
| COO | Chief Operating Officer |
| Relevant Period | February 6, 2014 through August 3, 2017, inclusive |
| COGS | Cost of Goods Sold |
| Desheh | Defendant Eyal Desheh, Teva's CFO from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, when he served as Teva's Interim President and CEO |
| DOJ | U.S. Department of Justice |
| FE | Former Employees of Teva who are referenced herein and identified as FE- |
| Galownia | Kevin Galownia, Teva's VP of Pricing Operations since January 2018, and formerly Teva's Senior Director, Marketing from January 2010 to March 2014, and its Senior Director, Marketing Operations from September 2014 to December 2017 |
| GAO | U.S. Government Accountability Office |
| GAO Report | GAO audit report titled, "Generic Drugs Under Medicare" and publicly released on September 12, 2016 |
| Generics Day | The September 9, 2016 investor day conference Teva hosted to discuss its generics business |
| Generics MDL | *In re Generic Pharmaceutical Pricing Antitrust Litigation*, Case No. 2:16-md-02724 (E.D. Pa.) |
| Glazer | Jeffrey Glazer, former CEO of Heritage Pharmaceuticals |
| Griffin | Deborah Griffin, Teva's SVP and CAO (Principal Accounting Officer) who also served as the Authorized U.S. Representative of Teva and Teva Finance during the Relevant Period. She was also VP and CFO of Teva USA during the Relevant Period. |
| Heritage | Heritage Pharmaceuticals Inc |
| Inflated Profits | The amount of profit Teva generated solely as a result of its price increases which was quantified through the Class Action plaintiffs and their expert's analysis. |
| LBE | The Latest Best Estimate, a document produced quarterly with the involvement of Oberman (and later Olafsson), Griffin, and Cavanaugh, one that tracked whether financial forecasts were being met, and which was delivered to Teva's Israeli executives, including Vigodman and Desheh |
| Levin | Jeremy M. Levin, Teva's CEO from May 9, 2012 to October 30, 2014 |
| Malek | Jason Malek, Former President of Heritage |
| MD&A | The Management Discussion & Analysis section of SEC Form 20-F |
| NADAC | National Average Drug Acquisition Cost, the non-manufacturer specific average market-wide price paid by pharmacies for a specific drug, collected via a monthly survey of pharmacists, and provided to the public by the U.S. Department of Health and Human Services' Centers for Medicare & Medicaid Services |

| Term | Definition |
|------|------------|
| NDC Code | National Drug Code, a unique three-segment product identifier for drugs required by the Food, Drug, and Cosmetic Act (21 U.S.C. § 360)). |
| Notes | Collectively certain U.S.-dollar-denominated senior notes issued by Teva Finance in a public offering on or about July 21, 2016, namely: (a) 1.400% Senior Notes due July 20, 2018 ("2018 Notes"); (b) 1.700% Senior Notes due July 19, 2019 ("2019 Notes"); (c) 2.200% Senior Notes due July 21, 2021 ("2021 Notes"); (d) 2.800% Senior Notes due July 21, 2023 ("2023 Notes"); (e) 3.150% Senior Notes due Oct. 1, 2026 ("2026 Notes"); and (f) 4.100% Senior Notes due Oct. 1, 2046 ("2046 Notes") |
| Notes Final Prospectus | The prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on July 19, 2016 |
| Notes Offering | The public offering of the Notes completed on or about July 21, 2016 |
| Notes Offering Materials | The Notes Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of Notes Registration Statement, including the Notes Final Prospectus, and the documents incorporated by inference therein |
| Notes Registration Statement | The Post-Effective Amendment No. 1 to the shelf registration statement on Form F-3 Teva filed with the SEC on July 13, 2016 |
| NYSE | New York Stock Exchange |
| Oberman | Allan Oberman, President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014 |
| Offerings | The ADS/Preferred Offerings and the Notes Offering |
| Offering Materials | The ADS/Preferred Offering Materials and the Notes Offering Materials |
| Officer Defendants | Defendants Erez Vigodman, Eyal Desheh, Sigurdur Olafsson, and Yaacov "Kobi" Altman. References to the Officer Defendants include only those individuals then employed by Teva at the referenced time. |
| Olafsson | Defendant Sigurdur ("Siggi") Olafsson, President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016 |
| Oracle ERP System | The internal enterprise resource planning software system on which Teva digitally stores drug-by-drug pricing, sales, and revenue data |
| Patel | Nisha Patel, Teva's former Director of Strategic Customer Marketing from April 2013 to August 2014 and its Director of National Accounts from September 2014 to December 2016 |

| Term | Definition |
|---|---|
| Plaintiffs | OZ ELS Master Fund, Ltd., Sculptor Special Funding, LP (f/k/a OZ Special Funding (OZMD), L.P.), Sculptor Enhanced Master Fund, Ltd. (f/k/a OZ Enhanced Master Fund, Ltd.), Gordel Capital Limited, OZ Global Equity Opportunities Master Fund, LTD., Sculptor Master Fund, Ltd. (f/k/a OZ Master Fund, Ltd.), and Sculptor Global Special Investments Master Fund, LP (f/k/a OZ Global Special Investments Master Fund, L.P.) |
| Preferred Final Prospectus | The final prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on December 3, 2015 at 5:26 p.m. ET |
| Preferred Offering | The public offering of Preferred Shares completed on or about December 3, 2015 and January 6, 2016 |
| Preferred Shares | 7.00% mandatory convertible preferred shares issued to the public on or about December 3, 2015 and January 6, 2016 |
| Price-Hike Strategy | Teva's new and undisclosed corporate strategy, adopted in 2013, to systematically and broadly implement price increases across its generic drug portfolio |
| Pricing Group | A group of Teva employees, led by Galownia in the United States, whose day-to-day responsibilities included analysis of the pricing for Teva's generic drugs |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| R&D | Research and Development |
| RFP | Request for Proposal, a blind-bidding process intended to solicit a "best and final" offer where each firm that submits a response without knowing what competing firms are bidding |
| S&M | Sales and Marketing |
| SEC | Securities and Exchange Commission |
| Sherman Act | Sherman Antitrust Act |
| State AGs | The Attorneys General of 47 States, the District of Columbia, and Puerto Rico who filed a Consolidated Amended Complaint against Teva and others on June 18, 2018, in the Generics MDL |
| Teva or the Company | Defendant Teva Pharmaceutical Industries Ltd |
| Teva Finance | Teva Pharmaceutical Finance Netherlands III B.V. |
| Teva Securities | Teva ADSs, call options on Teva ADSs, put options on Teva ADSs, and Preferred Shares ADS, and Notes, collectively |
| Securities Act Defendants | Defendants Teva Pharmaceutical Industries Ltd., Erez Vigodman, and Eyal Desheh |
| Vigodman | Defendant Erez Vigodman, Teva's President and CEO from February 11, 2014 to February 6, 2017 and one of its directors of the Board from June 22, 2009 to February 6, 2017 |

| Term | Definition |
|------|-----------|
| WAC | Wholesale Acquisition Cost, the list price of a generic manufacturer's drug to a wholesaler or a direct purchaser without discounts |
| YOY | Year-Over-Year |

This action is brought by OZ ELS Master Fund, Ltd., Sculptor Special Funding, LP (f/k/a OZ Special Funding (OZMD), L.P.), Sculptor Enhanced Master Fund, Ltd. (f/k/a OZ Enhanced Master Fund, Ltd.), Gordel Capital Limited, OZ Global Equity Opportunities Master Fund, Ltd., Sculptor Master Fund, Ltd. (f/k/a OZ Master Fund, Ltd.), and Sculptor Global Special Investments Master Fund, LP (f/k/a OZ Global Special Investments Master Fund, L.P.) (collectively, "Plaintiffs") under the Securities Exchange Act of 1934 ("Exchange Act") against Teva Pharmaceutical Industries Limited ("Teva" or the "Company") and certain of its former and current officers (collectively, "Defendants") to recover damages for losses Plaintiffs have suffered in connection with their purchases of Teva American Depositary Shares ("ADSs") and call options on Teva ADSs, and sales of put options on Teva ADSs, between February 6, 2014 and August 3, 2017, inclusive (the "Relevant Period"). This action is also brought under the Securities Act of 1933 ("Securities Act") against Teva and certain of its former and current officers in connection with Plaintiffs' purchases of securities in or traceable to the Company's public offering of ADSs and 7.00% Mandatory Convertible Preferred Shares ("Preferred Shares") conducted on or about December 3, 2015 (the "2015 Offering"). Plaintiffs allege the following upon personal knowledge as to their own acts and, as to all other matters, upon investigation of counsel, including, among other things, and review and analysis of: (i) public filings made by Teva with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and other publications disseminated by Defendants; (iii) news articles and conference call transcripts; (iv) review and analysis of analysts' reports; (v) other court filings related to Teva, including the amended complaint for violation of the federal securities laws in *Ontario Teachers' Pension Plan Board, et al v. Teva Pharmaceutical Industries Ltd. et al*, No. 3:17-cv-00558 (D. Conn.) (the "Class Action"), and pleadings in related matters; and (vi) publicly available information concerning

Teva.

## I.   NATURE OF THE ACTION

1.     Teva is the largest generic drug manufacturer in the world.

2.     This case arises from Defendants' false and misleading statements and omissions to investors concerning the source of Teva's financial success. As detailed herein, throughout the Relevant Period (February 6, 2014 to August 3, 2017, inclusive), Defendants repeatedly and consistently stated that Teva's generics segment was bolstered by legitimate business strategies, like cost cutting, "efficiency measures," and good product management. As a result of these and other misrepresentations, Teva Securities traded at artificially inflated prices throughout the Relevant Period.

3.     The truth was that Teva's quarter-after-quarter financial growth was driven by Defendants' role in a price-fixing scheme to systematically inflate the price of many of the generic drugs that Teva sold in the United States (the "Price-Hike Strategy"). The strategy was initiated in early 2013 and rolled out with a first batch of price increases in July and August 2013.

4.     During the Relevant Period, Teva imposed at least 76 price increases. These price increases were implemented at the highest levels of Teva's leadership. Each price increase was considered and approved by Teva's senior officers, and the profits generated from each price increase was carefully tracked on a daily, weekly, and quarterly basis. Over the Relevant Period, the strategy was wildly successful, generating over $2.3 billion in profits attributable solely to the price increases (the "Inflated Profit," as further explained in Section V below).

5.     Defendants were also highly successful at concealing that the Price-Hike Strategy was driving Teva's financial growth. Neither Teva, nor any of its peers, disclosed to investors any information concerning individual drug prices, changes in price, or revenues per drug, let alone profits. When analysts asked whether price increases were driving, in any way, Teva's profits and

2

performance, the Officer Defendants answered with unequivocal denials, stating, for example:

- "[A]ll the improvement you see in our ... margins *is not driven by price*. It is driven by quantities and by mix and by efficiency measures. *Not by price, 2014, 2015, and that's a very important message.*" (CEO Vigodman, Oct. 29, 2015)

- "So how did we" achieve $1 billion in increased profit margin? "*Not by pricing* but by portfolio mix, new products, and efficiency measures." (Head of Global Generics, Olafsson, Feb. 11, 2016)

- "Now there's a lot of *noise around pricing issues*.... Our exposure to all these things is very minimal.... *Teva was not associated with any of that*." (CFO Desheh, Nov. 19, 2015)

6.     Contrary to these assertions, the Price-Hike Strategy yielded hundreds of millions of dollars of Inflated Profit quarter-over-quarter through the second quarter of 2015, as illustrated in the chart below:

**Figure 1**



7.     The Defendants had to conceal that the Price-Hike Strategy was the primary contributor to this enormous lift in profits because the strategy was inherently risky and unsustainable for a variety of reasons, including that two-thirds of the increases were done in tandem with other drug manufacturers. Wholesale purchasers of generic drugs routinely set pricing

through competitive RFP bidding. Thus, when Teva raised prices, any manufacturer in the generic drug market could underbid Teva and wipe out Teva's market share. Additionally, the appearance of price gouging or collusion could draw public outrage, law enforcement scrutiny, and civil and criminal liability. The Inflated Profits could vanish as quickly as they appeared.

8.       Defendants' motive was to inflate the share price in order to make a large acquisition that Teva otherwise could not afford. As Teva's CFO Desheh predicted in January 2014, within 12 to 24 months, Teva's "stock price will go up and we'll be able to use our share as a currency ... to fund transactions" that could transform Teva into an even larger, more dominant force in generics. Vigodman also desired to undertake a significant acquisition when he became CEO at the start of the Relevant Period in February 2014.

9.       In line with Desheh's predictions, within 18 months, Teva's ADS price shot up along with the increasing profits. The share price hit an all-time high of $72 on July 27, 2015, the day Teva announced it was acquiring Actavis for $40 billion. (Figure 2) The cost of the acquisition, however, equaled roughly 20 years of Teva's recent average profits. As Defendants intended all along, they would use Teva's securities as "currency" and raise $27 billion from investors.

**Figure 2**

10.     By mid-2015, however, law enforcement had become focused on generic drug pricing, and Congress was calling for legislation to regulate pricing. CFO Desheh reassured concerned analysts: "there's a lot of **noise around pricing** issues. Some of it's coming from politicians...**Our exposure to all these things is very minimal**."

11.     As 2016 began, other pharmaceutical companies reported disappointing earnings and attributed the downturn to increased pressure to reduce prices as a result of increased government scrutiny and public uproar. When asked whether Teva faced the same risks, Olafsson falsely denied that Teva was not exposed: "Teva has not seen any fundamental change or worsening in the pricing environment." Vigodman claimed "[w]hat we see is a 4% to 5% erosion [in pricing] ... That's not something which is different from what we said during 2015." The truth was that Teva's Inflated Profits were being heavily affected by pricing pressure; in the first quarter of 2016, Inflated Profits were 45% **lower** than they were a year earlier.

12.     On July 12, 2016, the Connecticut Attorney General served Teva with a subpoena concerning its pricing for generic drugs, thwarting Teva's ability to implement further price raises. After receipt of the subpoena, Teva made no further price hikes.

13.     Though Teva had scheduled the $20 billion debt offering for the fall of 2016, on July 13, 2016, Defendants announced that the debt offering was being immediately accelerated. Defendants filed the Notes Registration Statement the same day, then raised the cash, and closed the deal on August 2, 2016. The next day, with Inflated Profits further declining since 2015, Teva reported disappointing earnings. The truth was beginning to be revealed but Defendants kept it from coming to light by continuing to deny that price increases ever occurred: "people that say that ... there's a big generic price inflation, are simply wrong." (Olafsson, Sept. 8, 2016)

14.     The truth eventually came to light. In November 2016, *Bloomberg* reported that

Teva was a target of the DOJ and State AGs' investigations and looming charges. The end of the Price-Hike Strategy brought further declines in profits. On December 5, 2015, Olafsson, an architect of the strategy and the driving force of the Actavis transaction, was fired. A week later, the State AGs sued Teva for violations of the Sherman Act.

15.     In the aftermath of these disclosures, the Company announced that its senior-most executives were leaving the Company amid the scandal. On December 5, 2016, Teva revealed that Sigurdur "Siggi" Olafsson, the Company's President and Chief Executive Officer of its generics segment, would "step down from his role" at the Company and formally retire at the end of the first quarter of 2017. Two months later, on February 6, 2017, Teva disclosed that its President and Chief Executive Officer, Erez Vigodman, was leaving the Company, effectively immediately. By May 2016, CFO Desheh was also out.

16.     On August 3, 2017, the very first investor call after their terminations, Teva announced it was required to take a $6.1 billion write-down of its entire generics business because its fundamental value had been "permanently impaired."

17.     Without the Price-Hike Strategy driving Inflated Profits, Teva's ability to service its over $30 billion in debt became questionable. The credit-rating agencies immediately downgraded the Company's debt to just above "junk." And after 30 years of maintaining or increasing its dividend, the new Board and management of Teva were forced to cut the dividend by 75%. Without the Price-Hike Strategy, Teva was a fundamentally weaker company than investors were led to believe. As a result of this news, the share price plummeted.

18.     Defendants carried out this securities fraud through three interrelated categories of misstatements and omissions, alleged with particularity below. Section III.C. *First*, Defendants explicitly attributed Teva's financial performance to legitimate and benign business strategies,

including cost cutting and product selection. Having attributed the source of Teva's revenues, Defendants were required to disclose the reality that Teva's performance was driven by the undisclosed Price-Hike Strategy. *Second*, under Item 5 of Form 20-F, Defendants were obligated to disclose that the Price-Hike Strategy was impacting Teva's profits, both as they dramatically increased, and later as they evaporated, a trend that Figure 1 illustrates. *Third*, Defendants repeatedly stated that Teva was excelling in a highly competitive environment. That was far from the truth, as Teva was only able to sustain the Inflated Profits because of a lack of competition. Whether illegal or not, this was a precarious reality, which could be, and ultimately was, undercut.

19.     Additionally, Defendants colluded with other manufacturers to fix prices for a subset of 16 drugs, which exhibited both parallel price increases with Teva's competitors and other indicia of collusion. Section III.E. The Class Action plaintiffs' investigation independently identified facts indicating this collusion. These allegations are corroborated by the facts identified through the State AGs' allegations that Teva engaged in a vast industry-wide price-fixing conspiracy. Additionally, the allegations herein, on information and belief, identify the Teva employee who the State AGs allege was central in the price-fixing; this employee, however, was not in a position to agree to or approve any pricing changes. Section III.E.1. Instead, Defendants Griffin, Chief Accounting Officer of Teva and CFO of Teva USA, and Cavanaugh, COO of Teva USA, made those decisions, approving all the price increases alleged herein.

20.     In addition to the Exchange Act securities fraud allegations, the Plaintiffs allege strict liability and negligence claims under the Securities Act against Teva, and certain of the Officer Defendants who executed the Offering Materials. The reasons why the Offering Materials are false and misleading are the same under the Exchange Act and the Securities Act. For efficiency, the misstatements are pled in accordance with Fed. R. Civ. P. 9(b) in the Exchange Act

section of the Complaint and are incorporated by reference in the Securities Act section of the Complaint. Section VII.

## II.    JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

22.    Venue is properly laid in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Moreover, the Class Action is pending in this District, and courts throughout the United States have found that this District is the most appropriate forum for related actions. *See Galmi v. Teva Pharm. Indus. Ltd.*, No. 2:16-cv-08259 (Apr. 3, 2017 C.D. Cal.), ECF No. 74; *Phoenix Ins. Co. Ltd. v. Teva Pharm. Indus. Ltd.*, No. 2:18-cv-3305, (Feb. 22, 2019 E.D. Pa.). ECF No. 38; *Grodko v. Teva Pharm. Indus. Ltd., et al.*, No. 2:17-cv-3743, (E.D. Pa. Apr. 10, 2018), ECF No. 37; *Baker v. Teva Pharm. Indus. Ltd., et al.*, No. 2:17-cv-3902, (E.D. Pa. Apr. 10, 2018), ECF No. 17; *Clal Ins. Co. Ltd. et al., v. Teva Pharm. Indus. Ltd. et al.*, No. 2:19-cv-00530 (E.D. Pa. Apr. 4, 2019), ECF No. 26; *Mivtachim The Workers Soc. Ins. Fund Ltd. et al., v. Teva Pharm. Indus. Ltd. et al.*, No. 2:19-cv-00674 (E.D. Pa. Apr. 4, 2019), ECF No. 23.

23.    In connection with these acts, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange, namely, the New York Stock Exchange ("NYSE").

## III.    EXCHANGE ACT ALLEGATIONS

### A.    Exchange Act Parties

24.    Sculptor Capital LP (f/k/a Oz Management LP) and Sculptor Capital II LP (f/k/a Oz Management II LP) (collectively, "Oz Management") are global, diversified alternative asset

advisors based in New York, New York. The following investment funds and accounts that are managed and/or advised by Oz Management are Plaintiffs in this action: OZ ELS Master Fund, Ltd., Sculptor Special Funding, LP (f/k/a OZ Special Funding (OZMD), L.P.), Sculptor Enhanced Master Fund, Ltd. (f/k/a OZ Enhanced Master Fund, Ltd.), Gordel Capital Limited, OZ Global Equity Opportunities Master Fund, Ltd., Sculptor Master Fund, Ltd. (f/k/a OZ Master Fund, Ltd.), and Sculptor Global Special Investments Master Fund, LP (f/k/a OZ Global Special Investments Master Fund, L.P.). Plaintiffs acquired and/or sold Teva Securities during the Relevant Period, including ADSs and Preferred Shares acquired in or traceable to the 2015 Offering, and were damaged upon the revelation of the alleged corrective disclosures.

25. Defendant Teva is incorporated in Israel, and the Company's principal executive offices are located at 5 Basel Street, P.O. Box 3190, Petach Tikva 4951033, Israel. The Company's U.S. wholly-owned subsidiary Teva USA's headquarters are located at 1090 Horsham Road, North Wales, Pennsylvania. Teva's Level III sponsored ADSs representing the Company's common stock are listed on the NYSE, trading under the ticker symbol "TEVA." There are currently over 840 million ADSs issued and outstanding.

26. Defendant Erez Vigodman ("Vigodman") served as Teva's President and Chief Executive Officer ("CEO") from February 11, 2014 to February 6, 2017, and as a member of Teva's Board of Directors from June 22, 2009 to February 6, 2017.

27. Defendant Eyal Desheh ("Desheh") served as Teva's Chief Financial Officer ("CFO") from July 2008 to June 30, 2017, with the exception of October 30, 2013 to February 11, 2014, during which time he served as the Company's Interim CEO and Interim President. Desheh also served as Teva's Group Executive Vice President from 2012 to June 30, 2017.

28. Defendant Yaacov "Kobi" Altman ("Altman") served as Teva's Acting CFO from

October 31, 2013 to February 11, 2014.

29.     Defendant Sigurdur "Siggi" Olafsson ("Olafsson") served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016.

30.     The Defendants referenced above in ¶¶26-29 are sometimes referred to herein as the "Officer Defendants."

**B.     Substantive Securities Fraud Allegations**

31.     The Class Action Complaint includes detailed accounts of numerous former Teva employees (the "Former Employees" or "FEs"). The accounts of these former employees, as set forth in the Class Action Complaint, are cited and referenced herein.

**1.     Pre-Relevant Period Allegations**

**a)     ADS Price Suffers;
Transaction Intention Announced**

32.     Leading up to the Relevant Period, Teva's share price had plummeted from the $60 range in 2010 down to the $30 range by 2013. As acknowledged by Teva's then-CEO, Levin, Teva's U.S. generics business had been "slowing fundamentally" for years. In light of this, Teva announced that it would focus on its other business segment, branded drugs. Shortly thereafter, on October 30, 2013, Levin was fired after just 18 months as CEO and was replaced by CFO Defendant Desheh. Both Desheh and Chairman Peter Frost were enthusiastic about Teva's prospects, with Frost telling analysts that his friends were buying "hundreds of millions of dollars" of Teva shares.

33.     By 2014, however, Desheh's optimism waned. On January 14, 2014, Desheh announced Teva's intention to make a major acquisition, predicting that within 12 to 24 months Teva's "stock price will go up and we'll be able to use our share as a currency ... to fund transactions." In February 2014, analysts reported that Teva's new CEO, Defendant Vigodman,

was also supportive of the acquisition strategy.

### 2. Teva Adopted Undisclosed Price-Hike Strategy

34.     Undisclosed to Teva's investors, however, by early 2013 Teva had adopted a non-public strategy to systematically increase prices across dozens of drugs in its generics drug portfolio (the "Price-Hike Strategy"). Teva's price increase decisions came from the highest levels of the Company under an established review and approval procedure. The process required Teva's Chief Accounting Officer and Teva USA CFO, Griffin, and Teva USA COO, Cavanaugh, to perform a careful cost-benefit-analysis to determine whether to make a price increase. Griffin and Cavanaugh would personally approve the increases (FE-1, FE-2), and then decide when the increases would become effective, often implementing the increases in batches (FE-1, FE-2).

35.     Teva's Pricing Group was required to carefully document and scrutinize price reductions. By contrast, the Pricing Group members were "told" via emails or in meetings to implement price increases with little or no justification (FE-3), often at the direction of the head of Teva USA's Pricing Group, Kevin Galownia, who did not have the authority to make price-increase decisions himself (FE-3, FE-1, FE-2, FE-4). After a price increase was implemented, Teva would send a letter to notify its customers, and would circulate a copy to employees whose work would be impacted by the increase (*e.g.*, customer service employees who would need to field consumer complaints following the hikes). (FE-2, FE-4) Teva would incorporate expected profits from the price increases into the Company-wide Oracle database, (FE-2, FE-1, FE-3), to which Oberman, Olafsson (who joined Teva in July 2014), Cavanaugh, and Griffin each had access. (FE-1, FE-3) "Scorecards" were generated by Oracle, daily or weekly, to capture generic drug revenues, including Inflated Profit, and tracked whether Teva was on schedule to meet forecasts. (FE-1, FE-2, FE-3) Scorecards were provided to Oberman (and later Olafsson), Griffin, and Cavanaugh. (FE-1, FE-2, FE-3)

36.     The Scorecards tracked profits against financial budgets and a long-term "Work Plan." The Work Plan contained forecasts for the coming three to five years and was prepared annually. Oberman (and later Olafsson), Cavanaugh, and Griffin were responsible for assembling the Work Plan for the generics segment, and Oberman and Olafsson were responsible for presenting it to Teva's executive committee in Israel, including Vigodman and Desheh (FE-2; FE-1) During each quarter, a Latest Best Estimate ("LBE") report was prepared, detailing whether forecasts were met or whether there was a "hole" between the forecasted profits and actuals. (FE-1; FE-2) Oberman (and later Olafsson), Cavanaugh, and Griffin were involved in preparing the LBE reports. (FE-1; FE-2) Teva's executive committee in Israel received the LBE reports. (FE-1; FE-2).

37.     While the Price-Hike Strategy was undisclosed, throughout the Relevant Period, Defendants told investors instead that Teva's increased profits came from ordinary business strategies, like cost cutting and new product launches. In Teva's financial disclosures filed with the SEC and on conference calls, the Exchange Act Defendants denied that Teva was engaged in price increases and concealed that those increases were driving profits.

38.     The Exchange Act Defendants concealed the Price-Hike Strategy because it was inherently risky, unsustainable, and could subject Teva to government and law enforcement scrutiny or prosecution. The strategy was unsustainable and risky for a number of reasons. First, the U.S. generic drug market was designed to be extremely competitive, with generic drugs acting as commodities, fully interchangeable and identical in every respect, except for price. Wholesale customers solicit pricing though a "blind" RFP bidding process, under which, even if Teva increased its prices, the profits could be short lived if other manufacturers undercut Teva's price to secure more market share. Second, generic drugs are an essential part of the lives of millions of

12

Americans. Dramatic increases in prices would, and in fact did, garner public criticism and Congressional action that further undercut the sustainability of the strategy. Third, many of Teva's price increases occurred in tandem with its competitors. Whether illegal or not, such pricing behavior is indicative of a lack of competition, if not collusion, and could, and again did, become the subject of intense civil and criminal law enforcement investigations. Had Teva disclosed that its core business strategy was to aggressively increase prices on generic drugs, investors would have valued the Company very differently from one with a strategy driven by traditional business strategies like fundamental growth and cost cutting, as the Exchange Act Defendants had falsely proclaimed.

39.     Teva's Price-Hike Strategy was particularly well-suited for concealment. The generics industry is highly opaque. Neither Teva nor any of its peers disclosed to the investing public any information concerning individual drug prices, changes or amounts of revenues per drug, or the profits from any particular drug. As explained below, to determine that the Price-Hike Strategy was actually the driver of Teva's success, the Class Action plaintiffs and their experts undertook an econometric analysis of thousands of data points from various non-public, subscription-based data services, including multiple regression analyses, to identify and quantify Teva's very large price increases, which greatly surpassed general pricing trends and inflation. The analysis then isolated the amount of profit Teva generated solely as a result of the increases. This analysis yielded the Inflated Profits measure alleged herein. *See* Section V.

### 3.     Teva Began To Implement The Price-Hike Strategy

40.     On July 3, 2013 and August 9, 2013, the Exchange Act Defendants began to implement the Price-Hike Strategy by raising the prices of 18 drugs. Fifteen of the increases were coordinated with Teva's competitors who also implemented price increases on the same drugs. The increases were as high as 812% of the original prices. *See* Appendix A.

13

41.     According to the Class Action plaintiffs' expert, in just the third and fourth quarters of 2013, the price increases generated as much as $250 million in Inflated Profit. Because the price increases required no additional research and development ("R&D") or sales and marketing ("S&M") expenses, the profit from the increases added directly to Teva's bottom line. Specifically, the 2013 price-hiked drugs would contribute as much as $875 million in Inflated Profit to Teva's bottom line by the end of the Relevant Period.

42.     Executives closely tracked the impact of the Inflated Profit through review of the Scorecards, LBE reports, and Work Plan. This reporting structure ensured that "everyone would have known" if there were significant price increases that generated large profits. (FE-2)

### 4.     2014 - Relevant Period Begins; Fraudulent Attribution Of Profits; ADS Price Jumps; Law Enforcement Scrutiny

43.     By 2014, price increases by generic drug companies had caused public concern and garnered attention within the industry. For example, on January 8, 2014, the National Community Pharmacists Association, based on a proprietary survey of its members, wrote to Congress stating that "[o]ver the last six months ... many of our members across the U.S. [] have seen huge upswings in generic drug prices," and requesting an investigation. As the public began to learn of the fact of large price increases on certain drugs, the Exchange Act Defendants made misleading statements to continue to conceal the Price-Hike Strategy and to falsely disassociate themselves from price increases by attributing profit to other sources.

44.     The Relevant Period begins on February 6, 2014, when Teva issued a press release announcing its fourth quarter 2013 and full year 2013 financial results. Those results had improved as compared to Teva's pre-Price-Hike Strategy performance. The press release, however, did not disclose the fact that the success was driven by Inflated Profits.

45.     Specifically, Teva touted a 14% increase in U.S. generics revenue for the fourth

quarter, attributing the increase to "higher sales" volume, reduced expenses, and "exclusive launches" of new generic drugs. Teva concealed, however, that all of the YOY improvement was driven by the Inflated Profit from price increases. This omission made the purported list of causes for the YOY profit growth misleading. Teva's pattern of misleading disclosures and omissions would repeat throughout the Relevant Period.

46.    During the February 6, 2014 earnings call, Desheh announced that Teva would increase its quarterly dividend by 5%, that the "U.S. generic business is highly profitable," and that "[w]e had a pretty good, even *excellent, second half* [of 2013] in the United States [generic] business." Oberman, CEO of U.S. generics followed and explained that "[a]t the gross profit levels that [Desheh] was talking about, [the U.S. generics business] is a *very valuable business to Teva*. And we see it continuing to be on a go-forward basis." This statement stood in stark contrast to Levin's August 14, 2013 assessment that the U.S. generics business was "slowing fundamentally."

47.    Investors and analysts noted positively the improved financial results. On February 6, 2014, a BMO Capital Markets analyst wrote that generic sales "came in above ... our expectations and consensus"; "[w]e think 4Q results are a high-quality beat with revenue and EPS coupled with an improvement in margins year over year.... Teva shares should be bolstered by today's positive earnings announcement."

48.    The disclosures sparked a long and steep increase in Teva's ADS price that would last throughout 2014 and 2015. Figure 1. By early March 2014, the ADS had risen from the $30s to trade at $48. The increased price of the ADS was critical to achieving the Exchange Act Defendants' stated intention to use the ADS as "currency" to make a major acquisition. On a March 4 investor conference call, Desheh explained that with "[t]he price under $40 ... we can't use [Teva Securities as] currency," but that, with "change[s] over the past few months," Teva was extracting

"itself [from] ... a corner that was difficult to come from," bringing Teva closer to a large acquisition.

49.     What investors and analysts did not, and could not, know was that Desheh, Oberman, and the Company's SEC filings had concealed the Price-Hike Strategy, and that, in the fourth quarter of 2013, the 18 price increases made pursuant to the strategy generated ***the entirety*** of Teva's year over year ("YOY") gain in U.S. generics revenue.

50.     <u>First Quarter 2014 Results; Analysts Take Note</u>: By the beginning of April 2014, Teva's ADS price had increased to $54.06, or 19%, since the Relevant Period began. The National Alliance Securities analyst concluded that Teva's ADS had "the Best YTD" 2014 performance relative to its peers, which was a stark contrast to how Teva had "dramatically underperformed in 2013."

51.     Teva continued its series of positive financial disclosures, while omitting that its finances were fueled by undisclosed Inflated Profit from the concealed Price-Hike Strategy. On May 1, 2014, Teva reported positive results driven by a $117 million YOY increase from Q1 2013 profits in its generic segment. The Exchange Act Defendants falsely attributed the revenue increase to lower expenses, a changed composition of revenues, and "new product launches." The truth was that $120 million for the quarter was generated by the Price-Hike Strategy.

52.     The 2014 Work Plan, which the executive committee reviewed in August 2013, would have included the expected profits from the July and August 2013 price increases. Cavanaugh, Griffin, and Oberman were each provided daily and/or weekly Scorecards that tracked whether Teva's actual results met or exceeded the Work Plan forecasts. Similarly, throughout the quarter, Vigodman and Desheh received documents reflecting the impact of the Inflated Profits compared to actual revenues versus the Work Plan through the LBE reports.

53.     Analysts reacted positively to Teva's surprising and rapid turn-around. Cowen and Company analysts wrote, "The bottom line is that this story is reversing (for the positive) much faster than previously anticipated, and the belief that 'growth' could reemerge is very real." J.P. Morgan predicted an "upside to both near-and-longer term EPS" because of Teva "taking several steps to regain its generic leadership including ... focusing more heavily on portfolio selection and management." Jefferies analysts noted that Vigodman "Impresses in His Wall Street Debut" due to his determination to reestablish "Teva's dominance in its core generic business."

54.     Second Quarter 2014 Results, Further Price Increases, and Law Enforcement Scrutiny: In April 2014, pursuant to the Price-Hike Strategy, Teva increased the prices of another 12 generic drugs, with eight of the increases carried out with Teva's competitors. Cavanaugh and Griffin would have both approved these price increases and tracked the Inflated Profits generated through the Scorecards pursuant to the established process for implementing price increases. These new price hikes alone generated as much as $50 million in Inflated Profit by the end of the second quarter and as much as $395 million by the end of the Relevant Period.

55.     On July 1, 2014, Teva hired Olafsson from Actavis to be the President and CEO of Teva's Global Generic Medicines Group.

56.     By the Summer of 2014, generic pricing was garnering even more public attention. On July 8, 2014, *The New York Times* published an article titled, "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise," highlighting that the price of a decades-old drug that Teva did not produce, digoxin, had nearly doubled since late 2013. Within days, and as a result of this article, the Connecticut Attorney General ("AG") began a non-public investigation into the companies that manufactured digoxin. The Connecticut AG issued subpoenas to Teva's competitors Impax, on July 14, 2014, and Lannett, on July 15, 2014; each company disclosed its

subpoena in an SEC filing the very next day.

57.     On July 31, 2014, Teva announced its Q2 2014 financial results, once again touting the profitability of its generic segment, which had increased by $156 million from 2013, and again attributed this success to legitimate business strategies. For example, Desheh stated during the earnings call that Teva's "improvement in sales this quarter was driven by the growth of our global generic business, primarily in the U.S."

58.     Analysts reiterated Teva's statements. A Jefferies analyst stated that "we continue to see signs of recovery for Teva's US generic business, which posted a strong 10% Y/Y gain," "Solid Q2." Piper Jaffray increased its price target for Teva from $48 to $55 because of "meaningful growth drivers for ... [the] generics businesses," and the "[s]teady performance for U.S. generics."

59.     In truth, the Price-Hike Strategy had generated as much as $160 million in Inflated Profit, accounting for *all* of the YOY increase in profit reported for Teva's global generics division.

### 5.     Third And Fourth Quarter 2014 – Direct Questions; Explicit Denials Of Price Hikes

60.     Teva continued to tout increasingly positive results driven by its U.S. generics business, even as scrutiny of certain price increases in the industry continued. The State AGs served Par Pharmaceuticals with a subpoena on August 6, 2014, which Par disclosed on August 11, 2014. On October 2, 2014, Congress sent letters to Teva and 16 of its peers. The letter addressed personally to Vigodman, sought information on "the underlying causes of recent increases in the price of [Teva's] drugs." Vigodman never responded to these letters. Any truthful answer would have required him to reveal the Price-Hike Strategy.

61.     Pursuant to the Price-Hike Strategy, on July 1 and August 28, 2014, Griffin and Cavanaugh implemented another 20 price increases (Appendix A), 12 of which Teva made

together with other manufacturers. The increases would have been recorded in the Oracle database and reflected in the daily Scorecards and LBE reports. The 12 price increases generated as much as $50 million in Inflated Profit.

62.     The expected Inflated Profits from the July and August 2014 price hikes, along with all the earlier increases, would have also been recorded in the Oracle database and reflected in the report to the Officer Defendants. For the third quarter of 2014, the price hikes implemented through August 2014 generated as much as $193 million in Inflated Profits.

63.     Third Quarter Results: On October 30, 2014, Teva once again released positive third quarter results driven by a $160 million increase in generic segments profits, or 40%, as compared to the third quarter of 2013. The Exchange Act Defendants fraudulently attributed this increase to a reduction in expenses once again.

64.     On the October 30, Q3 2014 earnings call, while on notice of impending Congressional hearings, a UBS analyst asked Vigodman: "could you talk about Generics a little bit in the U.S.? ... **whether there were price increases in some of your base business and whether that impacted**" profit. Vigodman fraudulently explained that the market was functioning normally and that prices were decreasing:

> When there's an opportunity, **when there is a shortage in the market**, we obviously look for pricing like any other business. But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business.

65.     While increases in prices due to shortages is a normal market dynamic, Vigodman's statement misled investors because at that time, Teva had implemented price increases on 46 drugs since July 2013 (some more than once), none of which were subject to shortages or other reported market anomalies. In total, the Price-Hike Strategy had yielded as much as $193 million in Inflated Profit in the third quarter of 2014. The profits from all of these price increases would have been

reflected in the Work Plan and LBEs that Vigodman and Desheh received.

66.     Still unaware of the truth, analysts reacted positively to Teva's financial results, and Teva's ADS price continued to rise. A Cowen and Company analyst stated that Teva's "Operations Are Improving, Cash Flows Are Accelerating." Piper Jaffray wrote, "*[i]mportantly, operating profit ... for the generics segment during the quarter was up 40% versus the same period a year ago.*" Morgan Stanley increased its Teva price target from $57 to $61, stating, "[w]e are encouraged by progress that Teva is making on global generics under Siggi Olafsson."

67.     <u>December 11, 2014 Guidance Call</u>: By November 2014, the DOJ initiated its own investigation into generic drug pricing and impaneled a grand jury in Philadelphia, Pennsylvania. The grand jury began issuing subpoenas to generic drug makers, the first on November 3, 2014 to Lannett and Impax relating to a drug Teva did not make. The companies disclosed these subpoenas days later in SEC filings, on November 6 and 7, respectively.

68.     On November 20, 2014, the Senate Subcommittee on Primary Health and Aging held a hearing to explore "if there was a rational economic reason as to why patients saw [] huge price increases [in generic drugs] or whether it was simply a question of greed of companies who were able to raise prices to whatever level they wanted." Teva was invited but refused to testify.

69.     Meanwhile, on December 11, 2014, during a guidance call, a Morgan Stanley analyst asked about risky price increases: for "generic manufacturers, *I'm assuming that wholesalers have been seeing extraordinary price increases in recent years* and has been buying inventory ahead of tremendous price increases.... Are you able to control it?"

70.     In response, Olafsson flatly denied that prices had increased at all: "So first *let me correct. I have to disagree that they have experienced tremendous price increase. I think overall the pricing in the US of generics has been flat to a slight down.*" Olafsson dismissed the matter

further: "There has been a lot of press about price increases on individual molecules and this has been *a hot political issue selecting a few products.*"

71.     Olafsson had direct access to facts that flatly contradicted his statements. By that time, Teva had implemented 50 price increases on 46 drugs, each from 50% to as much as 1,500%, and each part of Teva's concealed internal strategy and implemented pursuant to Teva's established internal practices.

72.     <u>Year-End 2014 Results</u>: On February 5, 2015, Teva filed its fourth quarter and full year 2014 financial results with the SEC, once again touting positive results driven by the generics segment. Profit for Teva's generic segment profit had increased $47 million for the fourth quarter, or 9%, as compared to 4Q 2013, while profit for the full year had increased $480 million from 2013.

73.     The Exchange Act Defendants attributed this success to cost savings and other benign factors, however, in Q4 2014 alone, Teva's Inflated Profit was as high as $219 million, or *four times* the fourth quarter profit increase that the Exchange Act Defendants were boasting. For the full year of 2014, Teva made Inflated Profit of nearly $700 million, or 144% of the reported YOY increase in generic profit for the whole Company. All of these results would have been reflected in the Work Plan, the Scorecards, and the LBE reports distributed to the Exchange Act Defendants.

74.     The following table reflects Teva's overall Inflated Profit for 2014:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full-Year |
|---|---|---|---|---|---|
| Inflated Profit | $120 | $160 | $193 | $219 | $693 |

75.     While concealing the Price-Hike Strategy and its effect on profits, on a February 5, 2015 earnings call, Desheh boasted that "the most notable contribution" to Teva's growth and

profits "was generated by our Generic business, improving profitability by more than 500 basis points," contributing "nearly $500 million" and comprising 31% of the Company's total profit. Unaware of the truth, analysts reacted positively to this success. Piper Jaffray wrote that "profitability of the generics business [is] continuing to improve." Barclays stated that "profitability for generics improved to 21.9% from 16.8% in 2013.... The company anticipates another 400 basis point improvement in 2015 ... a key priority."

76.     Throughout 2014, the Officer Defendants continued to mislead investors by attributing Teva's improved profits not to the Price-Hike Strategy but to other sources, claiming that some portion of Teva's increasing profitability in generics was attributable to a purported $2 billion "cost cutting" program that had first been adopted in late 2012. However, on a December 2014 investor call, Defendants eventually disclosed that only a fraction of that cost cutting program was profit as Teva had generated only $150 million in cumulative profit from the program since its inception. After that call, the Exchange Act Defendants stopped emphasizing cost cutting and rarely mentioned it again.

### 6.     The First Half Of 2015 – Teva ADS Price Soars To Become "Currency" For "Transformational" Actavis Acquisition

77.     In January 2015, Teva implemented another 14 price increases (Appendix A), nine of which were increased together with other manufacturers. Each increase was subject to the same rigorous internal review and approval process that included the Officer Defendants. The Inflated Profits were captured in the daily and weekly Scorecards and intra-quarter LBE reports that Griffin, Cavanaugh, and Olafsson circulated to Vigodman and Desheh to track whether forecasts were being met. By the end of the first quarter of 2015, the 14 price increases undertaken in that quarter would generate as much as $48 million in Inflated Profit while the overall Price-Hike Strategy would generate as much as $228 million in the quarter.

78.     The ADS prices, buoyed by Inflated Profits, rose to nearly $60, and the Exchange

Act Defendants' intention to use the ADS as "currency" for a "transformational" transaction was

materializing. On February 5, 2015, J.P. Morgan stated that "[w]e believe that Teva is looking at

assets of all sizes, and will not rule out transformational M&A if the opportunity presents itself."

On March 10, Susquehanna also took note, stating that "TEVA is increasingly focusing attention

on its financial capacity and appetite for M&A." By April 16, Barclays reported on Teva's

"willingness" to perform a "'transformational' acquisition in the generics space." On the same day,

Leerink wrote that Teva had an "urgency to diversify via M&A."

79.     Undisclosed at the time, by late 2014 the Exchange Act Defendants had approached

Allergan, but Allergen was not yet ready to make a deal. On July 27, 2015, Vigodman admitted

that Actavis "was basically the highest priority" for an acquisition. In fact, soon after arriving at

Teva from Actavis, at an August 2014 Teva meeting, Olafsson told employees that he had never

joined a company that did not eventually acquire his previous employer. (FE-1)

80.     With Allergan rejecting Teva's advances, the Exchange Act Defendants planned a

hostile offer for Teva's long-standing rival, Mylan. On April 21, 2015, the Exchange Act

Defendants filed a Form 6-K with the SEC, announcing Teva's unsolicited offer to acquire all of

the outstanding shares of Mylan. Mylan's board criticized Teva as a "low quality stock" and

quickly rejected the offer. This rejection intensified the Exchange Act Defendants' motive to

improve the ADS price.

81.     First Quarter 2015 Results: On April 30, 2015, Defendants once again announced

positive results driven by Teva's generic segment, touting a $296 million increase in profit, or

59%, compared to the first quarter of 2014. The Exchange Act Defendants again misleadingly

attributed this increase in profits to a reduction in expenses, as well as a new product launch and

higher profitability in Europe while concealing that as much as $228 million in Inflated Profit accounted for 77% of the reported generic profit increase.

82.     On the earnings call, Olafsson announced a "1,000 basis points improvement over a two-year period" in "operating profit in the generics segment," and attributed this improvement to "a significant improvement in our cost of goods, ... portfolio offering ... [including] when we have more of the launches, ... [and] our cost infrastructure."

83.     Still unaware of the true reasons for Teva's increased profits, analysts credited the Exchange Act Defendants' false statements. J.P. Morgan noted, "Teva continues to make progress on generics profitability ... we remain encouraged by the recovery in Teva's generic business." Cowen and Company noted that Teva's "outperformance was a result of better than expected U.S. generic sales." Buoyed by the fraud, Teva ADSs closed at $60.42 that day, an increase of 33% since the start of the Relevant Period.

84.     The Exchange Act Defendants continued to extol the success of Teva's generic segment. On May 13, 2015, at a Bank of America Conference, Desheh declared that Teva's improved generic business was "***nothing short of a revolution***," explaining that "[i]n 2013 our gross margin of generic business was 41.3%. And it's 46% in Q1 2015. Our operating margin was 16.7%. It is 27%, this is full 10 percentage points," *i.e.*, a $1 billion improvement.

85.     During a June 10, 2015 Goldman Sachs Global Healthcare Conference, Vigodman explained: "we started 2014 with a clear message, clear focus, getting the house in order first, solidifying the foundation of Teva. ***You see the profound change in the generic business. These are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014***." He fraudulently attributed all of this success to "cost reduction" and "[f]ull transformation of our operational network."

86.     $40 Billion Acquisition of Actavis Announced: As foreshadowed by Olafsson's July 27, 2015 remarks, and with Teva's ADS price reaching an all-time high of $72, Teva announced the transformational acquisition it had been seeking: it had entered into a definitive agreement to acquire Allergan's worldwide generics business, Actavis, for $40.5 billion in cash and equity.

87.     In announcing the deal, Vigodman explained that the rapid and surprising turnaround in Teva's generics segment since the start of the Relevant Period was the "precondition" for making the deal. Of course, he concealed that the true "precondition" underlying that turnaround was Teva's implementation of the Price-Hike Strategy.

### 7.     The Second Half Of 2015 - Motivation Shifts; Paying For Actavis

88.     To pay for its newly announced Actavis deal, the Exchange Act Defendants would have needed to raise over $30 billion in cash, which amounted to roughly **20 years** of Teva's recent annual earnings. Instead, Teva gave Allergan $7 billion in ADS, and raised cash from the public through a $7 billion secondary public offering of ADS and an initial public offering of Preferred Shares in early December 2015, and $15 billion from an offering of bonds set for 2017.

89.     On July 30, 2015, Teva reported positive Q2 2015 results driven by generics. Specifically, Teva reported a $193 million increase in generics profit, or 36%, compared to 2Q 2014, which it attributed primarily, and misleadingly, to reduced expenses and new product launches. Desheh, also touted "the impressive improvement in the profitability of our Generic business ... up from around 20%, 21% a year ago to between 39.5% to 30% in the first half of 2015," and the "strong focus on U.S. Generics business." The Exchange Act Defendants concealed that the Price-Hike Strategy contributed as much as $236 million in Inflated Profit in the second quarter alone and that without the Price-Hike Strategy, generic profit would have declined.

90.    <u>Third Quarter 2015 Results</u>: In July 2015, Teva implemented another seven price increases, four of which were executed together with other manufacturers' price increases. Cavanaugh and Griffin reviewed and approved each increase and the increases were reflected in the Scorecards, LBEs, and Work Plan circulated to the Exchange Act Defendants. By the end of the quarter, these seven price increases, together with earlier increase, would generate as much as $218 million in Inflated Profits. Furthermore, under the routine schedule, the expected profits would have been incorporated into the 2016 Work Plan that Olafsson, Cavanaugh, and Griffin would have finalized for a presentation to Vigodman and Desheh later in the summer.

91.    Following these increases, on October 29, 2015, the Exchange Act Defendants issued Teva's third quarter 2015 results, reporting an increase of $20 million in generics profits compared to the third quarter of 2014, and again misleadingly attributing this increase mainly to lower expenses. In reality, the Price-Hike Strategy contributed as much as $218 million, **ten times** the reported improvement in profit.

92.    On the earnings call, Vigodman hyped "huge opportunities in the United States" for generics. Olafsson similarly emphasized that "the Generic business in third quarter continued to drive growth," and that "[w]e really have been improving the profitability over time," pointing to increased margins of "16.8% in 2013, 22.1% in 2014, and year-to-date number is about 28.9%."

93.    Still unaware of the truth, analysts continued to accept this misleading narrative. Piper Jaffray wrote, "Margins for the generics business continue to improve.... Though top-line growth for the generics segment has been anemic, margins have continued to expand." Jefferies' analysts stated that, "Generic Drug Margins Continue to Improve," noting that "on the live Q3 presentation, management highlighted the significant improvement in profitability from its core generics business."

94.   <u>Increased Public Scrutiny On Pricing</u>: By the fall of 2015, Congressional initiatives, law enforcement actions, and public anger toward perceived abuses in drug pricing were in full force. Legislation was introduced in Congress that would penalize generic manufacturers for increasing prices at a rate higher than inflation. The State AGs and DOJ were continuing their investigations. The DOJ continued to issue subpoenas concerning generic pricing.

95.   On October 29, 2015, during the 3Q 2015 earnings call, analysts posed direct questions to the Exchange Act Defendants regarding whether Teva was exposed to the potential legislation. The Exchange Act Defendants specifically denied any exposure.

96.   On the call, after a series of questions on the sustainability of Teva's generics success, Vigodman reaffirmed the false premise that Teva had generated its profits solely from sustainable, ordinary business practices, and not price:

> We're very ... responsible in everything that portends to prices on the Generics side.... And I would even put it another way, ***all the improvement you see in our – in margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message***.

Then, when a Barclays analyst asked for management's thoughts on the proposed legislation's "potential limit to generic drug price increases," Olafsson further denied Teva's exposure:

> In terms of the proposed legislation on pricing control on generics, ... we have told you that overall on our whole portfolio, we have a decline in price. ***The talk about the inflation in generics when you have a big portfolio is really not there***.

The sole price increases that Olafsson was willing to acknowledge were those "due to some ***abnormalities*** in the market," like supply shortages.

97.   The fraudulent denials concealed the Price-Hike Strategy and analysts accepted the Exchange Act Defendants' statements. That day, UBS repeated the Exchange Act Defendants' fraudulent denials: "[Management] highlighted that the [generic business] improvement was ***not***

*driven by price*, but by volume, mix, and efficiency." In reality, Teva had made 71 price increases by that time, and none had been caused by market abnormalities like shortages. Moreover, a huge portion, if not all, of the margin improvement Vigodman had touted was driven by as much as $1.6 billion in Inflated Profit reported since the start of the Relevant Period, including over $690 million in 2014 and over $680 million in the first three quarters of 2015. All of this information was reflected in the Scorecards, LBEs, Work Plan and other reports regularly sent to Olafsson and Vigodman.

98.     The Exchange Act Defendants misstatements, which were necessary to maintain the ADS price in order to raise the cash for the Actavis deal, were also concealing an ever-increasing risk. Public, regulatory, and law enforcement scrutiny of the industry had already begun to undermine Teva's ability to execute and sustain the Price-Hike Strategy as it was becoming increasingly difficult for Teva to increase prices. In 2014, Teva made 32 increases. In 2015, Teva made a total of only 21 increases. Teva made 14 increases in January and seven in July, which would be the final round of significant price increases implemented in a systematic fashion during the Relevant Period. By the end of 2015, Inflated Profits had diminished quarter over quarter for the first time since Q1 2014.

99.     With this context, and with the offering of $7 billion in ADS and Preferred Shares weeks away, Teva attended a November 19, 2015 Jefferies conference. In response to a question about "everyone's favorite topic the last 2 months ... ***pricing, is it an issue? .... where do you go on pricing***?" Desheh acknowledged the concern over pricing and legislative actions, but claimed that "***Teva was not associated with any of that***." Desheh specifically denied Teva's exposure with respect to legislative initiatives to cap price increases, stating that Teva's exposure "is as a small as anybody can have." Desheh's statements were directly contradicted by reality.

100.     <u>Teva's False And Misleading Registration Documents For Its Secondary ADS And Preferred Share Offerings</u>: On November 30, 2015, Teva filed a Registration Statement with the SEC, regarding Teva's Secondary ADS and Preferred Share Offerings, and on December 3 filed two prospectus supplements and issued the Secondary ADS and Preferred Shares. The Offering Documents included numerous false misleading statements attributing Teva's profits to sources other than the Price-Hike Strategy. The ADS/Preferred Offerings raised approximately $7.2 billion.

**8.      First Half 2016 – Price-Hike Strategy Screeches To A Halt; Pricing Pressure Denied; Subpoenas Concealed; $20 Billion Debt Offering And Close Of Actavis Deal**

101.     By the end of 2015, the industry-wide pressure on generic pricing and the scrutiny on pricing practices created a new trend of downward pricing pressure. On January 11, 2016, one of Teva's major wholesaler customers, McKesson, announced that it "now expect[ed] that operating profit from generic pharmaceutical pricing trends will be significantly weaker" through the second half of its fiscal year, ending on March 31, 2016.

102.     On the same day, during a J.P. Morgan healthcare conference, J.P. Morgan asked Olafsson to comment "on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?" Olafsson fraudulently denied that Teva was involved in "big price increases":

> "There's ***a lot of headlines of examples of big price increases*** in generics. But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – ***there is a decline***."

Based on this denial, he also fraudulently denied that Teva's generics portfolio was exposed to price deflation:

> The generic pricing – we need to keep in mind ***there's a lot of talk about inflations in generic pricing***. But what we see is there's –

29

overall on our total portfolio of 270 products, ***there is a slight decrease in pricing***. ... on 95% of our portfolio, we experience price decline. And then on 5%, we might be ***flat or a slight increase....***

103.    The truth was that Teva had raised prices on 60 drugs, or 22% of the portfolio Olafsson cited, which had generated as much as $1.7 billion at that point in time. This would have been reflected on the daily Scorecards and intra-quarter LBE reports the Officer Defendants received. Moreover, the drugs driving Teva's profits were massively inflated, making Teva particularly vulnerable to the pricing pressure reported in the industry.

104.    <u>Fourth Quarter and Full Year 2015 Results</u>: On February 11, 2016, Teva issued its fourth quarter and full year 2015 financial results. Teva reported that its full year 2015 generics profit was up $500 million YOY, but concealed that over $848 million was Inflated Profit for the year.

105.    On the earnings call held the same day, Olafsson again touted a "$1 billion improvement in operating profit over 24 months period," pointing to generics profits going from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue, and stating, "[s]o how did we do this? ***Not by pricing*** but by portfolio mix, new products, and efficiency measures."

106.    Olafsson denied any price inflation, including Teva's 71 price hikes: "on pricing.... [W]e and the generic industry overall ***don't see price inflation of generics*** as it sometimes is portrayed in the media."

107.    In truth, the concealed Price-Hike Strategy had generated as much as $1.5 billion in Inflated Profits over the 24 months period Olafsson cited.

108.    By this time, it was nearly impossible for Teva to implement further price hikes. Teva reported that fourth quarter 2015 profit in generics increased only 1% compared to the fourth quarter of 2014. More firms reported pricing pressure and analysts grew increasingly concerned.

In response to Guggenheim stating that "some of your competitors have talked about pricing pressure in the generics business during the quarter," and asking, "[c]urious if you saw that, and if so what might be driving that," Olafsson responded fraudulently:

> [L]et me start on the pricing. ***As I mentioned in the beginning, we didn't see anything change in fourth quarter***. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.

109.    Guggenheim accepted Olafsson's reassurances, reporting that "[u]nlike its generic competitors, ***TEVA did not experience any increase in pricing pressure this quarter***, which highlights the ***strength of the company's platform***, in our view." Jefferies' analysts also believed Olafsson's false statements: "Mgt noted that smaller generics players may have realized outsized gains from price increases on individual drugs – and are thus now exposed to faster price erosion – and stressed that its portfolio breadth and optimized supply chain/cost structure allow the co to maintain solid profitability."

110.    Through these false statements, the Exchange Act Defendants concealed that the faltering Price-Hike Strategy was the true reason that YOY profit growth from generics was flattening. The 60 drugs on which Teva had increased prices faced renewed pricing pressure. Accordingly, rather than increase, the quarterly change in Inflated Profit had begun to decrease by as much as $70 million since the second quarter of 2015, or by 30%. This trend would continue throughout the Relevant Period.

111.    The following table reflects Teva's overall Inflated Profit for 2015:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full-Year |
|---|---|---|---|---|---|
| Inflated Profit | $228 | $236 | $218 | $166 | $848 |

112.    <u>Pricing Concerns Increase, Defendants Go On The Offense</u>: As investors became increasingly concerned about the pricing environment, the Exchange Act Defendants continued to

affirmatively deny any vulnerability to pricing pressure. At a March 8, 2016 conference, a Cowen analyst asked Olafsson to "discuss what you're seeing" on "generic pricing." Olafsson said that "[Teva] *never* saw" price increases and that "inflation *never* really happened in the generics business." He added, "overall the pricing hasn't changed that much," and was "***stable***," and there had been no "big changes in the pricing environment" since 2015. In reality, Teva's Inflated Profit had fallen 24% in the fourth quarter 2015, from $218 million to $166 million, compared to the prior quarter.

113.    First Quarter 2016 Results: With public and law enforcement pressure mounting, the Price-Hike Strategy faced increased pricing pressure and Inflated Profits declined. Teva was no longer able to make significant price hikes, and throughout all of 2016 only implemented five increases, all on April 6, 2016. The five price increases were all on drugs for which Teva had previously increased prices and were in markets where Teva possessed a monopoly. *See* Appendix A.

114.    In light of declining profits, the Exchange Act Defendants faced significant pressure to finance the Actavis acquisition, which, in order to close, would require raising an additional $20 billion in cash through a bond offering. On May 9, 2016, on the Q1 2016 earnings call, the Exchange Act Defendants set September 2017 as the new date for the $20 billion offering.

115.    On the same day, Teva also announced its financial results for the first quarter 2016, reporting that profit from generics was $215 million ***less than*** in the first quarter of 2015. Defendants misleadingly attributed the decline to higher expenses, lower sales, lower European profit, and fewer product launches. As pricing pressure neutralized the impact of the Price-Hike Strategy in the first quarter of 2016, Inflated Profits were $104 million ***less*** than compared to the first quarter of 2015, which accounted for half of the generics division's reported decline in profit.

The Scorecards, LBEs and Work Plan would have reflected the "hole" that was created by the drop in Inflated Profit. (FE-1, FE-2)

116.    Similarly, as additional generic drug manufacturers were accurately reporting poor results due to pricing pressure, the Exchange Act Defendants continued to deny that Teva was impacted by pricing pressure. On the May 9, 2016 earnings call, Olafsson stated that "the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate." He again denied, however, that Teva had exposure to price deflation, and instead pointed to the other manufacturers' business models as the cause of those firms' financial results:

> Throughout the ***ongoing debate*** this year about the level of generic price erosion in the United States, Teva has been very consistent and clear with investors. ***Teva has not seen any fundamental change or worsening in the pricing environment***... What this boils down to is each individual company's business model.... ***Nothing has happened in the last two quarters that has changed the pricing environment***.

By contrast, Olafsson blamed Teva's decline in generic profits entirely on issues unrelated to pricing, like an absence of new product launches. Olafsson also misleadingly attributed Teva's prior success to sustainable sources like "portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products ... and sales force effectiveness."

117.    Internal empirical facts that would have shown that Olafsson's statements were false were available to Olafsson through the Scorecards, LBE reports, Work Plans, and the Oracle database. Contrary to Olafsson's assertions, price deflation was substantially damaging Teva's profits just like Teva's competitors. Teva's Inflated Profit had plummeted from $236 million in the second quarter of 2015, to $218 million in the third quarter of 2015, to $124 million in the first quarter of 2016. Figure 1.

118.    Analysts were deceived by Olafsson's false denials. J.P. Morgan wrote,

"Reassuring Generics Outlook Ahead of [Actavis] Deal Close ... ***Teva does not see any major changes in the price environment***." Jefferies wrote "Generic pharmaceutical bellwether TEVA has **not witnessed a deterioration** in the pricing environment, according to mgt. ***This directly contrasts*** with what has been stated by a number of competitors over the past few months."

119.    With Teva under pressure to keep investors optimistic due the debt offering scheduled for the fall, the Exchange Act Defendants continued to fraudulently deny that Teva was facing pricing pressure increases:

- May 10, 2016 (Olafsson) "I know many of the competitors in the generic space ... are ***talking about a lot of pricing pressure***, but it shouldn't be. There is ***nothing that has happened*** over the last two quarters which has changed fundamental the market."

- June 3, 2016 (Vigodman) "So we are very consistent. Our message was conveyed, and we will continue to convey. What we see is a 4% to 5% erosion. That's what we see. That's not ***something which is different from what we said during 2015***. By the way, we continue saying it in 2016."

- June 8, 2016 (Olafsson) "[R]eally, the ***environment hasn't changed***. When we signed that [Actavis] deal in July [2015], we talked about 4% price erosion in the US generic business. And we are ***still talking about the same number***, what we see in the base business."

120.    Unbeknownst to the public, the Price-Hike Strategy continued to rapidly deteriorate into the second quarter of 2016. Inflated Profits would decline 52% YOY.

121.    On June 21, 2015, just days after Olafsson's June 8 statements, Teva received a subpoena from the DOJ seeking information relating to generics pricing. On July 12, 2016, Teva also received a subpoena from the Connecticut AG. Teva made no further price increases for the duration of the Relevant Period.

122.    Notes Offering Is Accelerated: On July 13, 2016, the Exchange Act Defendants surprisingly announced that Teva was accelerating its $20 billion debt offering from its previously announced September schedule. Olafsson, Vigodman, and Desheh gave bullish guidance to

investors for the end of 2016 through 2019. On the same day, Defendants filed the Registration Statement with the SEC. During an investor call on the same day, knowing that the other participants in the industry were reporting pricing pressure, a Citigroup analyst asked Olafsson whether he could "comment on the generics pricing assumptions that you have *baked into your forecast?*" Olafsson again denied increasing pricing pressure: "we are assuming and now forecasting for the guidance for the remainder of the year *same pricing assumption* as we have had for the first half of the year," because "*we saw no change in the pricing*. We saw a stable environment ... from first quarter into second quarter."

123. Contrary to Olafsson's representation that pricing was "stable," the pricing environment for Teva's generics portfolio was and had been deteriorating and Teva was unable to offset the deterioration with additional price increases. Inflated Profit was down $122 million, or 52%, for the second quarter as compared to the respective period in 2015. Thus, the pricing assumption Teva "baked into" the guidance was false.

124. With the truth concealed, Teva falsely informed investors that Teva was not experiencing the poor industry trend. Piper Jaffray reported that "management stated that it did not see further pricing pressure on the overall generics business," which "may ease recent worries regarding the near-term trajectory of the business." Morgan Stanley wrote that "pricing and LT Guidance [was] encouraging ... [m]gmt sees *US pricing environment as unchanged*."

125. The $20 Billion Debt Offering: On July 18, 2016, Teva launched the $20 billion bond offering to finance the Actavis transaction, of which approximately $15 billion were U.S. dollar denominated. The offering was made pursuant to the Notes Offering Materials, which incorporated several of the false and misleading quarterly and full year financial disclosures.

### 9. Third Quarter 2016 – Disclosure Of Declining Performance And Subpoenas; Generics Day

126.     <u>Second Quarter 2016 Results</u>: On August 4, 2016, Teva announced disappointing results for the second quarter 2016 and for the first time disclosed that the DOJ and State AG had issued subpoenas to Teva. For the second quarter of 2016, Teva reported $115 million less in generic profit than in the second quarter of 2015, which Teva attributed to increased expenses, the loss of exclusivity on certain products, and lower sales on products for which Teva had not taken price increases. Teva did not disclosed that it earned as much as $122 million *less* in Inflated Profit for 2Q 2016 YOY. The price of Teva Securities declined as a result of these disclosures.

127.     In an effort to mitigate the stock drop, the Exchange Act Defendants made another series of false statements reassuring investors that Teva still faced no increased pricing pressure. On the earnings call, a Citigroup analyst once again asked whether Teva was impacted by decreasing U.S. generic revenues, and once against Olafsson false stated that it was not: "the pricing is stable to the same degree as before ... *very stable* from the first quarter." Olafsson's statements would have been flatly contradicted by the daily Scorecards, and LBEs and Work Plan that Olafsson shared with the other Officer Defendants, all of which would have shown dramatically decreasing Inflated Profit.

128.     In response to a J.P. Morgan analyst's question about  whether Teva might increase prices after it acquired Actavis, Olafsson fraudulently answered that Teva had never increased prices to drive profits, and that "*pricing comes with shortages in the market* ... if there's some kind of dysfunction in the market, there might be a *small pricing opportunity that usually comes in and comes out*." Olafsson failed to disclose that Teva had made 76 price increases on 60 drugs, none of which were due to shortages. As had been the case, with increased pricing pressure, the Inflated Profit was continuing to decline.

129.    With the truth still concealed, the J.P. Morgan analyst was pacified, writing, "[Teva's] US generics business [was] modest[ly] below expectations but generic pricing environment remains stable." Morningstar analysts similarly wrote that Teva's "Management also noted underlying price erosion remains consistent in the mid-single digits at approximately 4%."

130.    The table below reflects the change in Teva's profits as reported in the first half of 2016, as well as the change in Inflated Profits for the same period:

| 2016 ($ millions) | Q1 | Q2 | Half-Year |
|---|---|---|---|
| **Reported YOY Change in Generics Profit** | -$215 | -$115 | -$330 |
| **(Unreported) YOY Change in Inflated Profit** | -$104 | -$122 | -$227 |

131.    <u>Teva's Generics Day</u>: On September 9, 2016, Teva held its "Generics Day" for investors, during which the Exchange Act Defendants continued to deny that Teva had ever inflated its generics prices. Olafsson stated that "[t]here is no inflation in the generic pricing"; "people that say that ... there's a big generic price inflation, ***are simply wrong***." He reiterated the false statement that price increases were a result solely of market abnormalities like shortages: "When price increases are taken, there's some kind of abnormality in the business. There are shortages."

132.    Olafsson also falsely touted Teva's purported "secret sauce" that made Teva immune from pricing pressure. In reality, there was no "secret sauce"; Teva did face pricing pressure on its drug portfolio and had "big generic price inflation" from years of large price hikes made pursuant to the Price-Hike Strategy. The Scorecards, LBEs and Work Plan would have reflected this pricing pressure.

10.   **Fourth Quarter 2016 – Teva Reported As Target Of Investigations; Disastrous Results; DOJ And State AG Charges; Executives Fired**

133.   <u>Bloomberg Article; DOJ Charges & State AGs Loom</u>: On November 3, 2016, *Bloomberg* published an article titled, "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," revealing for the first time that "according to people familiar with the matter," "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion" as the "antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs," and "the first charges could emerge by the end of the year." Moreover, "Connecticut Attorney General George Jepsen ... is seeking to lead a group of states ... seeking damages." Teva was specifically named as one of the companies.

134.   This was the first time that Teva was publicly reported as a potential target of criminal and civil liability. Immediately after the release of this information, the price of Teva Securities fell, with its ADS price plummeting 9%.

135.   <u>Disastrous Third Quarter Results; Continued Denials</u>: On November 15, 2016, Teva reported results for its third quarter of 2016. This was Teva's first financial report since acquiring Actavis. With Actavis revenues removed, Teva reported that its legacy U.S. generics revenues declined $277 million YOY from the third quarter of 2015, but attributed this decline to divestments and lost sales from certain drugs and concealed that as much as $121 million, or 44%, of the overall YOY decline, was attributable instead to a YOY decline in Inflated Profit as the Price-Hike Strategy crumbled. The Scorecards would have once again reflected the "hole" between forecasts and actual revenues that had been captured in the LBEs previously, and circulated to Olafsson, Desheh, and Vigodman.

136.   Olafsson continued to falsely insist, however, that "like previous quarters, there

*hasn't been any fundamental change in the US drug pricing*." When a Wells Fargo analyst asked whether the reported 7% increase in price erosion was a "result of having to tame previous price increases, or give back some of those?" Olafsson fraudulently stated "No," and insisted that the number increased because of divested drugs and was thus an anomaly limited to the quarter. In reality, the increase in price erosion was causing a dramatic decline in Inflated Profit. Figure 1. A J.P. Morgan analyst questioned Olafsson again, stating that "anyone that look[s] at the industry as a whole, it feels like this [is] a broader issue than [a] one-off market disruption." Once again, Olafsson adamantly insisted that "there hasn't again been any fundamental change" in pricing.

137.    The analysts were comforted by these false statements. Deutsche Bank wrote: "management continue[d] to expect mid-single digit price erosion in 4Q and over the longer term."

138.    <u>Olafsson Is Fired</u>: On December 5, 2016, less than three weeks later, Teva made the surprising announcement of Olafsson's "retirement." He was immediately replaced by Bhattacharjee as the new CEO, Global Generic Medicines Group. The reality was that 48-year old Olafsson had been fired. He is now the CEO of Hikma Pharmaceuticals PLC, as well as a director for additional companies.

139.    Analysts concluded that Olafsson had been terminated due to the poor performance of Teva's generics division. Analysts were unaware that the sudden change in performance was actually the materialization of the risks associated with the Price-Hike Strategy: Inflated Profit suddenly dropped; law enforcement was pursuing Teva; Teva's price-inflated generics portfolio was increasingly vulnerable to pricing pressure; and Teva could not mask its poor results with price increases.

140.    <u>DOJ Criminal Charges; State AGs Sue Teva</u>: On December 14, 2016, the DOJ announced it had charged (by information) Glazer and Malek, the former CEO and the former

President, respectively, of Heritage, a competitor of Teva's, for their roles in conspiracies to fix prices, rig bids, and allocate customers, including manipulating the market for Glyburide from 2013 through the end of 2015. With Teva controlling over 75% of the market for Glyburide during the Relevant Period, the connection between Teva and the DOJ's charges was clear.

141.    One day later, on December 15, 2016, the Connecticut AG announced that he and 19 other State AGs had filed a federal lawsuit for antitrust violations against Teva USA and five other major drug companies, alleging that Teva conspired on Glyburide. The State AGs' complaint cited emails, calls, and documents that evince explicit collusion between Teva and Heritage's principals, Malek and Glazer.

142.    The State AGs' complaint has been amended to include 13 additional drugs, seven of which implicate Teva, and 47 State AGs, as well as the AGs from the District of Columbia and Puerto Rico. That complaint is based in part on Glazer's and Malek's cooperation, each of whom has settled with the State AGs in exchange for cooperation. The State AGs are now investigating conspiracies regarding approximately 200 drugs, have led to additional complaints. Malek and Glazer have also pleaded guilty to Federal criminal charges, admitting that they participated in "a conspiracy to suppress and eliminate competition by allocating customers and fixing and maintaining prices for glyburide, from in or about April 2014 and continuing until at least December 2015," in violation of the Sherman Act.

## 11.    January – August 3, 2017, The End Of The Relevant Period

143.    On January 6, 2017, after Olafsson's departure, Teva provided its 2017 guidance a month earlier than planned, surprising analysts by announcing a significant reduction in performance. Vigodman attributed the reduction to previously-unannounced poor performance, and an "EBITDA gap of $1.2 billion emanating from our US generics business." Teva's legacy generics business "explain[ed] the majority of the gap." As a result, the price of Teva Securities

plummeted.

144.    Vigodman concealed, however, that this EBITDA "gap" was the result of the collapse of Teva's Price-Hike Strategy and concomitant decline in Inflated Profit. In 2016, Inflated Profit was only $420 million, compared to $848 million in 2015. In each quarter of 2016, Inflated Profit declined at least 45% YOY. In 2016, Teva made only five modest (~25%) price increases, on drugs that had already faced price increases.

145.    The following chart reflects the YOY reduction in Inflated Profit on a quarterly basis from 2015 to 2016:

| Inflated Profit ($ millions) | Q1 | Q2 | Q3 | Q4 | Full-Year |
|---|---|---|---|---|---|
| Inflated Profit | $228 | $236 | $218 | $166 | $848 |

146.    Vigodman continued to fraudulently claim that Teva's profitability since 2014 was "accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure," and "not by price."

147.    <u>Vigodman Is Terminated</u>: On February 6, 2017, Teva announced Vigodman's termination, effective immediately. As a temporary replacement, Teva appointed Peterburg, its Chairman of its Board since January 2015, as Interim President and CEO. The price of Teva Securities dropped significantly as a result of this news. The truth was that, like Olafsson, Teva had fired Vigodman. The Price-Hike Strategy was crushed along with the many years of success that Vigodman had touted.

148.    On February 13, 2017, Teva announced its full year 2016 and fourth quarter 2016 results. The Exchange Act Defendants disclosed that Teva's legacy U.S. generics business saw a reported $233 million YOY decline in quarterly revenues. Teva did not disclose that as much as $80 million of that YOY decline was a result of a decrease in Inflated Profit.

149.    For the full year of 2016, if excluding Actavis, Teva saw a ***decline*** in its legacy YOY U.S. generic revenue by $1.4 billion, which it attributed to a loss of exclusivity, lower sales of certain drugs, and the loss of revenues from divested product. What Teva did not disclose was that as much as $427 million of the yearly decline was a result of the decline in Inflated Profit.

150.    <u>Desheh Finally Out, $6.1 Billion Charge Announced</u>: On June 8, 2017, Teva announced four new Board nominations in an effort to reassure investors that Teva was acting to redeem itself. By June 21, 2017, Desheh left Teva to pursue a role at another company.

151.    On August 3, 2017, without the principal architects of Teva's Price-Hike Strategy, Desheh, Vigodman, and Olafsson, and with the new Board members in place, Teva charged $6.1 billion against its U.S. generics business, resulting in a permanent reduction in Teva's valuation and a dollar-for-dollar hit to its bottom line. Moreover, in stark contrast to the previous thirty years, Teva announced a 75% reduction in its shareholder dividend. Teva also reported a loss of $5.94 per share and drastically cut guidance again. The further revised guidance was a direct result of the foreclosed Price-Hike Strategy and disappearance of Inflated Profits that had fallen to $53 million per quarter.

152.    In light of this news, and with Teva facing $30 billion in debt that it had to service, credit rating agencies downgraded Teva's debt rating to just one notch above "Junk." Investors sold Teva Securities at an alarming rate, and Teva's ADS price fell precipitously.

**C.    False And Misleading Statements And Omissions**

153.    During the Relevant Period, the Exchange Act Defendants made three types of false and misleading statements or omissions on conference calls with investors and in SEC filings:

- <u>Item 5</u>    The Exchange Act Defendants violated their statutory duty to disclose material trends under Item 5 of Form 20-F. Defendants failed to disclose the material trend of generating profit as part of the concealed Price-Hike Strategy. They also concealed the trend of declining Inflated

Profit, and that they could no longer make price increases as the strategy unraveled.

- <u>False Statements Regarding Competition</u>   These statements falsely indicated that Teva was participating in competitive and functioning markets for generic drugs. To the contrary, Teva made dozens of price increases in tandem with its competitors. Teva and these companies deliberately did not compete on price.

- <u>False and Misleading Pricing Statements</u>   These statements concealed Teva's Price-Hike Strategy and the profits it generated. Later, the statements concealed that the Price-Hike Strategy fell apart as Teva was unable to make more price increases or sustain Inflated Profit. These statements were particularly misleading as the Exchange Act Defendants touted, and investors were highly attuned to, the sources of the generic segment's purported success.

154.    The alleged false and misleading statements and omissions below that were made in Teva's financial disclosures filed with the SEC, and were attributable to the Exchange Act Defendants as follows. Desheh was responsible for and signed each Form 20-F and 6-K. Vigodman was responsible for each Form 20-F and 6-K filed during his tenure as Teva's CEO. Olafsson was responsible for the reporting for Teva's generics segment in each Form 20-F and 6-K from the third quarter of 2014 through the third quarter of 2016. Oberman was responsible for the financial reporting for Teva's U.S. generics segment in Teva's Form 20-F for 2013, and Teva's 6-Ks for the first three quarters of 2014.

### 1.    Defendants Violated Their Statutory Duty To Disclose Pricing Trends

155.    During the Relevant Period, Defendants were under a statutory duty of disclosure pursuant to Item 5 of Form 20-F ("Item 5"), interpreted by the SEC and courts to require the same disclosures as Item 303 of Regulation S-K ("Item 303"). Item 303 (and Item 5) require that a foreign issuer like Teva must, in the Management Discussion and Analysis ("MD&A") section of its Forms 20-F, describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or, unfavorable impact on net sales or revenues

or income from continuing operations. The failure to disclose a material trend or uncertainty in violation of Item 303 is an omission that is actionable under the securities laws.

156.    According to the SEC's interpretive release regarding Item 303, disclosure is necessary where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations. Even if Defendants were not certain about the likely effect of the event or trend on their future revenues, Defendants were still required under Item 303 to disclose the manner in which that then-known trend, event, or uncertainty might reasonably be expected to materially impact Teva's future revenues.

157.    SEC Staff Accounting Bulletin No. 104 explains this disclosure duty further, requiring that management disclose in the MD&A section the impact of artificial or collusive price increases, demanding that: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

158.    During the Relevant Period, under Item 303, Defendants failed to disclose at least two trends related to the pricing of Teva's generic drugs. First, Defendants failed to disclose the trend that Teva's financial success was driven in a material way by the Price-Hike Strategy. These price increases, as discussed, generated as much as $2.3 billion in Inflated Profit for Teva over the Relevant Period. Yet, the Price-Hike Strategy and the Inflated Profits it generated were risky and unsustainable as the Price-Hike Strategy was susceptible to actual competition, as well as public scrutiny, and scrutiny by legislatures, regulators and criminal investigators.

159.    Second, starting no later than the beginning of 2016, Defendants failed to disclose the by-then known trend that the Price-Hike Strategy was beginning to fail. Teva could not

maintain the Inflated Profits as industry-wide pricing pressure, which Defendants consistently

denied, was reducing the inflated prices on Teva's generic drug portfolio. Teva was also finding it

increasingly difficult, if not impossible, to make additional price increases because of the scrutiny

from the public, Congress, and the DOJ and State AGs investigations; and indeed, Teva effectively

could not make any price increases after the DOJ subpoena was served on June 21, 2016.

160.     SEC Release No. 33-8350 provides MD&A disclosure guidance that is a nearly

perfect analogy to the facts here, requiring that:

> [I]f a company's financial statements reflect materially lower
> revenues resulting from a decline in the volume of products sold
> when compared to a prior period, MD&A should not only identify
> the decline in sales volume, but also should analyze the reasons
> underlying the decline in sales when the reasons are also material
> and determinable. The analysis should reveal underlying material
> causes of the matters described, including for example, if applicable,
> difficulties in the manufacturing process, a decline in the quality of
> a product, loss in competitive position and market share, or a
> combination of conditions.

161.     Instead, in violation of its duties under Item 303, Teva only disclosed trends that

did not bear on the issue of price inflation (through price increases), or price erosion. Teva's failure

to disclose the pricing trends was particularly misleading given that (i) price increases were a core

but concealed business strategy; (ii) management concurrently denied that pricing had impacted

Teva's bottom line and that the Company made price increases simply for profit, (iii) management

consistently minimized the positive impact of price increases on Teva's profits, (iv) management

consistently denied that price increases had resulted in price inflation, and (v) management denied

that price deflation was materially affecting Teva, even as its revenues from the former price

increases cratered.

### 2. The Exchange Act Defendants' False And Misleading Statements That Teva Operated In A Competitive Market With Respect To Price

162.    Throughout the Relevant Period, on conference calls and in Teva's SEC filings, the Exchange Act Defendants made materially false and misleading statements concerning purported "intense" or "fierce" competition on price in the U.S. market for generic drugs. These statements gave investors the false impression that the markets for generic drugs were functioning as intended. Given that their products are undifferentiated commodities, the only way that generics manufacturers can compete is on the price of their products. Such competition is the very purpose of the generics market, which was created to drive the price of generic drugs towards their marginal cost of production, opening access for patients to life-saving medicines.

163.    The Exchange Act Defendants' statements about supposed competition on price by generics manufacturers were materially false and misleading because Teva was not in fact competing on price. Instead, Teva and its competitors, on at least 48 occasions, raised their prices in tandem, often in very large amounts of well over 100%, rather than use lower prices to increase market share. Teva would also raise the price of drugs on which it had a monopoly, while other generics manufacturers stayed on the sidelines instead of entering the market. Teva was profiting from a lack of competition, not from thriving in a competitive market environment. The markets for generic drugs were not functioning competitively; rather than compete, generic drug manufacturers would deliberately and intentionally choose not to.

#### a) False Statements On Conference Calls

164.    <u>July 27, 2015 Conference Call</u>: On Teva's investor call to discuss the Actavis acquisition, Olafsson responded to a question concerning the competitive landscape of the generic drug market, stating that "the U.S. generic market is very competitive ... [T]here's fierce competition on most of the portfolio, if not all of the portfolio."

165. On that same conference call, Vigodman added:

> [W]e promise to do everything in our power to basically take the company to be able to continue the improvement that we have been witnessing here. We believe in competition, and we'll do what is needed in order to win in all the markets we operate.

166. <u>October 29, 2015 Earnings Call</u>: On the earnings call relating to Teva's Q3 2015 financial results, Olafsson similarly falsely stated that "[s]o on the pricing, I think pricing is obviously based on the competition. We have talked about that the overall pricing trend is down."

167. During the conference call, Defendant Olafsson also touted the previously announced Actavis acquisition as "highly synergetic and accretive." Olafsson cautioned, however, that Teva could not begin the integration of the two companies prior to the acquisition closing because Teva was "competing with [Actavis] in the market on a day-to-day" basis.

168. <u>November 19, 2015 Conference Call</u>: Desheh, on an additional investor conference call, again falsely stressed that Teva was fiercely competing in generics markets:

> Generic prices. There is – there are no – I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States ... So it is a highly competitive environment with players coming from all over the world with a very fierce price competition. The price of generic went down 50% over the past 10 years .... So we're playing a competitive game. We're playing it fairly. We of course play by the book and by the rule ... And we are in short playing in a very competitive market.

169. The statements and omissions set forth in ¶¶164-168 were materially false and misleading. Contrary to Olafsson's July 27, 2015 statement, by that time there was not "fierce competition on most of ... if not all of" Teva's generic drug portfolio. Since July 2013, Teva had made, pursuant to the Price-Hike Strategy, 61 price increases without any competitor competing on price. At least 48 of those price increases were made in tandem with Teva's supposed competitors. Vigodman's July 27, 2015 statement that "we believe in competition" was also false as a result, and the fact that the Officer Defendants had adopted and participated in the Price-Hike

Strategy, the success of which depended on a lack of competition. Olafsson's October 29, 2015 declaration that "pricing is obviously based on competition" was false because, by then, the opposite was true: pricing for the drugs subject to the Price-Hike strategy was based on a distinct lack of competition. Desheh's November 19, 2015 statements that Teva was "playing a competitive game...by the rule" in the generics markets was false and misleading for all the reasons that the other statements were. Each of these statements was particularly misleading given the importance of the concealed price increases to Teva's bottom line, and because the profits from this concealed source were in fact the centerpiece of Teva's supposed turn-around and its success.

**b)    False Statements In Teva's SEC Filings**

170.    In each of the Forms 20-F that Teva filed for the years 2013, 2014, and 2015, the Exchange Act Defendants made substantively identical false and misleading statements (adopted by reference in each quarterly filing) that (i) warned investors that "intense" competition was a primary risk Teva faced in the U.S. generic drug market, and that competition would force the price of generic drugs down, as would be expected; and (ii) described how Teva's competitive advantage was a "competitive pricing strategy" and the ability to launch new generics:

> Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

> In the United States, **we are subject to intense competition in the generic drug market** from other domestic and foreign generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. **We believe that our primary competitive advantages are our ability to**

**continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.**

171.    The Company also stated in the 2013 20-F that the primary factors driving earnings and growth in its generics segment were "aging population, an increase in global spending on healthcare, [and] economic pressure on governments to provide less expensive healthcare solutions."

172.    The statements and omissions set forth in ¶¶170-171 were materially false and misleading because, while the Exchange Act Defendants represented that the U.S. generic drug market was working effectively as designed by forcing rival generic drug manufacturers to compete for market share by underbidding each other on price, the opposite was true. Teva had made dozens of price increases over this time, including dozens in tandem with competitors. The statements to the effect that that "price typically declines, often dramatically" because of competition, resulting in "margin pressure," and that Teva's means to combat the purported effects of competition were through launches and a "competitive pricing strategy," were materially false and misleading because they concealed that in 2013, 2014, and 2015 Teva implemented the Price-Hike Strategy and undertook, respectively, 18, 31, and 18 systematic increases of generic drug prices to generate billions in Inflated Profits, by deliberately taking advantage of markets that lacked competition.

### 3.    False And Misleading Statements And Omissions Regarding Pricing

173.    The Exchange Act Defendants made numerous statements to conceal their Price-Hike Strategy and its effects. Those false and misleading statements fall into four general categories:

> (1) Statements in SEC filings that attribute the YOY changes in
>       Teva's generic segment profit and U.S. generic revenues to

sources other than the YOY changes in Inflated Profit from price hikes, which are misleading half-truths. Once the Exchange Act Defendants spoke on these subjects, they had a duty to fully and accurately describe the source of Teva's profits.

(2) Flat denials that Teva had engaged in and derived material financial benefit from price increases.

(3) False claims of limited price hikes asserting that Teva only raised prices on a select few generic drugs when there was a shortage or other abnormality in the market of that drug, when in fact none of the dozens of price increases the Company made were accompanied by a shortage.

(4) Denials of pricing pressure even as Teva could not maintain the Inflated Profit from price increases or implement new price increases.

### a)  Fourth Quarter And Full Year 2013 False And Misleading Financial Disclosures

174.    On February 6, 2014, Teva filed a press release disclosing its fourth quarter 2013 ("Q4 2013") financial results (the "Q4 2013 Press Release") and held an investor earnings conference call (the "Feb. 6, 2014 Earnings Call"). On February 10, 2013, the Exchange Act Defendants filed Teva's annual report with the SEC on Form 20-F (the "2013 20-F"), reporting Teva's full-year 2013 financial results.

175.    Q4 2013 Press Release: The Q4 2013 Press Release announced U.S. generics revenues of $1.2 billion for the fourth quarter, a YOY increase of $144 million, or 14%, which it stated "[r]esulted mainly from the exclusive launches of [niacin ER and temozolomide] ... in the third quarter of 2013, and launches of [duloxetine and tobramycin] ... in the fourth quarter of 2013, as well as higher sales of budesonide inhalation."

176.    The statements and omissions set forth in ¶175 were materially false and misleading because, having attributed the source of the revenue increase, the Exchange Act Defendants had a duty to disclose, but concealed the full truth that the Price-Hike Strategy, whereby Teva made at

least 18 systematic price hikes in July and August 2013, contributed materially to the results. These price increases generated as much as $147 million in Inflated Profit in Q4 2013, comprising the entire YOY increase in U.S. generic revenues.

177.   <u>2013 20-F</u>: The 2013 20-F disclosed a YOY decline in generic profit of $400 million, or 20%, "primarily" attributed to "lower revenues and lower gross profit, which were partially offset by a reduction in selling and marketing expenses," and "by sales of higher profitability products in the United States."

178.   The 2013 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Desheh and Altman, stating that the financial information contained in the 2013 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

179.   The statements and omissions set forth in ¶¶177-178 were materially false and misleading because, while the Exchange Act Defendants attributed the sources offsetting the decline, they had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 18 systematic price hikes in July and August 2013, contributed materially to the results. These price increases generated as much as $250 million in Inflated Profit in 2013 and, without that Inflated Profit, Teva would have reported a $650 million YOY decline in generic profit, or a 32% decrease, rather than the 20% decline reported by the 2013 20-F. The contribution of the Inflated Profit was significant, particularly in comparison to the attributed reduced S&M expenses, which declined only $26 million compared to 2012.

**b)      First Quarter 2014
           False And Misleading Financial Disclosures**

180.   On May 1, 2014, Teva held an investor earnings conference call ("May 1, 2014 Earnings Call"). On May 2, 2014, Teva filed its first quarter 2014 (the "Q1 2014") financial

statements on Form 6-K with the SEC (the "Q1 2014 6-K").

181.    In the Q1 2014 6-K, for the quarter, Teva reported revenues in its generic drug segment of $2.398 billion, including $1.048 billion in revenues from the U.S. market. The Company also reported quarterly segment profitability for its generics business of $499 million.

182.    The Q1 2014 6-K disclosed a YOY increase in generic profit of $117 million, or 31%, which was purportedly "primarily" due to:

> [H]igher revenues, higher gross profit and a reduction in selling and marketing expenses," with higher gross profit attributed to "the change in the composition of revenues in the United States and Europe, mainly products launched during the first quarter of 2014 and in the United States in the second half of 2013.

183.    In the Q1 2014 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

> United States Generic Medicine Revenues
>
> In the first quarter of 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 512 million, representing 15.0% of total U.S. generic prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and cost-effective production.

184.    During the May 1, 2014 Earnings Call, Desheh attributed the growth in U.S. generic revenues to "new product launches": "Teva's generics division experienced significant growth in the United States market, with 17% year-over-year growth, to a total of $1 billion with a number of new product launches."

185.    The statements and omission set forth in ¶¶181-184 were materially false and misleading because, having attributed the sources of the increases, the Exchange Act Defendants

had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 18 systematic price hikes implemented in July and August 2013, contributed materially to the results. The price increases generated as much as $120 million in Inflated Profit in Q1 2014 that accounted for all of the increase in generic profit, and nearly all of YOY growth in U.S. generic revenues. The Inflated Profit amounted to nearly three times the $42 million YOY reduction in S&M expenses.

### c)     Second Quarter 2014 False And Misleading Financial Disclosures

186.    On July 31, 2014, Teva filed its second quarter 2014 ("Q2 2014") financial statements on Form 6-K with the SEC ("Q2 2014 6-K), and held an investor earnings conference call ("July 31, 2014 Earnings Call").

187.    In the Q2 2014 6-K, for the quarter, Teva reported revenues in its generic drug segment of $2.515 billion, including $1.068 billion in revenues from the U.S. market. The Company also reported quarterly segment profitability for its generics business of $532 million.

188.    The Q2 2014 6-K disclosed a YOY increase in generic segment profit of $156 million, or 41%, "primarily" attributed to:

> [A] significant reduction in selling and marketing expenses, higher revenues and higher gross profit," which was attributed to "higher revenues in the United States, specifically of products launched during the first half of 2014 and in the second half of 2013, and higher revenues in Canada as well as ... the change in the composition of revenues in Europe.

189.    In the Q2 2014 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

> United States Generic Medicine Revenues
>
> In the second quarter of 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 508 million, representing 14.7% of total U.S. generic

prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and cost-effective production.

190.    On the July 31, 2014 Earnings Call, Desheh similarly attributed the "better results" in Teva's generic segment to "[t]he launches of 'generic Xeloda in March and generic LOVAZA this quarter in the U.S. market.'"

191.    The statements and omission set forth in ¶¶187-190 were materially false and misleading because, having attributed the source of the profit increase, the Exchange Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 30 systematic price hikes since July 2013, 12 of which were made in April 2014, contributed materially to the results. These price increases generated as much as $160 million in Inflated Profit in Q2 2014 that comprised all of the YOY increase in generic profit, and amounted to more than one and a half times the $101 million YOY reduction in S&M expenses to the Exchange Act Defendants attributed the generic profit increase.

### d)    Third Quarter 2014 False And Misleading Financial Disclosures

192.    On October 30, 2014, Teva filed its third quarter 2014 ("Q3 2014") financial statements on Form 6-K with the SEC (the "Q3 2014 6-K"), and held an investor earnings conference call (the "Oct. 30, 2014 Earnings Call").

193.    In the Q3 2014 6-K, for the quarter, Teva reported revenues in its generic drug segment of $2.432 billion, including $1.124 billion in revenues from the U.S. market. The Company also reported quarterly segment profitability for its generics business of $556 million.

194.    The Q3 2014 6-K disclosed a YOY increase in generic profit of $160 million, or

40%, which was purportedly "primarily" from:

> [H]igher gross profit and a significant reduction in selling and marketing expenses," with higher gross profit attributed to "lower expenses related to production, higher revenues from our API business as well as higher gross profit due to the change in the composition of revenues.

195.    In the Q3 2014 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

> **United States Generic Medicine Revenues**
>
> In the third quarter of 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 504 million, representing 14.4% of total U.S. generic prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and cost-effective production.

196.    During the Oct. 30, 2014 earnings call, Vigodman also attributed Teva's results to new products:

> I think overall, we have a good revenue of the new launches this year – capecitabine, the generic Lovaza, Omega-3 and entecavir. Entecavir was a new launch for us in the quarter. I think all these three products have been very significant contributors to the year.

197.    The statements and omission set forth in ¶¶193-196 were materially false and misleading because, having attributed the source of the profit increase, the Exchange Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 50 systematic price hikes since July 2013, 20 of which were made in Q3 2014, contributed materially to the results. These price increases generated as much as $193 million in Inflated Profit in Q3 2014, a YOY increase of $90 million. That YOY increase of as much as $90 million accounted for over half of the YOY increase in generic profit, and was more than the entire

$81 million YOY reduction in S&M expenses to which the Exchange Act Defendants attributed the generic profit increase.

198.   Oct. 30, 2014 Earnings Call: By this time, Congress had sent a letter to Vigodman requesting information regarding price increases, Lannett and Impax had both disclosed subpoenas from the Connecticut AG, and articles had highlighted increased drug prices on certain drugs Teva did not sell. In this context, on the Oct. 30, 2014 Earnings Call, the UBS analyst asked "could you talk about Generics a little bit in the U.S. ... whether there were price increases in some of your base business and whether that impacted some of" Teva's financial performance?

199.   Vigodman denied that Teva was engaged in any price increases, particularly any that had resulted in hundreds of millions of dollars in Inflated Profit:

> I think that pricing – I've said it before, there's never a price increase on the base business as a whole. Like any other business, if there's a pricing opportunity that comes in the market, we look for that. But the base business itself has been eroding overall because of the consolidation of the customers.

Vigodman then explained that the market was functioning under normal conditions, *i.e.*, that prices increase only where there are shortages or market dynamics:

> When there's an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business. But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business.

200.   Vigodman's statements and omissions set forth in ¶199 were materially false and misleading because, far from price increases only occurring when there are shortages or market dynamics so dictate, Teva had adopted the Price-Hike Strategy. Vigodman concealed that Teva had increased prices on 50 drugs and that those concealed increases—the very subject of the UBS analyst's question—resulted in as much as $720 million in Inflated Profit reported since the start of the Relevant Period, and as much as $193 million in Q3 2014 alone, on drugs for which there

were no shortages.

### e)      December 11, 2014 False And Misleading Statements

201.    On December 11, 2014, Teva held a guidance call to discuss Teva's 2015 business outlook (the "Dec. 11, 2014 Guidance Call"). On the call, and in light of increased reports of price hikes on generic drugs, the Morgan Stanley analyst asked: "with respect to generic inventory in the channel, both for Teva and for other generic manufacturers, I'm assuming that wholesalers have been seeing extraordinary price increases in recent years and has been buying inventory ahead of tremendous price increases?"

202.    Olafsson flatly denied even the existence of price increases, and minimized the possibility that Teva had engaged in large price increases:

> So first let me correct. I have to disagree that they have experienced tremendous price increase. I think, overall, the pricing in the U.S. of generics has been flat to a slight down. There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products.

203.    The statements and omission set forth in ¶202 were materially false and misleading because, in responding to a direct question regarding price hikes, Olafsson had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 50 systematic price hikes since July 2013, with 32 in 2014, contributed materially to the results. Far from a limited issue involving "a few products," by Q3 2014, Teva's dozens of increases generated a total of as much as $720 million in pure profit, which would increase to as much as $943 million by the end of 2014. Olafsson's statement that pricing had been "flat to a slight down" across the U.S. generics market concealed the full truth that Teva's business model since 2013 had generated 30% of Teva's overall profit from drastic price increases on generics drugs.

f)     **Fourth Quarter and Full Year 2014
False And Misleading Financial Disclosures**

204.    On February 5, 2015, Teva filed a press release with the SEC that reported the

Company's fourth quarter 2014 ("Q4 2014") and full year 2014 ("FY 2014") financial results (the

"Q4 2014 Press Release"). On February 9, 2015, Teva filed its 2014 20-F with the SEC (the "2014

20-F") reporting the Company's FY 2014 financial results, and held an investor earnings

conference call (the "Feb. 5, 2015 Earnings Call"). The false statements in the 2014 20-F are also

incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh,

and Griffin signed, the ADS Final Prospectus, and the Preferred Final Prospectus.

205.    <u>Q4 2014 Press Release</u>: The Q4 2014 Press Release disclosed a YOY increase in

generic profit of $47 million, or 9%, attributed "primarily" to: "[O]ur lower S&M expenses and

lower R&D expenses."

206.    The statements and omissions set forth in ¶205 were materially false and misleading

because, having attributed the source of the profit increase, the Exchange Act Defendants had a

duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at

least 50 systematic price hikes since July 2013, 32 of which were made in 2014, contributed

materially to the results. These price increases generated as much as $219 million in Inflated Profit

in Q4 2014, a YOY increase of as much as $72 million. That $72 million YOY increase accounted

for the entire YOY increase in generic profit. In contrast, Exchange Act Defendants attributed the

increased generic profit to a $113 million YOY reduction in S&M expenses, and an $8 million

YOY reduction in R&D expenses.

207.    <u>2014 20-F</u>: The 2014 20-F disclosed a YOY increase in generic profit of $480

million, or 29%, attributed to:

> [L]ower S&M expenses and higher gross profit," which was
> purportedly "mainly a result of higher revenues in the United States,

specifically of products launched during 2014 and in the second half of 2013, and higher revenues in Canada, which led to higher gross profits, as well as higher gross profit from API sales to third parties.

208. In the 2014 20-F, for the year, Teva reported revenues in its generic drug segment of $9.814 billion, including $4.418 billion in revenues from the U.S. market. The Company also reported annual segment profitability for its generics business of $2.148 billion.

209. In the 2014 20-F, Teva also discussed the competitive landscape in the U.S. market, which the Company described as intensely competitive. Specifically, the 2014 20-F states, in relevant part:

> In the United States, **we are subject to intense competition in the generic drug market** from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. **We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.**

210. The Company also stated in the 2014 20-F that the primary factors driving earnings and growth in its generics segment were "aging population, an increase in global spending on healthcare, [and] economic pressure on governments to provide less expensive healthcare solutions."

211. The 2014 20-F contained signed certifications pursuant to SOX by Defendants Vigodman and Desheh, stating that the financial information contained in the 2014 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

212. The statements and omission set forth in ¶¶207-211 were materially false and

misleading because, having attributed the source of the profit increase, the Exchange Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 50 systematic price hikes since July 2013, 32 of which were made in 2014, contributed materially to the results. These price increases generated as much as $693 million in Inflated Profit in 2014, a YOY increase of as much as $443 million, which increase accounted for nearly the entire YOY increase in generic profit, and was more than the entire $337 million reduction in S&M expenses to which the Exchange Act Defendants attributed the increase in generic profit.

213.    The table below reflects Teva's improved profits as reported in 2014, as well as the YOY change in Inflated Profits for the same period:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full-Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $117 | $156 | $160 | $47 | $480 |
| (Unreported) YOY Change in Inflated Profit | $120 | $160 | $90 | $72 | $443 |

### g)    First Quarter 2015 False And Misleading Financial Disclosures

214.    On April 30, 2015, Teva filed its first quarter 2015 ("Q1 2015") financial statements on a Form 6-K with the SEC (the "Q1 2015 6-K"), and held an investor earnings conference call (the "April 30, 2015 Earnings Call"). The false statements in the Q1 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

215.    In the Q1 2015 6-K, for the quarter, Teva reported revenues in its generic drug segment of $2.621 billion, including $1.439 billion in revenues from the U.S. market. The Company also reported quarterly segment profitability for its generics business of $799 million.

216.    The Q1 2015 6-K disclosed a YOY increase in generic profit of $296 million, or 59%, attributed "primarily" to:

> [H]igher gross profit and lower selling and marketing expenses as well as lower research and development expenses," with higher gross profit purportedly "mainly a result of the launch of esomeprazole in the United States during the quarter and improved profitability of our European business.

217.    In the Q1 2015 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

> **United States Generic Medicines Revenues**
>
> In the first quarter of 2015, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 488 million, representing 13.7% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production.

218.    On the April 30, 2015 Earnings Call, Olafsson similarly concealed the impact of the Price-Hike Strategy when discussing the sources of the improvements in generic profitability since the beginning of 2014. On the call, the Bank of America analyst asked, "[H]ow much more potential exists to increase generic segment margins purely from organic gains and operational efficiency?" Olafsson claimed that the "1,000 basis points improvement over a two years period" in "operating profit in the generics segment" was attributable to "probably three or four things":

> First of all, ... significant improvement in our cost of goods... the next thing is the portfolio offering ... [including] exclusive complex generics of offering ... [as] when we have more of the launches, it will drive up the margin. The third thing is the cost infrastructure.

219.    The statements and omission set forth in ¶¶215-218 were materially false and misleading because, having attributed the source of the profit increase, the Exchange Act

Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 64 systematic price hikes since July 2013, 14 of which were made in January 2015, contributed materially to the results. These price increases generated as much as $228 million in Inflated Profit in Q1 2015, a YOY increase of as much as $108 million, which increase accounted for over a third of the YOY increase in generic profit. The Inflated Profit increase also amounted to more than double the $43 million YOY reduction in S&M expenses, and nine times the $12 million YOY reduction in R&D expenses, to which the Exchange Act Defendants attributed the increased generic profit. Olafsson's statements on the call were also misleading because they concealed that the Price-Hike Strategy was a fundamental part of Teva's improvement. By the end of Q1 2015, Teva had generated as much as $1.1 billion in Inflated Profit on the price increases since July 2013.

### h)      June 11, 2015 False And Misleading Statements

220.      As investors, analysts, and the Exchange Act Defendants were focused on Teva's outstanding offer to acquire Mylan, during a June 11, 2015 Goldman Sachs conference, Vigodman touted "the profound change in the generic business," since 2014, stating:

> These "are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014," and attributing this success solely to "[t]he execution of the cost reduction program: $600 million net savings, 2014; $500 million, 2015," and a "[f]ull transformation of our operational network," claiming that "[w]e closed or divested 11 plants during the last 12 months[;] [w]e centralized procurement.... So everything that was done during 2014 was based on organic ... moves only."

221.      The statements and omissions set forth in ¶220 were materially false and misleading because, having attributed the source of the profit increase, Vigodman had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 64 systematic price hikes since July 2013, which generated over $1.1 billion in Inflated Profit by the close of Q1

2015, contributed materially to the results. Strikingly, the excess profit of as much as $1.1 billion generated by the price increases accounted for all of the improved operating profit that Vigodman touted.

> i)   **Second Quarter 2015**
> **False And Misleading Financial Disclosures**

222.    On July 30, 2015, Teva filed its second quarter 2015 ("Q2 2015") financial statements on a Form 6-K with the SEC (the "Q2 2015 6-K"), and held an investor earnings call regarding the financial results and the Actavis transaction (the "July 30, 2015 Earnings Call"). The false statements in the Q2 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

223.    In the Q2 2015 6-K, Teva reported, for the quarter, that revenues in its generic drug segment of $2.466 billion, including $1.326 billion in revenues from the U.S. market. The Company also reported quarterly segment profitability for its generics business of $729 million.

224.    The Q2 2015 6-K disclosed a YOY increase in generic profit of $193 million, or 36%, attributed "primarily" to:

> [H]igher gross profit as well as lower selling and marketing expenses," while claiming that higher gross profit was "mainly a result of higher gross profit in the United States, due to the launches of aripiprazole in the second quarter of 2015 and of esomeprazole during the first quarter of 2015, and lower production expenses.

225.    In the Q2 2015 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

> **United States Generic Medicines Revenues**
>
> In the second quarter of 2015, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 483 million, representing 13.5% of total U.S. generic prescriptions. We seek to continue our U.S.

market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, our broad product line, our commitment to quality and regulatory compliance and our cost-effective production.

226.     The statements and omissions set forth in ¶¶223-225 were materially false and misleading because, having attributed the source of the profit increase, the Exchange Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 64 systematic price hikes since July 2013, contributed materially to the results. These price increases generated $236 million in Inflated Profit in Q2 2015, a YOY increase of $76 million, which increase accounted for 39% of the YOY increase in generic profit, and amounted to over one and a half times the $53 million YOY reduction in S&M expenses to which Exchange Act Defendants attributed the increased generic profit.

### j)     Third Quarter 2015<br>False And Misleading Financial Disclosures

227.     On October 29, 2015, Teva filed its third quarter 2015 ("Q3 2015") financial statements on a Form 6-K with the SEC (the "Q3 2015 6-K"), and held an investor earnings call (the "Oct. 29, 2015 Earnings Call"). The false statements in the Q3 2015 6-K are also incorporated by reference into the ADS/Preferred Registration Statement that Vigodman, Desheh, and Griffin signed, the ADS Final Prospectus and the Preferred Final Prospectus.

228.     In the Q3 2015 6-K, Teva reported, for the quarter, revenues in its generic drug segment of $2.202 billion, including $1.032 billion in revenues from the U.S. market. The Company also reported quarterly segment profitability for its generics business of $578 million.

229.     The Q3 2015 6-K disclosed a YOY increase in generic profit of $20 million, or 4%, attributed "primarily" to:

[L]ower selling and marketing expenses, partially offset by lower gross profit," which in turn was partially offset "by higher gross profit of our API business.

230.    In the Q3 2015 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

**United States Generic Medicines Revenues**

In the third quarter of 2015, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with approximately 481 million total prescriptions, representing 13.4% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, our broad product line, our commitment to quality and regulatory compliance and our cost-effective production.

231.    The statements and omissions set forth in ¶¶228-230 were materially false and misleading because, having attributed the source of the profit increase, the Exchange Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 71 systematic price hikes since July 2013, seven of which had been implemented in July 2015, contributed materially to the results. These price increases generated as much as $218 million in Inflated Profit in Q3 2015, a YOY increase of $25 million, which accounted for all the YOY increase in generic profit.

232.    During the Oct. 29, 2015 Earnings Call, Vigodman disavowed that any of the improvement in Teva's results over the previous years were driven by generic pricing:

We're very – and are very responsible in everything that portends to prices on the Generics side and on the Specialty side. And I would even put it another way, all the improvement you see in our – in margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message.

233.    The statements and omissions set forth in ¶232 were materially false and misleading

because, by this time, Teva had increased prices on at least 71 drugs since July 2013 as part of its Price-Hike Strategy, often by well over 100%, generating over $1.6 billion in Inflated Profit over that time, including as much as $690 million in 2014 and as much as $680 million in the first three quarter of 2015 alone. Thus, the Inflated Profit contributed significantly to improving Teva's generic profit margin, as that Inflated Profit was devoid of any material corresponding costs, directly contradicting Vigodman's statements.

234.    In light of recent legislative proposals that would penalize generic manufacturers for raising prices above the rate of inflation, an analyst from Barclays asked for management's thoughts on "the potential limit to generic drug price increases." Olafsson minimized the extent and effect of Teva's practice of increasing prices and implied that Teva was not dependent on such profit and, thus, was immune to the effects of the proposed legislation:

> In terms of the proposed legislation on pricing control on generics, first of all we don't really know what it's going to be. But let me give you an example. So Teva has the largest portfolio on the U.S. market. We are offering approximately 275 products. And we have told you that overall on our whole portfolio, we have a decline in price. The talk about the inflation in generics when you have a big portfolio is really not there. 95% of our portfolio is declining due to the consolidation of the customers I talked about. There might be 5% of the portfolio that is either flat or increasing in pricing due to some abnormalities in the market.

235.    The statements and omissions set forth in ¶234 were materially false and misleading because, by this time, Teva had made at least 71 systematic price hikes, seven of which Teva implemented on July 29, 2015, and many of which were increased by more than 100%. The 60 drugs subject to these price increases made up 22% of Teva's generic drug portfolio, and none of these price increases were due to "some abnormalities in the market" like a shortage or an increase in demand. By the end of Q3 2015, Exchange Act Defendants' Price-Hike Strategy had generated over $1.6 billion in Inflated Profit.

k)     November 19, 2015
       False And Misleading Statements

236.    On November 19, 2015, Jefferies held a conference, at which Desheh was pressed by the Jefferies analyst, who asked, "[L]et's talk about everyone's favorite topic the last 2 months, pricing and specialty pharmacy. Could you just give us your 20,000 foot view on pricing, is it an issue? Your particular products, where do you go on pricing?"

237.    Desheh minimized the extent of Teva's policy and practice of making price increases and its financial dependence on profit therefrom:

> Now there's a lot of noise around pricing issues. Some of it's coming from politicians who are driving agenda, which is very, very legitimate. Our exposure to all these things is very minimal .... And Teva was not associated with any of that. So we're playing a competitive game. We're playing it fairly. We of course play by the book and by the rule. And we believe that our exposure to any initiative on price reduction in the United States is as a small as anybody can have.

238.    The statements and omissions set forth in ¶237 were false and misleading because Teva was critically dependent on Inflated Profit from price increases, and the ability to make additional price increases to increase profits, to fill any holes in its financial projections. Thus, Exchange Act Defendants' Price-Hike Strategy was greatly exposed to any initiative that addressed generic drug pricing, such as those which would grant Medicare the ability to negotiate prices, which could lead to price deflation. Without the benefit of the Price-Hike Strategy, Teva could not generate additional Inflated Profit or fill financial holes, while Teva's past practice of generating massive profits through inflated prices left it very exposed to any efforts that would cause price deflation of those already-increased drugs. Relatedly, these statements implied to investors that Teva was not engaging, and had not engaged, in any practice of increasing prices, which was simply untrue.

> l)    **Teva's Registration Documents For Its**
> **Secondary ADS And Preferred Share Offerings**
> **Contained False And Misleading Statements**

239.    On November 30, 2015, Teva filed a Registration Statement on Form F-3, signed by Vigodman, Desheh, and Griffin, with the SEC (the "ADS/Preferred Registration Statement"), as well as two preliminary prospectus supplements, filed pursuant to Rule 424(b)(5), which disclosed certain details regarding Teva's intention to offer additional ADS and newly created Mandatory Convertible Preferred Shares ("Preferred Shares") to the public. On December 3, 2015, Teva filed two prospectus supplements with the SEC (referred to hereafter as the "ADS Final Prospectus" and the "Preferred Final Prospectus," respectively).

240.    The ADS/Preferred Registration Statement, the ADS Final Prospectus, and the Preferred Final Prospectus each incorporated by reference the 2014 20-F, Q1 2015 6-K, Q2 2015 6-K, and Q3 2015 6-K. For all of the reasons stated above, the incorporated 2014 20-F and Q1, Q2, and Q3 2015 6-Ks contained materially false and misleading statements and omissions.

> m)    **January 11, 2016**
> **False and Misleading Statements**

241.    At a January 11, 2016 J.P. Morgan conference, a J.P. Morgan analyst asked Olafsson, "McKesson this morning announced some maybe challenging pricing on the generics side or an expectation of that going forward. Could you just comment a little bit on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?"

242.    In answer to this question, Olafsson responded:

> The generic pricing – we need to keep in mind there's a lot of talk about inflations in generic pricing. But what we see is there's – **overall on our total portfolio of 270 products, there is a slight decrease in pricing. It's low single digit, but year on year we see a low single-digit decrease because on 95% of our portfolio, we experience price decline. And then on 5%, we might be flat or a**

**slight increase.** So, overall, we see that in the business. There's a lot of headlines of examples of big price increases in generics. But when you are a company of the size of Teva and you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – there is a decline.

243.     The statements and omissions set forth in ¶242 were materially false and misleading because they minimized the impact of price increases – which by the end of Q3 2015 had generated as much as $1.7 billion in Inflated Profit – on Teva's bottom line since July 2013, and, thus, Teva's potential exposure to price deflation that its competitors and wholesalers were already reporting. By this time, Teva had increased the prices of 60 of its generic drugs, three of which Teva had recently increased the prices on July 29, 2015, and many of which were increased by more than 100%. These drugs made up 22% of Teva's generic drug portfolio, flatly contradicting Olafsson's claim that 5% of Teva's generic portfolio "might be flat or a slight increase." The context is particularly important because McKesson was one of Teva's major wholesalers and, thus, would presumably be experiencing issues in pricing similar to those faced by Teva.

### n)     Fourth Quarter And Full Year 2015 False And Misleading Financial Disclosures

244.     On February 11, 2016, Teva filed with the SEC a press release reporting the Company's fourth quarter 2015 ("Q4 2015") and full year 2015 ("FY 2015") financial results ("Q4 2015 Press Release"). The same day, Teva filed its Form 20-F for the fiscal year ended December 31, 2015 with the SEC (the "2015 20-F") reporting the Company's FY 2015 financial results, and held an investor earnings conference call (the "Feb. 11, 2016 Earnings Call"). The false statements in the 2015 20-F are also incorporated by reference into the Notes Registration Statement that Vigodman, Desheh, and Griffin signed, and the Notes Final Prospectus.

245.     <u>Q4 2015 Press Release</u>: The Q4 2015 Press Release disclosed a YOY increase in generic profit of $7 million, or 1%, attributed "primarily" to "the reduction in S&M expenses,

partially *offset*" by, in part, "lower sales of budesonide (Pulmicort®) in the United States."

246.    The statements and omissions set forth in ¶245 were materially false and misleading because the Exchange Act Defendants explained that profits were offset by reduced sales, while they had a duty to disclose but concealed the full truth that Inflated Profit had declined from as much $219 million in Q4 2014 to $166 million in Q4 2015, a decline of $53 million or 24%. This decline occurred because the Price-Hike Strategy was unsustainable and under increasing investigation by governmental agents and, thus, Teva's ability to make further increases was reduced.

247.    <u>2015 20-F</u>: The 2015 20-F disclosed a YOY increase in generic profit of $500 million, or 24%, attributed "primarily" to "lower S&M expenses and higher gross profit," which was purportedly "mainly a result of higher revenues from new products launched in the United States during 2015, lower other production expenses and higher gross profit from API sales to third parties."

248.    In the 2015 20-F, Teva reported revenues in its generic drug segment of $9.546 billion, including $4.793 billion in revenues from the U.S. market. The Company also reported annual segment profitability for its generics business of $2.682 billion.

249.    In the 2015 20-F, Teva also discussed the competitive landscape in the U.S. market, which the Company described as intensely competitive. Specifically, the 2015 20-F states, in relevant part:

> In the United States, **we are subject to intense competition in the generic drug market** from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. **We believe that our primary competitive advantages are our ability to**

**continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.**

250.    The Company also stated in the 2015 20-F that the primary factors driving earnings and growth in its generics segment were "aging population, an increase in global spending on healthcare, [and] economic pressure on governments to provide less expensive healthcare solutions."

251.    In the 2015 20-F the Company also touted the prospects of its previously announced acquisition of Actavis and its impact on the Company's ability to market and distribute generic drugs at competitive prices. Specifically, Teva stated that "[u]pon consummation of our acquisition of Actavis Generics, the Actavis Generics portfolio and pipeline, combined with our strong existing generics portfolio, will further enhance our goals of delivering the highest quality generic medicines at competitive prices."

252.    The 2015 20-F contained signed certifications pursuant to SOX by Defendants Vigodman and Desheh, stating that the financial information contained in the 2015 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

253.    The statements and omissions set forth in ¶¶247-252 were materially false and misleading because, having attributed the source of the profit increase, the Exchange Act Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 71 systematic price hikes since July 2013, contributed materially to the results. The price increases generated as much as $848 million in Inflated Profit in 2015, a YOY increase of $155 million that amounted to 31% of the YOY increase in generic profit.

254.    The table below reflects Teva's improved profits as reported in 2015, as well as the

YOY change in Inflated Profits for the same period:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full-Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generics Profit | $296 | $193 | $20 | $7 | $516 |
| (Unreported) YOY Change in Inflated Profit | $108 | $76 | $25 | -$53 | $155 |

255.   Feb. 11, 2016 Earnings Call: In his opening statements, Olafsson touted "2015 was a very good year for Teva Generics," while explicitly denying that pricing had played any role in that supposed success, stating:

> We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue. This is $1 billion improvement in operating profit over 24 months period. So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures.

256.   The statements and omissions set forth in ¶255 were materially false and misleading because they are directly contradicted by the empirical data showing that Teva had, in 2014 and 2015, made as much as over $1.5 billion in Inflated Profit from price increases – more than the $1 billion improvement touted by Olafsson.

257.   Later in the call, and repeated in his slide presentation, Olafsson minimized Teva's participation in price increases, and thus their impact on the Company's bottom line:

> Briefly, on pricing. As I've previously stated, we and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media. On the contrary, for 2015, we saw a mid-single-digit price decline for the overall business.

258.   The statements and omissions set forth in ¶257 were materially false and misleading because Teva had taken at least 71 price increases since July 2013, many for over 100% or more. The Inflated Profit from the increases implemented as part of Exchange Act Defendants' Price-Hike Strategy was a necessary foundation of Teva's purported financial success over that time.

259.    Olafsson denied that Teva was seeing any change in its pricing environment:

> In the US, our largest market, we saw approximately 4% price
> erosion.... We expect to see the same in 2016. Nothing today points
> to a significant change in the generic pricing environment.

A Guggenheim Securities analyst asked: "some of your competitors have talked about pricing

pressure in the generics business during the quarter. Curious if you saw that, and if so what might

be driving that." Olafsson responded:

> As I mentioned in the beginning, we didn't see anything change in
> fourth quarter. We saw approximately 4% pricing pressure or price
> decline in the US business over 2015 flat over the year.

The slides Olafsson presented during the call echoed these statements: "Also do not see the sharp

drop in prices other competitors have seen recently [;] Mid-single digit decrease in 2015[.]"

260.    The statements and omissions set forth in ¶259 were materially false and misleading

because, while Exchange Act Defendants claimed not to have seen any changes in the pricing

environment, (i) internally, Teva's profits from price increases had decreased precipitously, from

as much as $236 million in Q2 2015, to $218 million in Q3 2015, to $166 million in Q4 2015, a

decline of $70 million, or 30%, in two quarters, and (ii) Teva was increasingly unable to implement

further price increases, as it had in the past.

**o)      March 8, 2016**
**False And Misleading Statements**

261.    During a March 8, 2016 Cowen conference, Olafsson touted the increased

profitability of Teva's generics segment, attributing it to sources other than price increases:

> In terms of growing the profitability, from 2013 to 2015, we grew
> the operating profit of the generic business from 17% in 2013, and
> we exited for the full year of 2015 we were at 28.1%. So it's about
> 1,100 basis points we improved the profitability on approximately
> $10 billion in revenue. So it was a significant improvement over a
> 24-month period. Part of that was due to the improvement in our
> cost of goods sold, very important in consolidation of plants and

> looking for the money there. But also part of it was due to portfolio
> selection and the cost infrastructure.

262.     The statements and omissions set forth in ¶261 were materially false and misleading because, once Olafsson chose to speak on this subject and having attributed the source of the profit increase, Olafsson had a duty to disclose but concealed the full truth that Teva had by then generated over $1.7 billion in profit from price increases on dozens of generic drugs from 2013 through 2015, pursuant to the Price-Hike Strategy; far more than the $1.1 billion in improved generic profit touted by Olafsson.

263.     Later on the call, a Cowen analyst asked Olafsson: "Can you discuss what you're seeing," in generics pricing, "what you're observing, and then maybe in the context of what you're hearing from others, both US and ex-US?" In response, Olafsson declared:

> So we came out in our fourth quarter results, and told the market that we had seen approximately 4% price decline in the US market in 2015.... I think overall the pricing hasn't changed that much. There was a lot of talk about inflation in generic pricing. But we never saw that.... [I]nflation never really happened in the generic business.... I don't see any big changes in the pricing environment. It's relatively stable. 4% is worse than maybe two years ago. But it's similar to what we saw in 2014.

264.     The statements and omissions set forth in ¶263 were materially false and misleading because the truth was that the Price-Hike Strategy, whereby Teva had inflated the prices on 60 base-business generic drugs from July 2013 through Q1 2016, had generated well over $1.7 billion in Inflated Profit from the beginning of the Relevant Period through the end of 2015. The Inflated Profit generated by the Price-Hike Strategy, however, had drastically fallen. Thus "the pricing" had changed and was not like it had been in 2014; Teva implemented at least 32 price increases that year alone, while, in 2016, it would make only five, all of which were on prices of drugs that had been previously increased.

>
> **p)      First Quarter 2016**
>      **False And Misleading Financial Disclosures**

265.    On May 9, 2016, Teva filed its first quarter 2016 ("Q1 2016") financial statements on Form 6-K with the SEC (the "Q1 2016 6-K"), and held an investor earnings call (the "May 9, 2016 Earnings Call") (collectively, May 9, 2016 Statements"). The false statements in the Q1 2016 6-K are also incorporated by reference into the Notes Registration Statement that Vigodman, Desheh, and Griffin signed, and the Notes Final Prospectus.

266.    <u>Q1 2016 6-K</u>: For the quarter, Teva reported revenues in its generic drug segment of $2.170 billion, including $976 million in revenues from the U.S. market. The Company also reported quarterly segment profitability for its generics business of $584 million.

267.    The Q1 2016 6-K disclosed a YOY decline in generic profit of $215 million, or 27%, attributed "primarily" to:

> [L]ower gross profit, as well as higher R&D expenses," while lower gross profit was purportedly "mainly a result of lower sales of high gross profit products in the United States, higher production expenses and lower gross profit in our European markets.

268.    In the Q1 2016 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

> **United States Generic Medicines Revenues**
>
> In the first quarter of 2016, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with approximately 463 million total prescriptions, representing 12.7% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production, including through our pending acquisition of Actavis Generics.

269.    The statements and omissions set forth in ¶¶266-268 were materially false and misleading because, having attributed the source of the profit decline, the Exchange Act Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $228 million in Q1 2015 to $124 million in Q1 2016, a decline of $104 million or 46%. That YOY decline in Inflated Profit comprised as much as 48% of the YOY decline in generic segment profit, and was more than four times the $25 million YOY increase in R&D expenses to which the Exchange Act Defendants attributed the results. It further concealed that the Price-Hike Strategy was unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable to make more hikes.

270.    May 9, 2016 Earnings Call: In his opening remarks, Olafsson explained away the decline in generic profit margin by blaming it on issues other than pricing:

> When compared to first quarter 2015, the operating profit declined by 360 basis points, fully explained by the exclusive launch of generic Nexium, esomeprazole, in the first quarter 201[5]. Excluding the exclusivity period of esomeprazole in first quarter, the profit margin of the generic segment was 24.4%.

271.    The statements and omissions set forth in ¶270 were materially false and misleading because they excluded entirely the decline in Teva's Inflated Profit from the unsustainable Price-Hike Strategy, including the steep decline of $42 million in Inflated Profit from Q4 2015 to Q1 2016, and the $104 million YOY decline compared to Q1 2015. That YOY decline comprised 48% of the decline in YOY generic profit that Olafsson attributed to a decline in sales of generic Nexium, reflecting that Exchange Act Defendants could no longer maintain the Inflated Profit generated by the increases implemented since July 2013, nor could they make further price increases.

272.    Also, on that call, Olafsson, while asserting he would "do my best to provide you with as much color as possible," claimed that Teva was immune from downward pricing trends:

> Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year. Teva experienced approximately 4% price erosion in the United States last year, and our guidance for this year is that it will remain the same.... From where I sit today, there is nothing that changes my mind about that. Nothing has happened in the last two quarters that has changed the pricing environment. What this boils down to is each individual company's business model...

The slides presented by Olafsson during the conference call echoed Olafsson's statements:

> What has changed in the US pricing environment since Q4 2015? The short answer is...nothing[.]... There is no change in the pricing environment[.] It all comes down to each company's business model.... Why is Teva generics performance better than most GRX companies? Portfolio optimization .... [and] [n]ew products....

273. The statements and omissions set forth in ¶272 were materially false and misleading because, far from not seeing "any fundamental change or worsening in the pricing environment," Teva's Price-Hike Strategy of generating billions in profits from price increases was collapsing. In Q3 2015 Teva earned as much as $218 million in Inflated Profit from price increases, while in Q1 2016 it earned $124 million; and while, in 2015, Teva made 21 price increases on generic drugs, in 2016 it would implement only five, all of which were on prices of drugs which had previously been increased.

274. During the May 9, 2016 earnings call, Olafsson also offered the supposed reasons why Teva's generics division had achieved success over several years, and thus was differently positioned compared to its competitors who were reporting increased pricing pressure:

> We have taken a significant step to transform our generic business, solidify our foundation, increase our profitability, and to better position us to generate sustainable long-term growth. These many steps have included portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products, regaining a leading position in submission on first-to-files, enhancing our go-to-market, and sales force effectiveness capabilities, and much, much more. These are the very capabilities that companies must possess in order to thrive at the global level.

> We have created a unique and differentiated platform, positioned to
> extract significant value in the global growing generic space.

275.    The statements and omissions set forth in ¶274 were materially false and misleading because, while attributing Teva's supposed past success to other factors, Olafsson had a duty to disclose but concealed the full truth that Teva had generated as much as $1.9 billion in Inflated Profit from price hikes reported since the start of the Relevant Period. The Inflated Profit, however, had begun to dry up due to the unsustainability of the Price-Hike Strategy, and the materialization of the risks concealed by Exchange Act Defendants – recently reported by Teva's competitors – namely the risk of increased pricing pressure due to increased public, Congressional, and regulatory scrutiny of generic drug price increases, which would result in increased competition and the inability to take further price increases.

### q)    False And Misleading Statements On Conference Calls In The Build Up To The $20 Billion Debt Offering

276.    On May 10, 2016, Olafsson participated in a Bank of America conference, and claimed that Teva was immune from pricing pressure:

> [T]here's nothing I have seen which shows a worsening pricing environment. We saw a price erosion in the US last year of approximately 4%. ...
>
> I know many of the competitors in the generic space, and in the specialty space, are talking about a lot of pricing pressure, but it shouldn't be. There is nothing that has happened over the last two quarters which has changed fundamental the market. And I feel that we are blaming the environment on individual company's business model more than anything else because as long as you have the right portfolio, you have had the right investment in R&D, you really have a strong opportunity.

During a June 3, 2016 Sanford C. Bernstein conference, in response to an analyst question regarding pricing pressure, Vigodman stated Teva was not facing increased pricing pressure:

> So we are very consistent. Our message was conveyed, and we will
> continue to convey. What we see is a 4% to 5% erosion. That's what
> we see. That's not something which is different from what we said
> during 2015. By the way, we continue saying it in 2016. I think our
> results in Q1 demonstrated that.

Then, during a June 8, 2016 Goldman Sachs Global Healthcare Conference, Olafsson conveyed a

similar response to a question from a Goldman Sachs analyst regarding pricing pressure:

> But really, the environment hasn't changed. When we signed that
> deal in July, we talked about 4% price erosion in the US generic
> business. And we are still talking about the same number, what we
> see in the base business.

277. The statements and omissions set forth in ¶276 were materially false and misleading

because Teva was experiencing a drastic decline in Inflated Profit from price increases, the

inability to make additional price increases, and, in the past two quarters, the acceleration of the

deterioration of the pricing environment. Thus, the Price-Hike Strategy was proving to be

unsustainable, with Inflated Profit declining by $104 million in Q1 2016 as compared to Q1 2015,

as the risks concealed by Exchange Act Defendants' strategy began to materialize, namely

increased pricing pressure and the inability to take further price increases due to increased public,

legislative, and regulatory scrutiny of generic drug price increases, which resulted in increased

competition.

### r)       False July 13, 2016 Guidance Assumption

278. On July 13, 2016 call, the Exchange Act Defendants announced the acceleration of

Teva's debt offering, including the Notes Offering, to the end of July, which, on the May 9, 2016

investor call, had been scheduled to occur in September 2016 or in Q4 2016. A Citigroup analyst

asked about pricing: "[C]an you comment on the generics pricing assumptions that you have baked

into your forecast? Following on that, Siggi, maybe you could just comment on the generics pricing

environment, more broadly, that you are currently seeing in the marketplace."

279.    In response Olafsson indicated that Teva had still not seen any change in the pricing environment, and that this stable pricing was baked into the assumptions underlying Teva's guidance and projections:

> Our assumption and what we assume is basically approximately 5% organic growth that we see year on year.... In terms of generic pricing in the second quarter, we saw no change in the pricing. We saw a stable environment, as we talked about, from first quarter into second quarter. Obviously, in second quarter, as we have highlighted to investors, there was no significant new launches that we saw in Teva, which obviously impacts the overall generic numbers. The pricing has remained stable.... Our assumption for the rest of the year is basically assuming the same pricing erosion. It is difficult to say; but as I'm sitting here today, with the information I have in hand, we are assuming and now forecasting for the guidance for the remainder of the year same pricing assumption as we have had for the first half of the year.

280.    The statements and omissions set forth in ¶279 were false and misleading at the time because Teva's price erosion assumption was not based on "stable" pricing in which there was "no change" in the second quarter or the "first half of the year." In truth, Teva was at that time experiencing a drastic decline in Inflated Profit from price increases, the inability to make additional price increases, and, over the past year, the acceleration of the deterioration of the pricing environment. Teva generated $10 million less in Inflated Profits from the first quarter of 2016 to the second quarter of 2016, which was part of a trend of steep decline. Teva generated $122 million less Inflated Profit in the second quarter 2016 than it had in the second quarter of 2015. In the first two quarters of 2015, Teva made as much as $464 million in Inflated Profit. In the first two quarters of 2016, Teva made $238 million. In the first half of 2015, Teva had made 14 price increases. In the first half of 2016, Teva only made five, generating less than $12 million by the end of the Relevant Period.

### s)   The False And Misleading Registration
### Statement and Prospectus

281.   On July 13, 2016, Teva filed with the SEC a Post-Effective Amendment No. 1 to

Form F-3, which was signed by Vigodman, Desheh, and Griffin, (the "Notes Registration

Statement"). On July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final

prospectus for the Notes Offering (the "Notes Final Prospectus). The Notes Registration Statement

and the Notes Final Prospectus incorporated by reference the 2015 20-F and the Q1 2016 6-K. The

incorporated 2015 20-F and Q1 2016 6-K contained false and misleading financial disclosures, as

described above.

### t)   Second Quarter 2016
### False And Misleading Financial Disclosures

282.   On August 4, 2016, Teva filed its second quarter 2016 ("Q2 2016") financial

statements on Form 6-K with the SEC (the "Q2 2016 6-K"), and held an investor earnings

conference call (the "Aug. 4, 2016 Earnings Call").

283.   In the Q2 2016 6-K, for the quarter, Teva reported revenues in its generic drug

segment of $2.294 billion, including $892 million in revenues from the U.S. market. The Company

also reported quarterly segment profitability for its generics business of $614 million.

284.   The Q2 2016 6-K disclosed a YOY decline in generic profit of $115 million, or

16%, attributed "primarily" to:

> "[L]ower gross profit," which in turn was purportedly "mainly a
> result of loss of exclusivity on certain products as well as increased
> competition on other products in the United States ... and higher
> production expenses..."

285.   In the Q2 2016 6-K, Teva stated, in part:

**United States Generic Medicine Revenues**

In the second quarter of 2016, we continued to lead the U.S. generic
market in total prescriptions and new prescriptions, with

> approximately 446 million total prescriptions, representing 12.1% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production, including through our recent acquisition of Actavis Generics, which will substantially expand our generics operations and pipeline.

286.    During the Aug. 4, 2016 Earnings Call, Desheh attributed the poor performance of the Company's generic segment to factors other than a decrease in Inflated Profit:

> Revenues of our US generics business was impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide which were the major drivers of our generic business in the US in the second quarter last year.

287.    The statements and omissions set forth in ¶¶283-286 were materially false and misleading because, having attributed the source of the profit decline, the Exchange Act Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $236 million in Q2 2015 to $114 million in Q2 2016, a decline of $122 million or 52%. That YOY decline in Inflated Profit comprised nearly all of the YOY decline in generic profit. The statements further concealed that the Price-Hike Strategy was unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable to implement further hikes.

288.    Also, during that call, and in response to a Citigroup analyst's inquiry regarding pricing stability, Olafsson denied seeing any change in the pricing environment:

> [T]he pricing is stable to the same degree as before. We saw approximately in the US, 4% price erosion in the business, in a way very stable from the first quarter. And the global pricing impact we saw in the business, in the generic business was approximately 5%. So we are pleased with the environment.

Olafsson then reiterated the same false and misleading sentiment later in the call: "So overall, the

business itself is fairly stable. As I mentioned in the beginning, we are seeing exactly the 4% price

erosion.... 4% price erosion in the US."

289.    The statements and omissions set forth in ¶288 were materially false and misleading

because, in Q2 2016, Teva suffered a $122 million YOY reduction in Inflated Profit from price

increases compared to Q2 2015, and Teva was increasingly unable to implement further price

hikes, implementing only five, immaterial increases during 2016, compared to 21 in 2015, and 32

in 2014, during the height of the strategy.

290.    In response to a question from a J.P. Morgan analyst regarding whether Teva could

implement price hikes following the Actavis acquisition, Olafsson stated:

> I think the pricing comes with shortages in the market. If you have
> an exclusive product, if there's some kind of dysfunction in the
> market, there might be a small pricing opportunity that usually
> comes in and comes out. But overall, the size, and being a combined
> company doesn't play into that.

291.    The statements and omissions set forth in ¶290 were materially false and misleading

because they minimized Teva's Price-Hike Strategy when, in reality, Teva took 76 price increases

on 60 drugs, most of which were for 100% or more, that were not associated with any such shortage

or dysfunction. This left Teva very exposed to the pricing pressure facing the industry at the time.

> u)    **In the Third Quarter 2016, Exchange Act Defendants
> Continue To Deny Price Inflation And Increased
> Pricing Pressure In Statements To Investors**

292.    On September 7, 2016, Desheh participated in a Wells Fargo conference where he

was asked by the Wells Fargo analyst, "Teva has said during this whole, the last couple years, that

you're not really seeing the same generic erosion, pricing erosion that some of the other companies

have mentioned or blamed. Is that still the case?" Desheh responded by claiming that Teva was

not experiencing increased pricing pressure:

> Now, with talking about prices of the base business, product that
> we've been selling more than two years already, the prices are very
> stable there.... [Y]ou don't see -- there you don't see the erosion.
> Where we see erosion is ... [when] you have six months exclusivity,
> you start with the high price, and then obviously more competitors
> go into the market and the price goes down. But when we look at
> the base, there's no – there's no pressure on prices.

On Teva's September 9, 2016 Generic Medicines Business Overview call with analysts, the slides

presented echoed that Teva was not experiencing a change in pricing pressure: "

> Price erosion is nothing new[.]... [Teva's] [d]iverse portfolio and
> competitive cost structure allows for long-term value creation[.]

293.    The statements and omissions set forth in ¶292 were materially false and misleading

because, while Desheh claimed that Teva's base business was experiencing "no pressure on

prices," and the slides claimed that "price erosion is nothing new," Teva was suffering massive

declines in Inflated Profit and the inability to implement further hikes due to increased pricing

pressure that was itself the materialization of the risks concealed by the Exchange Act Defendants.

Most recently, in Q2 2016, Teva suffered a massive $122 million YOY reduction in Inflated Profit

from price increases compared to Q2 2015, and Teva implemented only five immaterial hikes in

2016, compared to 21 in 2015, and 32 in 2014, demonstrating the unsustainability of the Price-

Hike Strategy.

294.    During the September 9, 2016 call, Olafsson categorically denied Teva had increased

prices on its generic drugs: "There is no inflation in the generic pricing, which I will talk about."

Later during that same call, in response to a Bank of America analyst's question regarding the

impact of specialty drug pricing on generics, Olafsson responded: "[S]o first of all, we need to

differentiate generics from branded pricing. And people that say that the generic – there's a big

generic price inflation, are simply wrong." Olafsson even claimed that Teva had a "*secret sauce*"

that immunized the Company from price fluctuations.

295.     The statements and omissions set forth in ¶294 were materially false and misleading because each of these statements minimized (i) Teva's practice of making price increases pursuant to the Price-Hike Strategy, often by raising the price over 100% above the pre-inflation price, on 60 drugs or 22% of its portfolio; (ii) the importance of the Inflated Profit from those price increases to the Company, (iii) the unnatural price inflation in Teva's book of generic drugs caused by those increases and the attendant risks associated with such inflation; and (iv) that Teva was at the time experiencing a dramatic drop in Inflated Profit from those price increases and an inability to implement further increases as a result of the materialization of the risks concealed by the Exchange Act Defendants.

296.     During the September 9, 2016 call, Olafsson also responded to a question as to whether Teva would be taking price increases following the Actavis acquisition, stating:

> So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics. When price increases are taken, there's some kind of abnormality in the business. There are shortages.

297.     The statements and omissions set forth in ¶296 were materially false and misleading because they implied that because Teva only increased prices in limited circumstances, it was not exposed to price deflation. The truth was that Teva had raised the prices of 60 drugs, or 22% of its portfolio, via 76 price increases frequently by more than 100% of the original price, and thus had enormous price inflation in its portfolio; none of the price increases related to shortages.

#### v)     Third Quarter 2016
#### False And Misleading Financial Disclosures

298.     On November 15, 2016, Teva filed its third quarter 2016 ("Q3 2016") financial statements on Form 6-K with the SEC (the "Q3 2016 6-K"), and held an investor earnings conference call (the "Nov. 15, 2016, Earnings Call").

299.     The Q3 2016 6-K disclosed a YOY increase in U.S. generic revenue of $261

million, or 25%, attributed to increased revenues from Actavis. But, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $277 million, or 27%. In discussing the increased revenues that were due to Actavis, Teva disclosed that those revenues were:

> [P]artially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in sales of budesonide ... due to increased competition and the loss of exclusivity on esomeprazole.

300.    The statements and omissions set forth in ¶299 were materially false and misleading because, having attributed the sources offsetting the increased revenues from Actavis, the Exchange Act Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $218 million in Q3 2015 to $97 million in Q3 2016, a decline of $121 million or 56%. That YOY decline in Inflated Profit comprised as much as 44% of the YOY decline in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis. It further concealed that the Price-Hike Strategy was unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable to implement further hikes.

301.    During the Nov. 15, 2016 Earnings Call, a Credit Suisse analyst asked, "[Y]ou mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the mid single-digits going forward.... [W]hat's going to happen in the coming quarters [that] will be different than what you saw this quarter?" Olafsson responded:

> Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing. And what we saw in the difference between the 5% or mid single-digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product.

Olafsson doubled down on this explanation when pressed by an incredulous analyst from J.P. Morgan, who asked how Teva was sure that the decline was not the same pricing pressure seen

throughout the market. Olafsson reiterated that "where I sit here today, experiencing the market, there hasn't again been any fundamental change."

302.    The statements and omissions set forth in ¶301 were materially false and misleading because Teva was in fact experiencing a sustained and material decline in the pricing environment, particularly with regard to the drugs whose price Teva had previously raised pursuant to the Price-Hike Strategy, in direct contradiction to Olafsson's specific denials. These flat denials in answer to specific questions on the matter, in the face of contrary empirical evidence that Teva had inflated prices on 60 drugs, profited by as much as over $2.1 billion since the start of the Relevant Period, and was now suffering from drastic YOY reductions in Inflated Profit generated from those price hikes and an inability to implement more, were particularly misleading.

303.    During the same Nov. 15, 2016 Earnings Call, a Wells Fargo analyst asked whether the stated 7% price erosion experienced that quarter was a "result of having to tame previous price increases, or give back some of those?" Olafsson denied the existence of a pricing trend beyond that caused by Actavis-acquisition related divestitures:

> No, basically, the main reason ... was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it. What our customers did, as they do, is that there is a new player in the market that took over those products, and that became a pricing pressure on roughly about 60 molecules of -- and these were one of our top -- the top molecules we had in our portfolio. So there was an instability that happened in the market during the month of August, when the new owners were taking market share. It didn't change the fundamental of the market. It didn't change the structure of the market, or the chemistry of the market, but we saw the impact on the divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

304.    The statements and omissions set forth in ¶303 were materially false and misleading because the Inflated Profit from price hikes had declined drastically, contributing just $97 million in Q3 2016, a YOY reduction of $121 million, or 56%. The sharp decline in Inflated Profit was a

result of the materialization of the risks that the Exchange Act Defendants concealed as they implemented their Price-Hike Strategy, namely increased pricing pressure resulting from increased public, legislative, and regulatory scrutiny of generic drug pricing, which in turn resulted in increased competition and the inability to implement further price hikes. Those were not single-quarter issues related to divested products, as suggested by Olafsson, but a long-term trend with no end in sight.

### w)   The January 6, 2017 Guidance Call

305.   During a December 8, 2016 Citi Global Healthcare Conference, Vigodman announced that Teva would provide 2017 guidance early in January 2017. On the January 7, 2017 Business Outlook Conference Call, Vigodman claimed Teva's past success was not due to Inflated Profit from price hikes, stating:

> Since the start of 2014, one of our greatest priorities has been to increase the profitability of our generics business. In the first three years of this great effort, we have been able to improve significantly the margins of Teva's standalone generics business. This has been accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure.

306.   The statements and omissions set forth in ¶305 were false and misleading because, having attributed the source of the profitability increases, Vigodman had a duty to disclose but concealed that the Price-Hike Strategy, whereby Teva made at least 76 systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributed over $2.2 billion to Teva's profit from the start of the Relevant Period through the end of 2016.

### x)   Fourth Quarter and Full Year 2016 False And Misleading Financial Disclosures

307.   On February 13, 2017, Teva filed with the SEC a press release ("Q4 2016 Press Release") reporting the Company's fourth quarter 2016 ("Q4 2016") and full year 2016 ("FY 2016") financial results, and held an investor earnings conference call (the "Feb. 13, 2017 Earnings

Call"). Two days later, on February 15, 2017, Teva filed its Form 20-F for the fiscal year ended December 31, 2016 with the SEC (the "2016 20-F") reporting the Company's FY 2016 financial results (collectively, the "Q4 and FY 2016 Statements").

308.    2016 20-F: The 2016 20-F disclosed a YOY decline in U.S. generic revenues of $200 million, or 5%. When removing the impact of Actavis' $1.168 billion in U.S. generic revenues, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $1.4 billion, or 29%. Per the 2016 20-F this decline purportedly:

> [R]esulted mainly from the loss of exclusivity on esomeprazole ... and aripiprazole ..., a decline in the sales of budesonide ... due to increased competition, loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition and the decline in sales of capecitabine.

309.    The statements and omissions set forth in ¶308 were materially false and misleading because, having attributed the source of the increased revenues, the Exchange Act Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $848 million in 2015 to $421 million in 2016, a decline of $427 million or 50%. That YOY decline in Inflated Profit comprised 31% of the YOY decline in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis. Even giving Teva the benefit of Actavis' 2016 revenues, the YOY decline in Inflated Profit was more than double the $200 million YOY decline in U.S. generic revenues. It further concealed that the Price-Hike Strategy was unsustainable, as Inflated Profit was drastically declining, and Teva was unable to implement more hikes.

### D.    Additional Allegations Of Scienter

310.    A host of facts, in addition to those discussed above, raise a strong inference that the Exchange Act Defendants knew or were deliberately reckless in not knowing the true facts when making the materially false and misleading statements and omissions identified herein.

1.     **Former Employee Allegations**

311.   As described in the Class Action Complaint and as part of the Class Action plaintiffs' investigation, several former Teva employees provided information on a confidential basis that supports a strong inference that the Exchange Act Defendants acted with scienter in making the alleged materially false and misleading statements and omissions. The former employees' accounts corroborate one another and the additional facts alleged herein.

312.   Senior Product Operations Manager [or "FE-1"] started at Teva in 2005 and, until 2011, FE-1 worked in new generic drug forecasting. From 2011 to July 2014, FE-1 was a manager, responsible for forecasting and analysis of a product group, and from July 2014 through April 2016 was a Product Manager and then Senior Product Manager responsible for supply chain and inventory management of Teva's base-line generics business. In FE-1's most recent role, FE-1 reported to Bryan Bart who, in turn, reported to Galownia, Senior Director of Marketing. According to FE-1, based on personal knowledge:

> (i) Teva stored drug-by-drug pricing, sales, and revenue data on the Company's Oracle ERP System; (ii) the Company's long-range "Work Plan" forecasting 3-5 years of revenue on a granular level, and prepared annually following a predetermined scheduled, was reviewed and approved by Teva's U.S and Israeli executives; (iii) daily or weekly "Scorecards" that tracked generic drug revenues and informed Teva executives of any "holes" or "red flags" were distributed to Teva's top U.S. executives, including Griffin, Cavanaugh, Olafsson, and Oberman; (iv) quarterly Latest Best Estimates ("LBEs") comparing results to Work Plan forecasts were sent to U.S. and Israeli executives; (v) Teva increased prices when other companies did, when it had a monopoly, and when there was a shortage; (vi) Olafsson claimed that every company he joined acquired his previous employer; (vii) Nisha Patel ("Patel") was Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016, and Patel was on maternity leave on or about August to December 2013; and (viii) that compensation structure for Teva's national account managers was not tied to individual performance.

313.    Senior Director of Trade Relations [or "FE-2"] worked at Teva from 2006 until August 2012. During his tenure, FE-2 was in charge of sales for the branded, generics, and injectables groups. FE-2 later, and until leaving Teva, oversaw the branded drug national account managers, reporting to the Head of U.S. Brands. FE-2 also remained involved and knowledgeable about Teva's U.S. generics. According to FE-2, based on personal knowledge:

> (i) Teva aligned its generic and branded segments under the "One Teva" motto; (ii) Galownia evaluated Teva's generics drug portfolio on a "constant and ongoing" basis to find opportunities to increase prices; (iii) Galownia was "just the guy doing the evaluation," as the decision to increase prices was made by senior executives, including Cavanaugh and Griffin, who would conduct their own evaluations of the costs and financial benefits of each price increase on a drug-by-drug basis, a process in which Christine Baeder, VP Commercial Operations, was also involved; (iv) Cavanaugh and Griffin reported directly to Oberman, and would later report to Olafsson; (iv) the process for increasing price could take up to 60 days, required formal notice to customers, and was done in batches; (v) it was critical to ensure that price increases would "stick," *i.e.*, competitors would not undercut Teva's price increases; (vi) "everyone would have known," including, Oberman, and later Olafsson, if a large price increase generated significant profit, something which Cavanaugh, Griffin, Oberman, and later Olafsson, would track closely, if not daily; (vii) executives used price increases to "fill the hole," when actual revenue did not meet forecasts; (viii) each year the finance and operations teams created a budget that included revenue forecasts; and (ix) the senior managers including Griffin, Cavanaugh, and Oberman, received reports on whether revenues were meeting forecasts up to four times per quarter.

314.    Associate Manager of Customer Marketing [or "FE-3"] worked at Teva from September 2014 until May 2016 and was a member of the pricing team. FE-3 reported to a person who reported to Galownia, who reported to Baeder and, for a time, to Cavanaugh. FE-3 was responsible for evaluating requests for proposals and assessing market pricing for generic drugs. According to FE-3, based on personal knowledge:

> (i) members of the Pricing Group could only lower prices of generic drugs after undertaking an extensively researched and documented analysis; (ii) when prices were increased, the Pricing Group was

"told" to increase the price in a meeting or via email, often from Galownia; (iii) Galownia did not have the authority to raise prices, decisions to raise prices came from higher-level management; (iii) customers were informed of price increases; (iv) even a small change in price (*e.g.*, $0.25) could have a "huge impact" on revenues; (v) a shared Excel file, kept on a shared electronic drive, contained pricing information and was readily accessible to the Pricing Group and top Teva executives; (vi) the Company stored pricing and revenue data "down to the NDC code" on the Oracle system; and (vii) executives, including Cavanaugh, Oberman, and Olafsson, had access to the Oracle ERP System, and were routinely filled in on sales numbers.

315.    Manager of Customer Operations [or "FE-4"] was employed at Teva from April 2008 to April 2014 and was responsible for metrics for the phone system and managing the process for customer calls to Teva regarding generic drugs. FE-4 reported directly to Baeder until 2012, and later to Michelle Osmian. According to FE-4, based on personal knowledge:

(i) in the early part of 2013, at a quarterly marketing group "all-hands" meeting that FE-4 attended, along with additional pricing, sales, finance, and customer service employees at Teva's North Wales U.S. headquarters, Galownia informed the attendees that Teva was implementing a strategy to increase the prices of generic drugs; (ii) Galownia could not approve price increases, as Cavanaugh, or an executive above her made these decision; (iii) after a price increase, Teva would send letters to customers informing them of the increase; the letters were also emailed to Teva employees whose work was impacted by price increases; (iv) Teva regularly raised prices on generics from 2013 onward and was "getting more aggressive with pricing" by raising prices more frequently up until the time of FE-4's departure in April 2014; and (v) consumer complaints would rise following price increases, and the complaints were logged and sent to Baeder on a monthly basis.

**2.      The Exchange Act Defendants Were Motivated To Use Teva's ADS As "Currency" For A "Transformational" Acquisition**

316.    The desire to complete a "transformational" acquisition provided motive to the Exchange Act Defendants to make false statements to inflate the price of Teva Securities. By January 2014, after the Price-Hike Strategy was in place and had generated material profits toward fourth quarter 2013 results, Desheh announced this motivation in setting out that "the stock price

will go up and we'll be able to ***use our share as a currency ... to fund transactions***." When Vigodman was hired in February 2014, he similarly favored significant M&A activity.

317.    Concealed from investors, however, was that by as early as the middle of 2014, Teva was already focused on acquiring Actavis. Soon after joining Teva from Actavis in August 2014, Olafsson presciently announced at an "all-hands" quarterly meeting at the North Wales U.S. headquarters that he had never joined a new company that did not subsequently purchase his former employer. (FE-1) By the end of 2014, numerous systemic price hikes were implemented pursuant to the Price-Hike Strategy, including 46 drugs and generating Inflated Profits as high as $943 million. Teva's ADS was trading in the mid-$50s. Also, by that time, as Vigodman would later reveal on July 27, 2015, the Exchange Act Defendants had developed a list of acquisition targets with Actavis at the top. Also concealed from investors at this time, Teva had already approached Actavis and had been rebuffed.

318.    By the end of the first quarter 2015, the Price-Hike Strategy resulted in another batch of price increases, involving 11 drugs. All told, Inflated Profit was over $1.1 billion, and Teva's ADS was trading near $63. The Exchange Act Defendants' "willingness" to perform a "'***transformational***' acquisition in the generics space" was well-known to analysts, as was their "urgency to diversify via M&A," as Barclays and Leerink wrote on April 7 and 16, 2015, respectively. On April 21, 2015, the Exchange Act Defendants attempted to purchase Mylan but on April 27, 2015, Mylan's Board dismissed the offer.

319.    During a June 10, 2015 Goldman Sachs conference, Teva again announced positive results, with Vigodman emphasizing to investors the "***profound change in the generic business***" and Olafsson noting the improvement of "***$1 billion ... in 14 months, 16 months***." Neither disclosed that the Price-Hike Strategy had generated over $1.1 billion in profits for the generics

unit over that same time. By July 27, 2015, artificially bolstered by profits from the fraud, the price of Teva's ADS reached an all-time high of $72.

320.    That day, Teva announced the $40 billion acquisition of Actavis from Allergan. Vigodman explained that the improvement in generics was a "***precondition***" for accomplishing their motivation for a deal. Without the inflated securities as a "currency," however, Teva did not have the cash as the $40 billion purchase price was roughly ***twenty years*** of Teva's average annual income from 2013 to 2015.

321.    By the second quarter of 2015, however, the Price-Hike Strategy had peaked. Teva began to experience pricing pressure on its generic drugs and was increasingly thwarted in its ability to make additional large price increases. With the Exchange Act Defendants still needing to raise the capital necessary to pay for the $40 billion purchase of Actavis, Inflated Profits began to evaporate. As questions arose regarding increasing pricing pressure and Teva's weakening financials, the Exchange Act Defendants repeatedly denied that Teva was making profits from price increases and that Teva was facing pricing pressure. After the Exchange Act Defendants had raised over $27 billion in public offerings on July 28, 2016 and closed the Actavis deal on August 2, 2016, the Exchange Act Defendants disclosed that Teva had been subpoenaed by the government. Soon after that, the truth began to leak into the marketplace, and the fraud fell apart.

### 3.    Conscious Misbehavior Or Recklessness

#### a)    Implementation Of The Price-Hike Strategy

322.    With the goal of rejuvenating its failing generics business, Teva adopted the Price-Hike Strategy in early 2013. Then-Senior Director of Marketing, Kevin Galownia, announced this deliberate strategy at a quarterly "all-hands" meeting at Teva's U.S. headquarters that was attended by members of the sales, customer service, finance, and pricing groups. (FE-4) Galownia explained that Teva would raise prices on its generic drugs in a systematic manner. (FE-4) This strategy

stood in contradiction from the strategy that then-CEO Levin had set in 2012 to focus on branded drugs. This significant strategy change was implemented by Teva's highest executives, (FE-4) and could not have been decided by Galownia alone. (FE-4, FE-3, FE-2, FE-1)

323.   The senior executives at the U.S. headquarters needed to provide explicit approval to implement price increases. The daily and weekly reports circulated to Cavanaugh, Griffin, Oberman and later Olafsson would have captured the Inflated Profits from the Price-Hike Strategy (FE-1), as well as the intra-quarter reports that these Officer Defendants assembled and sent to Teva's senior executives in Israel. (FE-1, FE-2) According to FE-2, and consistent with this process, "everyone would have known" of large price increases that had a significant financial impact, including Oberman, especially if it was used to fill a "hole" between revenues and forecasts.

### b)   Only Senior Executives Could Make Price Increases

324.   A strong inference of scienter is also supported by the fact that the execution of the Price-Hike Strategy required that, pursuant to an established and formalized process that was in place by 2012 when FE-2 was employed at Teva, senior executives would have been required to personally analyze and approve each price increase. (FE-2) Galownia and the Pricing Group would initiate the process. (FE-2, FE-4) Galownia would analyze Teva's portfolio of established generic drugs on a "constant and ongoing basis," and would produce a "list of opportunities" and recommendations of potential price increases to Teva USA COO Maureen Cavanaugh and Deborah Griffin, who was Chief Accounting Officer of Teva and the CFO of Teva USA. (FE-2)

325.   However, Galownia was "just the guy doing the evaluation," (FE-2), as his superiors made the actual decision to increase the price of a generic drug. (FE-2, FE-3, FE-1) Accordingly, Cavanaugh and Griffin would each separately evaluate whether Teva would make a

price increase, and if so, when. (FE-2) Cavanaugh would review the price increases from the operational perspective, while Griffin would undertake a financial cost-benefit analysis that would evaluate both whether and when to implement the price increases. (FE-2) In particular, Griffin would have to factor in specific contract terms and costs associated with increasing pricing and determine the right timing for the increase. (FE-2) Sometimes, Griffin's decision was to raise a price, but wait until the next quarter when the contractual implications would be more favorable. (FE-2) This recommendation and evaluation process could be quick, but could also span weeks, with the implemented price hike following as many as 60 days after Galownia's initial recommendation. (FE-2)

326.   The members of the Pricing Group would routinely engage in a bottom-up analysis in deciding to lower prices. This required them to conduct and provide senior executives with detailed analysis and documentation justifying their decisions to reduce prices. (FE-3) Price increases, in contrast, came from the top down. When prices were increased, the Pricing Group was simply "told," by email or in a meeting, to raise the prices of certain drugs, without conducting any analysis justifying the increase. (FE-3) Members of the Pricing Group did not have authority to implement price increases. (FE-3) Defendants became "more aggressive with pricing" by frequently increasing prices from 2013 onward. (FE-4) Empirical evidence confirms this observation. Appendix A.

327.   As was the case during the Relevant Period, and as the empirical evidence confirms, approved price increases would often be batched together and announced on the same day. (FE-2) Once a price increase was made, Teva would send letters to affected customers informing them of the price increase. (FE-2, FE-4) Galownia or his team would also email these letters to all Teva employees whose work would have been impacted by price increases. (FE-4)

328.     Given this formalized process involving Griffin and Cavanaugh, there is a strong inference that Exchange Act Defendants were aware of, or at least recklessly disregarded, the 76 price increases, ranging from 50% to 1500%, over the course of over three years, that generated over $2 billion in Inflated Profit.

### c)   Continuous Access To Documents And Information Tracking Profits From Price Increases

329.     The Exchange Act Defendants were given documents that tracked the financial impact of the Price-Hike Strategy against the detailed revenue goals for Teva's U.S. generics business, as often as on a daily basis. (FE-1) They also had access to Company-wide databases with detailed drug-by-drug information about the price, sales, and profits of each drug on a real-time basis. (FE-1, FE-3) Given the close attention paid to revenue and its sources, and the readily available information concerning these topics, there is a strong inference that the Exchange Act Defendants knew or recklessly ignored that billions of dollars in Inflated Profit were generated through the Price-Hike Strategy, and its collapse caused the later short-falls in profits.

330.     <u>Long Range Work Plan</u>: Among the documents the Exchange Act Defendants created and received was a long-range Work Plan, generated annually, that included generic revenue forecasts for three to five years, and that contained granular pricing details down to the NDC level. (FE-1) The employees preparing the Work Plan would receive feedback from executives over the course of a pre-established schedule. (FE-1) The process began around March each year, with the U.S.-based executives, including Oberman and Olafsson, reviewing and approving the Work Plan over the late summer. (FE-1) The U.S.-based executives would then present the Work Plan to Teva's executives in Israel, including Vigodman and Desheh, each year. (FE-1)

331.     <u>Daily Scorecards</u>: Weekly or daily Scorecards were circulated among Teva's top

executives, including Olafsson and Oberman. (FE-1, FE-2) These Scorecards provided these executives with regular access to U.S. sales and revenue data for generic drugs. (FE-1) The Scorecards also compared Teva's actual revenue figures to longer-term revenue goals. (FE-1) The executives used the Scorecards to track "holes" between the actual revenues and forecasts, including the Work Plan. (FE-1, FE-2) The price increases were used to "fill" the holes. (FE-2)

332.   <u>Latest Best Estimates</u>: Teva's U.S. executives also tracked, and would report to the executives in Israel, U.S. generic performance on a quarterly basis through the LBEs which showed how a current financial quarter compared to long term forecasts. (FE-1) The LBEs would also be circulated to the executives in Israel. (FE-1)

333.   <u>Oracle ERP System</u>: Teva housed its pricing, revenue and sales data of its generic drugs on its Oracle ERP system, a Company-wide database. (FE-1, FE-3) Through this system, pricing, sales and revenue information for each generic drug was readily and easily available at the granular level, "down to the NDC code." (FE-3) Teva executives, including Griffin, Cavanaugh, Oberman, and Olafsson all had access to Oracle. (FE-1, FE-3) Oracle was the source for the data used for the Scorecards, Work Plan and the LBEs. (FE-1)

> **d)**   **The Exchange Act Defendants Spoke Repeatedly About The Pricing Of Generic Drugs**

334.   The Exchange Act Defendants repeatedly claimed that they had accurate knowledge of the sources of Teva's generics profitability.

335.   The Exchange Act Defendants claimed to have intimate knowledge of whether Teva had taken price increases and whether those price increases contributed to the increased profitability of Teva's generics division. For example, on October 29, 2015, Vigodman claimed awareness that "all the improvement ... in our ... margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015." Similarly, on

February 11, 2016, Olafsson claimed he knew that the "$1 billion improvement in operating profit over 24 months period," was achieved "[n]ot by pricing but by portfolio mix, new products, and efficiency measures." On November 19, 2015, when asked about industry price increases, Desheh claimed that "Teva was not associated with any of that."

336.   The Exchange Act Defendants also claimed knowledge of when Teva would take price increases, limiting them to instances with shortages. For example, on October 30, 2014 Vigodman claimed he knew that Teva looked for pricing only "when there is a shortage in the market." On August 4, 2016, Olafsson claimed that Teva would increase prices only when there were "shortages in the market," and that then "there might be a small pricing opportunity."

337.   The Exchange Act Defendants further claimed that they were aware of the rate of pricing decline that Teva was experiencing in 2016, and how it compared to prior years. For example, on June 3, 2016, Vigodman asserted that he knew that "[w]hat we see is a 4% to 5% erosion.... That's not something which is different from what we said during 2015." Earlier, on May 9, 2016, Olafsson asserted awareness that despite "a tougher pricing environment or price deflation," "Teva has not seen any fundamental change or worsening in the pricing environment.... What this boils down to is each individual company's business model.... Nothing has happened in the last two quarters that has changed the pricing environment." Similarly, on September 7, 2016, Desheh claimed that the pricing environment for Teva's base generic business was "very stable," and that "there's no pressure on prices."

338.   The Exchange Act Defendants also claimed knowledge of whether Teva was competing in a functional and competitive generics market. For example, on July 27, 2015, Olafsson asserted that he knew that "there's fierce competition on most of [Teva's] portfolio, if not all the portfolio." During that same call, Vigodman added, "We believe in competition, and

we'll do what is needed in order to win all the markets we operate." On November 19, 2015, Desheh claimed he knew that Teva was "playing a competitive game .... playing it fairly .... by the book and by the rule."

339.   This self-proclaimed personal involvement by the Exchange Act Defendants' supports a strong inference that they each possessed knowledge of the true state of affairs of the business, and thus had knowledge that their representations were misleading, or were reckless in not knowing.

### e)   Exchange Act Defendants' And Analysts' Focus On Generics

340.   A strong inference of scienter is also supported by the fact that the Exchange Act Defendants repeatedly stated that Teva's generics segment, which was bolstered by its U.S. division, was driving the Company's turnaround during the Relevant Period. For example, on May 13, 2015, Desheh described the turn-around in generics as "nothing short of a revolution." On June 10, 2015, Olafsson touted improvement of the "generic business by ... $1 billion [] in 14 months, 16 months." That same day, Vigodman touted "the profound change in the generic business," citing increased operating profit from 2013 to 2014.

341.   Further supporting a strong is inference of scienter is that in accordance with the Exchange Act Defendants' statement, analysts focused upon Teva's generics businesses, and particularly its U.S. division, as a financial driver for the Company. For example, in a February 5, 2015 report, Piper Jaffray noted that "the profitability of the generics business [is] continuing to improve." On April 30, 2015, J.P. Morgan wrote: "Teva continues to make progress on generics profitability ... we remain encouraged by the recovery in Teva's generic business." The same day Cowen and Company noted that Teva's "outperformance was a result of better than expected U.S. generic sales."

342.     Similarly, when industry pricing pressure damaged Teva's competitors, analysts repeatedly questioned the Exchange Act Defendants about pricing pressure over the course of several months, to which the Exchange Act Defendants repeatedly provided detailed denials. For example, on February 11, 2016, Guggenheim asked Olafsson about "pricing pressure in the generics business," with Olafsson claiming to know that "on the pricing ... we didn't see anything change in fourth quarter." On September 7, 2016, Wells Fargo asked whether Teva was "seeing the same generic erosion, pricing erosion that some of the other companies" had, to which Desheh asserted he knew that "the base [generics] business ... the prices are very stable there."

### f)     The Magnitude, Importance And Duration Of The Fraud

343.     A strong inference of scienter is also supported by the fact that the Price-Hike Strategy generated as much as $2.3 billion in Inflated Profit, with Inflated Profit driving Teva's reported financial turnaround throughout the Relevant Period. In 2014 and 2015, Inflated Profits comprised an increasingly large portion of Teva's overall net income. Inflated Profits accounted for an increasing percentage of the generics segment profits, with 15% in 2013, 32% in 2014, and 32% in 2015. Inflated Profit accounted for an even larger portion of the Company's overall net income: 20% in 2013, 23% in 2014, 54% in 2015, and more than 100% of the overall profit in 2016. The stronger inference is that the Exchange Act Defendants knew of the source of these profits.

344.     Likewise, in 2016, when Teva faced mounting pricing pressure and accelerated price erosion, the Price-Hike Strategy deteriorated and Teva was thwarted from additional price hikes. Accordingly, Teva's generic drug profits plummeted. By 2017, Teva's ability to service its outsized $35 billion debt was made questionable by its deteriorating financial condition, and Teva was not only forced to take a staggering $6.1 billion impairment charge against its generics

business, but to uncharacteristically reduce its dividend as well. The stronger inference by far is that the Exchange Act Defendants were aware of the source of this decline or were reckless in not knowing.

        **g)**      **Contemporaneous Red Flags Indicated**
                         **That The Exchange Act Defendants' Statements**
                         **Were False Or Misleading**

345.    Contemporaneous red flags alerted the Exchange Act Defendants to the possibility that their statements were false and misleading. At a minimum, the Exchange Act Defendants recklessly failed to review or check information that they had a duty to monitor under these circumstances.

346.    <u>Congressional Inquiry</u>: On October 2, 2014, Congress sent Vigodman a personal letter seeking answers to "the underlying causes of recent increases in the price of [Teva's] drugs." This should have placed the Exchange Act Defendants on notice to discover whether Teva had taken price increases and to what extent. Despite this, on October 30, 2014, in the fact of analyst questions on the subject, Vigodman denied that Teva derived revenues from price increases. Similarly, Congress invited Teva to testify at a November 20, 2014 hearing on whether "there was a rational economic reason as to ... huge price increases." All of this should have sparked an internal inquiry from Teva's executives. Yet, on December 11, 2014, when faced with the assertion from an analyst that wholesalers were seeing large price increases, Olafsson flatly denied that Teva was involved in those practices.

347.    <u>The State AG And DOJ Investigations</u>: The fact that the DOJ and the State AGs began investigations into Teva's competitors related to their pricing practices also supports a strong inference of scienter. The fact of those investigations should have triggered an internal inquiry at Teva into the facts of its own pricing practices, including the dozens of price increases that Teva made in tandem with its competitors.

348.   <u>GAO Report</u>: On September 12, 2016, the GAO, which Congress had commissioned over two years earlier, publicly released its report on "Generic Drugs Under Medicare," documenting its audit of Medicare Part D data from June 2015 to August 2016. The GAO found hundreds of unexplained "extraordinary price increases," defined as the price of a particular drug increasing over 100% within a 12-month period, and that some drug prices increased more than 1,000%. Teva had numerous drugs that showed extraordinary price increases in the GAO report. The facts of the GAO report support the inference that the Exchange Act Defendants spoke the alleged false statements with scienter.

### h)   Officer Terminations Support Scienter

349.   Scienter is further supported by the fact that three of Teva's Officer Defendants – Olafsson, Vigodman, and Desheh – resigned or had their employment terminated at a critical time, when Teva's Price-Hike Strategy was deteriorating, and it was facing scrutiny from regulators. There is a strong inference that the termination of Olafsson was connected to his fraudulent cover-up of the Price-Hike Strategy and the subsequent decline in Teva's profits as the strategy collapsed. The explanation for his termination as "retirement" was false, and the first charges from the DOJ and State AGs regarding their pricing investigations were released only days later. There is a similarly strong inference regarding Vigodman's termination. He was fired without a replacement just one month after Teva significantly revised its 2017 guidance downwards, resulting in part from increased price erosion and dwindling generic profits, and one week before Teva reported disappointing financial results for Q4 2016. Finally, less than two months after Desheh left Teva, and in the very first reporting period after all Defendants were gone, Teva took a staggering $6.1 billion charge against its U.S. generics business and announced a radical 75% reduction in dividend payments to shareholders. This supports an inference that it was these Exchange Act Defendants who were blocking the true financial state of the Company from coming to light.

### i)   Other Facts Supporting Scienter

350.   The Receipt Of The Subpoenas: Teva's receipt of subpoenas from the DOJ and the Connecticut AG on June 21, 2016 and July 12, 2016, respectively, supports a strong inference of the Exchange Act Defendants' scienter. Particularly, those subpoenas triggered a legally mandatory duty to inquire into Teva's pricing practices. Instead, the Exchange Act Defendants continued to make materially false and misleading statements about their exposure to price erosion, including during Teva's September 9, 2016, Generics Day.

351.   Bloomberg Article: The November 3, 2016 *Bloomberg* article revealed that Teva was the subject of the DOJ criminal inquiry, and that the DOJ and State AGs could likely bring charges later in the year. Despite this, Vigodman, almost two weeks later, on November 15, 2016, claimed that he was "not aware of any fact that would give rise to an exposure to Teva with respect to the investigation." The State AGs suit and the DOJ charges against Glazer and Malek soon followed, and, subsequently, those investigations have expanded massively. The close proximity of Vigodman's statement to the announcement of the charges diminishes the plausibility of innocent explanations or denials from the Exchange Act Defendants.

### 4.   Corporate Scienter

352.   Teva possessed scienter by virtue of the fact that the Officer Defendants, who acted with scienter as set forth above had binding authority over the Company. In addition, certain allegations herein establish Teva's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.

353.   It can be inferred that senior corporate executives at Teva possessed scienter such that their intent can be imputed to the Company. For example, in 2013, Galownia, Teva's Senior

Director of Marketing who led Teva U.S.'s pricing department, knew of and discussed Teva's new Price-Hike Strategy at a quarterly "all-hands" meeting of the sales, customer service, finance, and pricing groups. Additional unknown executives sufficiently senior to impute their scienter to Teva were also aware of the Price-Hike Strategy given that it (a) required the involvement of numerous divisions within Teva to implement, including the Operations department under U.S. COO Cavanaugh and the Finance department under U.S. CFO Griffin, and (b) had a material impact on Teva's financial statements.

354.    As yet unidentified employees also approved the false statements despite knowing of their false and misleading nature. As discussed, Teva had in place extensive processes to track its financial performance on a daily, quarterly, and yearly basis. From this, it can be inferred that someone at Teva approved of the false and misleading statements in Teva's financial statements concerning the source of its generics profits, while knowing that the true source of the profits was Inflated Profits from the Price-Hike Strategy. According to FE-2, "everyone" would have known of price increases that had a material impact on Teva's U.S. financial reporting. It can also be inferred that someone who knew of the Price-Hike Strategy and its dependence on lack of competition also approved the false and misleading statements that Teva was competing intensely on price.

### E.    Teva Engaged In Collusion, Rendering The Statements False And Misleading And Further Supporting A Strong Inference Of Scienter

355.    Teva engaged in a series of anticompetitive conspiracies as to particular drugs. Plaintiffs make this allegation based on information identified in: (i) Plaintiffs' Counsel's own investigation; (ii) the investigation cited in the Class Action Complaint; and (iii) the State AGs allegations in their Consolidated Amended Complaint against Teva and others ("CAC"), filed June 18, 2018.

356.    The Class Action plaintiffs' investigation included, among other things, interviews with former employees and econometric analysis of data accessible only through subscription-based data services.

357.    The States AGs identify evidence culled from their long-running investigation, which began in 2014, including documents obtained pursuant to multiple subpoenas and cooperation by defendants who have settled with the State AGs and pled guilty to federal antitrust violations. That investigation remains ongoing. Connecticut's AG, George Jepsen, who initiated and led the State AGs' investigation, has publicly emphasized that the CAC's allegations have a strong basis in direct evidence. In an October 31, 2017 interview with CNBC, held after the States filed their proposed CAC, Jepsen emphasized that the CAC's now-expanded allegations rested on compelling evidence: "We've uncovered – through emails, text messages, and telephone patterns, plus cooperating witnesses – a very compelling case of systematic and pervasive price fixing within the industry."  On December 9, 2018, an assistant attorney general and antitrust investigator in Connecticut who has been leading the State AGs' investigation, Joseph Nielsen, announced that the scope of this investigation had expended to at least 16 companies and 300 drugs, and had exposed "the largest cartel in the history of the United States."

### 1.    Teva Colluded With Other Manufacturers To Fix Prices

358.    <u>Parallel Price Increases</u>: The Class Action plaintiff's investigation identified 17 sudden and aberrational price increases undertaken by Teva that show strong indicia of collusion. These price increases, the details of which are reflected in Appendix B, relate to 16 drugs (the "Collusive Drugs") that collectively generated as much as $1.23 billion dollars in Inflated Profit for Teva.

359.    In each instance, the drug's major manufacturers, including Teva, enacted large price increases at or around the same time, raising prices to exactly, or nearly exactly, the same

level. For some, Teva was the first to raise prices, and others followed; other times, Teva followed another manufacturer's lead. The Class Action plaintiffs' investigation identified, in addition to these lock-step price increases, corroborating indicia of collusion, detailed below, including: (i) motive and opportunity to increase prices; (ii) price increases against apparent self-interest; and (iii) interfirm communications.

360.    <u>Motive and Opportunity</u>: Companies and individuals involved in generic drug pricing, sales, and marketing are, as in any other industry, motivated to increase the profit earned on their products. In the generic drug industry specifically, the natural profit motive may bend toward a motive to collude, due to the cold realities of marketing products that are, despite their scientific sophistication, a commodity. Because federal law requires generic drugs to be "readily substitutable," price is the only meaningful mechanism by which generic drug manufacturers may differentiate their products, a circumstance which over time, and absent collusion, drives prices down to a point just above the manufacturers' marginal costs of production. Each of the Collusive Drugs is a long-established generic in a mature market in which prices had leveled off to a steady equilibrium. The manufacturers of the Collusive Drugs, therefore, had a common motive to increase their profits by conspiring to raise prices in tandem, overriding the natural downward pressure on prices.

361.    In the context of this motive, each Collusive Drug's market is characterized by factors that, as a matter of economics, present the opportunity to collude, including:

- <u>High Concentration</u>  The market for each Collusive Drug was an oligopoly by a handful of manufacturers who collectively controlled substantially all of the market.

- <u>High Barriers to Entry</u>  Entering a generic pharmaceutical market requires significant lead time for development and regulatory approval. The cost is significant; the process of obtaining regulatory approval alone can cost millions. Further, there is financial risk that the recoupment of any

investment could be delayed or never happen. Regulatory approval, known as an "ANDA" approval, could be denied or delayed for months or years due to technical failures or other factors. According to the GAO and others (including Teva), during the Relevant Period the FDA was significantly "backlogged," and thus potential market entrants could have to wait years for approval. It has been reported that in 2015 ANDA approvals often took 40 months or more.

- <u>Demand Inelasticity</u>  The Collusive Drugs are all important, and in many cases absolutely critical, to the end-consumer's health and well-being. As a general matter, demand for such drugs is inelastic, *i.e.*, the quantity demanded does not vary significantly as price changes, as the consumer cannot simply walk away as prices rise. Another factor contributing to demand inelasticity is that health insurance plans typically will pay for medications regardless of price, so long as the drug is on the plan's approved list. The Class Action plaintiff undertook statistical analysis of the market for each of the Collusive Drugs, confirmed inelasticity for each drug, and empirically observed that volume did not change as the price increased.

- <u>Lack of Alternative Products</u>  Doctors choose to prescribe specific drugs to their patients for reasons related to the specific pharmacological distinctions among the drugs in a particular class and, consequently, they cannot simply substitute one product for another when price varies. This is true of the Collusive Drugs. For instance, Pravastatin is one of several generic statins, but unique for its relatively low level of binding to blood plasma proteins, which may have life-altering implications for certain patients.

- <u>Inherent Fungibility of Generic Drugs</u>  Each manufacturer's version of each of the Collusive Drugs is, by nature, interchangeable with any other manufacturer's version. By law, all generic drugs must be readily substitutable for another generic of the same brand drug.

362.    <u>Price Increases Against Self-Interest</u>: There was no reasonable commercial or economic justification for the price increases in the Collusive Drugs. In no case was a shortage reported during the Relevant Period for any of the Collusive Drugs, nor any sudden significant increase in demand. Thus, absent a collusive understanding among competitors, a manufacturer that acted alone to enact significant price increases ran a tremendous risk of losing all, or most, of its market share if competitors undercut the suddenly-inflated price. As an empirical fact, each manufacturer was able to substantially increase, and maintain increases on, the prices for the Collusive Drugs within a short period of time; no competitor sought to seize increased market

share by undercutting the other market participants with even a slightly-smaller price increase. Without a deliberate strategy, such price increases would have been against Teva's self-interest, further supporting the Exchange Act Defendants' scienter.

363.    The "risk" Teva would have undertaken without collusion was particularly acute with respect to the six Collusive Drugs for which Teva was the first to increase the price, namely Ketoconazole (cream and tablets), Nystatin, Theophylline, Diclofenac, Propranolol, and Estradiol. Appendix B. The fact that Teva was so often willing to expose its market share to predation by other manufacturers whose prices sat many multiples below Teva's plausibly supports that, in reality, there was no risk at all; Teva had reached a collusive understanding that other market participants would themselves raise prices soon thereafter, and/or that Teva's "fair share" of the market would remain untouched despite its extraordinary price increase.

364.    <u>Inter-Firm Communications</u>: The State AGs' CAC describes evidence showing Teva engaged in extensive direct communication with other manufacturers. For example, the State AGs allege that over 1,500 communications occurred between certain of Teva's "senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs" and employees at 15 other manufacturers between July 1, 2013 and July 30, 2014.

365.    Furthermore, the Class Action plaintiffs' investigation identified a multitude of trade shows and conferences that afforded individuals responsible for Teva's generic drug prices an opportunity to interact with their counterparts at other manufacturers during the Relevant Period, many of which occurred in close proximity to price increases that Teva and/or other manufacturers implemented on the Collusive Drugs. A list of such events, indicating attendance by Olafsson, Oberman, Cavanaugh, Galownia and Patel is attached hereto as Appendix C. In all instances identified in Appendix C, representatives of at least one other manufacturer – and

typically many more – also attended.

366.     Trade shows and conferences provided opportunities for one-on-one meetings among Teva personnel, including several of the Exchange Act Defendants, and personnel of other manufacturers. For instance, at both the 2013 and 2014 annual meetings of the National Association of Chain Drug Stores ("NACDS"), Teva reserved a "strategic exchange" bungalow. NACDS advertised "strategic exchange" bungalows as "opportunities to meet and discuss strategic issues with key trading partners." In essence, Teva paid for a secluded area where its personnel could meet privately with others, including other manufacturers.

367.     <u>Government Investigations Corroborate An Inference Of Collusion</u>: Corroborating the inferences drawn from the Class Action plaintiffs' investigation, the State AGs' CAC alleges, based on specifically-described communications, seven drug markets where Teva conspired to fix prices and/or allocate markets, namely the markets for: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline. Nystatin and Theophylline – two drugs where the States uncovered evidence that Teva, in coordination with Heritage, agreed to "take the lead" on price increases, overlap with the set of drugs where the Class Action plaintiffs' investigation found strong indicia of collusive price-fixing.

368.     The State AGs focus many of their drug-specific collusion allegations on the communications of Malek, Heritage's President. In dealing with Teva, Malek coordinated market allocation and price increases with a particular Teva employee, with whom he had a preexisting relationship. This employee joined Teva in April 2013 and was on maternity leave from August through December 2013. On information and belief, this employee is Nisha Patel ("Patel"), Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016. Patel was on maternity leave from

August through the end of 2013, (FE-1), and her tenure at Teva, based on publicly available social media sites, aligns with that of Malek's Teva contact. Patel had responsibilities relating to pricing prior to her shift to National Accounts. (FE-1, FE-3) The following is a brief timeline of those interactions, and their anticompetitive outcomes:

- <u>July 2013</u>  After three calls between Malek and Patel spanning more than 43 minutes, Nystatin appeared on an internal Teva list of "potential" price increases, despite a Nystatin price increase having met internal resistance the prior month, when Teva first considered the prospect. Patel went on maternity leave soon afterwards.

- <u>February 7, 2014</u>  After several contacts between Patel and Malek, Nystatin again appeared on an internal Teva spreadsheet as a candidate for a price increase.

- <u>April 4, 2014</u>  Teva increased WAC for Nystatin and Theophylline.

- <u>April 15, 2014</u>  Malek and Patel had a 17-minute conversation, during which they discussed price increases and/or market allocation as to at least the seven drugs referenced above. Patel and Malek determined that, as Teva had raised WAC on Nystatin and Theophylline days earlier, Teva would "take the lead" on implementing price increases for those drugs, and other competitors would follow. Heritage would lead on the other five.

- <u>April 16-17, 2014</u>  Multiple Teva employees communicated with Zydus, a competitor in the market for Acetazolamide.

- <u>May 1-6, 19-22, 2014</u>  Patel had at least three calls and exchanged at least 30 text messages with the Actavis pricing manager responsible for Glyburide-Metformin.

- <u>May 9, 2014</u>  A Teva employee responsible for pricing spoke with their counterpart a Mylan, a competitor in the market for Glipizide-Metformin; these employees remained in close communication through 2014.

- <u>July 8, 2014</u>  Teva refused to bid when a large Heritage customer requested a quote on Nystatin from Teva, in response to Heritage's price increase on the drug.

- <u>By July 9, 2014</u>  Teva had increased prices on Nystatin, Theophylline, Glyburide, and Glyburide-Metformin, and Heritage had increased prices on all seven drugs Malek and Patel had discussed on April 15. If Teva did not increase prices, it furthered the agreement by refraining from bidding

competitively, lowering prices, or, in the case of Leflunomide, leaving the market entirely.

- <u>July 25, 2014</u>   After a large wholesaler solicited bids from Teva and Aurobindo on Glyburide, Teva spoke with Heritage (and Heritage with Aurobindo) "to ensure uniformity and compliance with the scheme," and resolved that Teva and Aurobindo would decline to provide a bid.

369.   These seven examples of Teva's reaching anticompetitive agreements are drawn just from the limited subset of drugs manufactured by both Teva and Heritage, a relatively small player in the industry. The State AGs have indicated that the CAC's common thread is Heritage, and that they plan to bring separate complaints focused on companies other than Heritage. The States are investigating collusive conduct relating to nearly 200 additional drugs.

370.   The DOJ also continued to actively investigate Teva, as evidenced by its motion to stay discovery in the *Propranolol Antitrust* matter on the ground that the plaintiffs' allegations of price-fixing "overlap[] substantially with one aspect of [DOJ's] criminal investigation." The Southern District of New York, in sustaining the *Propranolol Antitrust* allegations over Teva's motion to dismiss, reasoned that "[t]he presence of an ongoing investigation into the same subject matter as alleged in the pleadings here raises an inference of conspiracy." DOJ intervened similarly in the *Generic Pharmaceuticals* MDL, seeking stays and asserting that the drugs at issue – including the Collusive Drugs Baclofen, Fluocinonide, Pravastatin, and Propranolol – overlap with the DOJ's criminal investigation, further corroborating the existence of illegal price-fixing as to those drugs.

## 2.   Evidence of Collusion Further Supports A Strong Inference Of Scienter

371.   Teva's collusion additionally supports a strong inference of scienter. Given all the information available to them, the Exchange Act Defendants knew, or recklessly disregarded, that in order for the Price-Hike Strategy to generate the high level of Inflated Profits apparent in data

regularly available and reported to them, Teva would likely have had to, and did, coordinate, communicate, and potentially reach illegal agreements with other manufacturers.

372.    As alleged, Teva's price increase approval processes necessarily involved senior management. Neither Patel, nor any person in her position, had the authority or ability to raise prices or to determine which drugs Teva would bid on, including the ones that Malek and Patel had discussed. (FE-2, FE-1, FE-3) Teva's senior management and executives, including Griffin and Cavanaugh, approved all price increases.

373.    Moreover, many of the Collusive Drugs were major drugs for Teva and the profits from the price hikes were substantial. In all, the Collusive Drugs generated $1.2 billion over the Relevant Period. The financial implications of the price increases would have been reflected in the analysis that Griffin and Cavanaugh undertook in deciding whether to take the price increase, and when. (FE-1, FE-2) That financial impact would also be reflected in the financial reporting for which they and Oberman and Olafsson were responsible, and which was presented to Vigodman and Desheh. (FE-2, FE-1) These included regularly updated forecasts and scorecards. The information was also available on the Oracle ERP system.

374.    With the knowledge gained from these reports and data, Teva's executives and the generic segment CEO (Oberman and then Olafsson), Teva CAO and CFO of Teva USA (Griffin), and COO of Teva USA (Cavanaugh) could see when price increases were effective for an abnormally long time, or whether an abnormal quantity of price increases remained effective in contravention of rational economics.

375.    Moreover, the State AGs have alleged that for years Teva adhered to a "widespread" "code of conduct," among generic drug manufacturers that allowed them to "fix prices and allocate markets to suppress competition." The "code's" objective was to attain a price

equilibrium where manufacturers had no incentive to compete for additional market share by lowering price. Under that code, "competitors" would agree collectively to raise or maintain drug prices, dictating that a competitor should not "punish" another for price increases by underbidding the competitor who raised prices, as that would be "irresponsible." Manufacturers also would enter into collusive "fair share" market allocation agreements by making knowingly uncompetitive bids, refusing to bid, or readjusting market share by walking away from customers.

376.   The State AGs have stated that evidence they have secured shows that executives at the highest levels in many of the defendant companies conceived and directed many of the schemes. This assertion corroborates the allegations arising from the Class Action plaintiffs' investigation, including that Cavanaugh and Griffin were involved in pricing decisions, and Olafsson and Oberman would have received and reviewed reports and forecasts reflecting the Inflated Profit generated thereby.

377.   Furthermore, Oberman, Olafsson, and Cavanaugh personally attended numerous trade shows and conferences during the Relevant Period, affording them the opportunity to interact with individuals responsible for pricing and marketing decisions at other manufacturers (Appendix C).

### 3.   The Undisclosed Fact Of Teva's Collusion Constitutes An Independent Basis For Falsity

378.   The false and misleading statements regarding the source of Teva's profits as described in its SEC disclosures identified above in Section III.C.3, and the false and misleading statements regarding competition in Teva's SEC disclosures as identified above in Section III.C.2, were false and misleading, in addition to the reasons enumerated above, because Teva conspired with other manufacturers to fix prices for certain generic drugs. Statements regarding the supposed source of Teva's revenues were false because they omitted the fact that Teva's revenues were

partly generated by collusive means. Statements describing the supposed competitiveness of the U.S. generic drug market were false because Teva was in reality participating in series of anticompetitive conspiracies that distorted competitiveness.

### F.  Loss Causation

379.  In addition to the allegations herein, the Exchange Act Defendants' fraudulent conduct directly and proximately caused Plaintiffs to suffer substantial losses as a result of purchasing Teva Securities at artificially inflated prices during the Relevant Period.

380.  The Exchange Act Defendants, through each category of false and misleading statements and omissions, concealed the truth about Teva's core business strategy that materially contributed to Teva's financial and operational success during the Relevant Period. By concealing, among other things, the Price-Hike Strategy, that Teva was not competing on price, that the strategy was driving known material trends, and that as the strategy failed and pricing competition increased Teva's financial condition was deteriorating, the Exchange Act Defendants also concealed the numerous and related risks associated with their false statements and omissions, including but not limited to, the risks that:

- the strategy was highly risky and not sustainable, and as the strategy failed, Teva's profits would collapse;

- by their nature, especially when done in tandem with competitors, price hikes might appear to arise from anti-competitive and/or collusive conduct and, thus, draw the attention of government investigators and law enforcement agencies, precipitating possible legal actions, civil liabilities, and criminal sanctions;

- should the Price-Hike Strategy come under public, legislative, or law enforcement scrutiny, the viability of sustaining the Inflated Profits and/or implementing new price hikes would be severely undermined, and would thereby undercut a major driver of the generic segment's profit;

- if pricing pressure or competition increased, Teva would be far more susceptible to a rapid and material decline in Inflated Profits, resulting in poor financial results and undercutting reported and forecasted profits;

- upon the failure of the Price-Hike Strategy, the Company could be further disrupted by the termination of the senior managers who were responsible for the strategy, and by any increased difficulty in hiring qualified replacements; and

- as the Price-Hike Strategy in fact failed over time, Teva's Inflated Profits declined, and Teva was prevented from making additional price increases, those trends would continue.

The concealed risks bear directly on Teva's ability to generate and sustain its profits and its ability to service the over $30 billion in debt.

381.    Beginning in August 2016, the concealed risks began to materialize through a series of negative events and disclosures that revealed, on a piecemeal basis, the false and misleading nature of the Exchange Act Defendants' Relevant Period statements and omissions. Despite these partially corrective events and disclosures, Teva Securities' prices remained artificially inflated and were prevented from declining to their true value by the Exchange Act Defendants continuing to make materially false and misleading statements that had the effect of, at least temporarily, concealing their fraud. As the relevant truth leaked out into the market from August 2016 to August 2017, Plaintiff suffered losses, which were foreseeable and caused by the materialization of the risks that the Exchange Act Defendants' fraudulent conduct concealed from investors, as set forth below.

### 1.    August 4-5, 2016

382.    After the close of trading on August 4, 2016, Teva filed its Q2 2016 6-K, reporting 2Q 2016 results, which announced (i) poor generics segment earnings, including a $115 million YOY decline in profits for the generics segment; and (ii) that "[o]n June 21, 2015 [sic], Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products" and "[o]n July 12,

2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."

383.    On this news, the prices of Teva Securities declined. Between the close of trading on August 4, 2016 and on August 5, 2016, the price of Teva's ADS fell $1.24 or 2.24% to close at $54.21; the Preferred Share price fell $12.00 or 1.32% to close at $895.00.

384.    This marked the beginning of the relevant truth leaking out, as Teva's Price-Hike Strategy had begun to collapse, as Teva lost its ability to profit from the 76 historic price hikes, or to implement new increases in 2016. The disclosure of the subpoenas was a materialization of the risk that, after nearly two years of ongoing investigations, the DOJ and State AGs would seek evidence from Teva in connection with Teva's pricing practices.

### 2.    November 3, 2016, December 13-16, 2016

385.    On November 3, 2016, during the trading day on the NYSE, *Bloomberg* published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," describing the DOJ's "sweeping" two-year investigation related to the soaring prices of generic drugs and how executives from more than a dozen generic pharmaceutical manufacturers, including Teva, were suspected of colluding to raise the prices of generic drugs. The article broke the news that the first criminal charges against executives of those companies could emerge by the end of the year, and that State AGs were seeking to bring claims against generic manufacturers.

386.    On this news, the prices of Teva Securities declined once again. Between the close of trading on November 2, 2016 and the close of trading on November 3, 2016, Teva's ADS price fell $4.13 or 9.53% to close at $39.20; the Preferred Share price fell $56.50 or 7.36% to close at $711.00; and the prices of Teva's 2023, 2026, and 2046 Notes fell $12.93 or 1.31%, $11.19 or 1.15%, and $27.94 or 3.02%, respectively.

387.    In a November 3, 2016 article titled "News of Charges in Price-Fixing Inquiry

Sends Pharmaceuticals Tumbling," *The New York Times* reported that the news that the DOJ and State AGs' investigations found serious evidence of criminal conduct caused significant declines in the price of Teva Securities. On November 4, 2016, S&P Capital IQ lowered its rating of Teva ADS from "buy" to "hold" and its 12-month price target by $34 to $50 per share, noting that "[w]e think this could pose yet another challenge to an industry that has been hit hard by charges of high drug prices and will be an overhang on the shares." HSBC in its November 4, 2016 analyst report, downgraded Teva from "buy" to "hold" and lowered its price target from $66 per share to $44 per share, noting "US DOJ investigation into alleged US generic drug price collusion creates significant uncertainty" for Teva and for investors. In a November 10, 2016 article titled "DOJ's price-fixing investigation could lead to sizable liabilities, analyst says," *Fierce Pharma* reported that analysts tracking the generic drug industry believed that liability from the investigations could have a sizeable financial impact on Teva, estimated at $700 million.

388.    Within weeks the expected governmental actions materialized. On December 13, 2016, the DOJ, by means of an Information, charged Malek and Glazer, the top two executives at Heritage, with two felony counts of violating Section 1 of the Sherman Act partly for fixing the price of Glyburide, a drug for which Teva held 75% of the market.

389.    On December 14, 2016, led by the Connecticut AG, the State AGs filed their lawsuit against Teva and several of its peers for civil violations of the antitrust laws, accusing Teva of conspiring to allocate the markets for and fix the prices of generic drugs, including for Glyburide, and of participating in a larger market-wide collusive conspiracy. *Forbes* reported the next day, in an article titled "State Attorneys General Accuse Six Generic Companies Of Fixing Drug Prices," that the AG's complaint revealed new information regarding Teva's potential exposure, made "clear which companies could be implicated in the antitrust investigation federal

prosecutors are pursuing," and also noted that Glazer and Malek were cooperating.

390.    On the news of the DOJ charges and the filing of the State AGs' complaint, the prices of Teva Securities continued to decline. Between the close of trading on December 13, and December 16, 2016, the ADS price fell $1.15 or 3% to close at $36.51, and the Preferred Share price fell $28.00 or 4% to close at $645.00; the price of the Company's 2046 Notes also declined $17.54, a drop of 2.5%.

### 3.    November 15, 2016

391.    On November 15, 2016, before trading opened on the NYSE, Teva filed a press release with the SEC reporting its Q3 2016 financial results, which were well below consensus expectations largely due to poor sales in Teva's generics divisions, including a $277 million YOY decline in revenue in Teva's "legacy" U.S. generics segment (*i.e.*, in the pre-Actavis-transaction portion of Teva's U.S. generics business). In the Company's November 15, 2016 earnings call, the Company also revised downward its 2016 guidance, and disclosed for the first time that the rate of price erosion for its generic drugs has increased from 5% to 7%, although Olafsson falsely claimed that the increase was the result of divestitures from the Actavis transaction, and thus was limited to one quarter.

392.    On this news, the prices of Teva Securities continued to decline. Between the close of trading on November 14 and 15, 2016, the ADS price fell $3.43 or 8.36% to close at $37.60; the Preferred Share price fell $38.01 or 5.22% to close at $689.99.

393.    Analysts responded negatively to the new information concerning the Company's disappointing financial results. That day, in a report titled, "Are The Wheels Coming Off? Sure Feels That Way," PiperJaffray lowered its price target from $57 per share to $43 per share, noting that "it appears to us that Teva painted an overly sanguine picture of its generics business at its investor event in September [during the Generics Day]," and describing Q3 2016 as a "credibility-

damaging quarter," because, in the face of Olafsson's explanation that the price erosion would be limited, it was "difficult for us to take that assertion at face value." Also, that day, Deutsche Bank wrote "TEVA reported 3Q revenue that was below our estimate on lower generic sales ... the company saw higher than expected price erosion in 3Q ..." and, as a result, lowered its price target for the Company from $68 per share to $54 per share on "lower growth assumptions for generics." Likewise, in a November 16, 2016 report, Morgan Stanley lowered its price target for the Company from $63 per share to $42 per share, as a result of the lower than expected generics growth and worse than expected price erosion.

### 4.   December 5-6, 2016

394.   After the close of trading on December 5, 2016, Teva filed a Form 6-K announcing that Olafsson would be stepping down as President and CEO of the Company's Global Generic Medicines Group and that, effective immediately, he would be replaced by Bhattacharjee. Teva offered no explanation for Olafsson's departure, instead claiming he was "retiring" even though he was only in his late 40s and quickly obtained other employment.

395.   On this news, on December 6, 2016, the prices of Teva Securities continued to decline. Between the close of trading on December 5 and on December 6, 2016, the ADS price fell $2.01 or 5.43% to close at $35.03; the Preferred Share price fell $26.26 or 4.00% to close at $630.75; the price of Teva's 2046 Notes fell $17.01 or 1.95%.

396.   Analysts tied Olafsson's termination to the disappointing results in Teva's generics segment and concerns over pricing pressure. On December 6, Morningstar reported: "Teva's announcement [that it] will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence. ***Recent pricing pressure*** in the generic drug market ... remain[s] significant near-term challenge[] for Teva, which makes the abrupt leadership change a ***concerning development at a critical time*** for the company." A December 5 BTIG report noted "[w]ithout Siggi Olafsson at the

120

helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained *focused on price erosion for the [company's] base generic business*" and that "the departure of Mr. Olafsson [sic] creates more uncertainty as we head into 2017."

     **5.**    **January 6, 2017**

397.    On January 6, 2017, before the beginning of the trading day on the NYSE, Teva filed a press release on Form 6-K announcing a significant reduction in the 2017 guidance previously released on July 13, 2016. In the investor conference call that day, Vigodman claimed the "significantly" reduced guidance resulted from "significant headwinds" faced by "[t]he entire healthcare sector" to which Teva "ha[d] not been immune," and "some issues specific to Teva" resulting in "an EBITDA gap of $1.2 billion emanating from our US generics business." In addition to the materialization of the concealed risks described herein, this was the materialization of the risk of the Exchange Act Defendants using an "assumption" for price erosion in the July 13, 2016 guidance that was empirically false at the time; specifically, Defendants assumed a pricing environment that was "stable"— *i.e.*, 4%-5% erosion rate disclosed in prior years and quarters— when, in fact, pricing pressure was causing a more rapid decline.

398.    As a result of this new negative information, the prices of Teva Securities continued to decline. Between the close of trading on January 5 and January 6, 2017, the ADS price fell $2.86 or 7.53% to close at $35.10; the Preferred Share price fell $47.00 or 6.91% to a close at $633.00; and the prices of Teva's 2026 and 2046 Notes declined $10.96 or 1.17% and $17.75 or 2.01%, respectively.

399.    Analysts tied this disclosure to the fact that the prior guidance was "inflated" as a result of understating generic drug price erosion. In a report dated January 6, 2017, Evercore ISI conducted its own price erosion analysis for the Company and noted that, as a result of its lower than expected revenues and EPS, "I think it's *pretty clear that mgmt's prior expectation for 2017*

*were very inflated.*" Similarly, the same day, Maxim Group downgraded its rating of the Company from "buy" to "hold" and its price target for the Company from $49 per share to $41 per share and noted "challenges in the near term to the core generic ... business are becoming bigger issues." In a January 8, 2017 report, Piper Jaffray stated that "Teva once again provided disappointing guidance, further eroding what in our view was already *limited management credibility*."

### 6.    February 6-7, 2017

400.    On February 6, 2017, after the close of trading on the NYSE, in a Form 6-K filed with the SEC, Teva announced the termination of Vigodman as CEO, effective immediately and without a permanent replacement, and the conclusion of his service on the Board of Directors.

401.    On this news, the prices of Teva Securities continued to decline. Between the close of trading on February 6 and on February 7, 2017, the ADS price fell $2.16 or 6.29% to close at $32.19; the Preferred Share price fell $29.00 or 4.57% to close at $605.00; Teva's 2026 Notes fell $13.69 (1.51%); the 2046 Notes fell $32.33 (3.76%).

402.    Analysts tied Vigodman's abrupt departure to the Company's poor financial performance in its generics business since no later than Q2 2016, as well as sustained difficulties for the generics business ahead. For example, in a February 6, 2017 report titled "CEO Transition Adds Further Uncertainty to Story," J.P Morgan reported

> [W]e view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges. With Teva facing headwinds across both its generics (incremental competition, pricing headwinds) and branded business ... we continue to believe a near-term recovery in the company's business is unlikely.

Similarly, that day, Wells Fargo concluded that "more investors will be uneasy with the uncertainty of an unexpected and abrupt CEO departure."

7.        **August 3-7, 2017**

403.    On August 3, 2017, before the NYSE opened, Teva filed a press release on a Form 6-K announcing lower-than-expected Q2 2017 financial results. The Company (i) attributed its poor financial results to poor performance in its U.S. generics business (with reported profits of only $691 million, far below analyst expectations) and "accelerated price erosion"; (ii) was required to take a $6.1 billion accounting charge permanently writing-down the value of the generics business; and (iii) imposed a 75% reduction in the Company's longstanding dividend. The Company also significantly lowered its guidance for 2017, revising downward its earlier-reported guidance from January 2017 for the Company's net revenues, operating income, EBITDA, EPS, and cash flow. On the Company's earnings conference call held that day, McClennan, Teva's interim CFO, explained that the poor results and reduced guidance were partly the result of increased price erosion and price pressure. Importantly, Bhattacharjee further noted the "impact of the shelf stock adjustments that [Teva has] done," as a "key element" of the revised outlook. Shelf stock adjustments are contractual provisions that require charge backs to customers when prices decline. It was highly foreseeable that prices would decline on at least the 60 drugs subject to the Price-Hike Strategy, drugs for which Teva had increased price by at least 50%, and as much as 1543% over the Relevant Period. Teva's $6.1 billion permanent impairment charge directly reduced Teva's bottom line dollar-for-dollar.

404.    Analysts reacted harshly. That day, J.P. Morgan wrote, "Teva reported weaker-than-expected results but more importantly lowered in 2017 sales and EPS guidance ... and cut its dividend by 75%.... U.S. ***generic weakness appears to be at the heart of these reductions***." Jefferies wrote, "Mgt Had Effectively No Choice but to Cut the Dividend; Maintaining Debt Covenants a Key Concern." Oppenheimer noted, "it may be difficult for Teva's board to attract top talent (meaningful pharma CEO experience) given the company's ongoing challenges," as the

CEO and CFO positions remained unfilled. Analysts were further concerned about Teva's ability to sustain its debt and debt rating. Jefferies wrote: "Can It Get Any Worse?" noting that "[a]t present, Teva has a debt covenant that requires a minimum leverage of 4.25 x (net debt/EBITDA) by YE17 ... If mgt's ever-shrinking EBITDA guidance ... erodes much further, *it is possible Teva may not meet the [debt] obligation*." The reality was that Teva's poor results, guidance reduction, and the risk that it could not satisfy its debt obligations were the materialization of the risks associated with the Price-Hike Strategy and its ultimate demise. There was no realistic prospect that the strategy could be revived, or that it could again generate the same Inflated Profits. The result was the write down of the generics business by $6.1 billion, and Teva cutting its dividend by 75%.

405.    With the true financial condition of the Company more evident, credit rating agencies immediately issued rating downgrades. On August 3, 2017, Moody's downgraded Teva's debt rating to Baa3 (one step above "junk"), with a negative outlook, reflecting slower-than-anticipated deleveraging "as Teva contends with weakness in its US generics business." Likewise, on August 4, Fitch Ratings also downgraded Teva to BBB- (one step above "junk"), with a negative outlook.

406.    As investors digested the news, the prices of Teva Securities dropped. Between the close of trading on August 2 and the close of trading on Monday, August 7, 2017, the price of Teva's ADS fell $12.66 or 40.51% to close at $18.59; the Preferred Share price fell $184.50 or 32.92% to close at $376.00; the price of the 2018, 2019, 2021, 2023, 2026, and 2046 Notes fell $7.76 (.78%), $12.45 (1.25%), $30.10 (3.05%), $38.72 (3.95%), $40.88 (4.20%), and $57.51 (6.34%), respectively.

### G.    Presumption Of Reliance And Fraud-On-The-Market Doctrine

407.    Plaintiffs are entitled to a presumption of reliance on Defendants' material

misrepresentations and omissions pursuant to the fraud-on-the-market doctrine. At all relevant times, the market for Teva's ADS, Preferred Shares, and Notes was efficient for the following reasons, among others:

> (a) Teva's ADS met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;
>
> (b) The average weekly trading volume of Teva Securities was significant;
>
> (c) As a regulated issuer, Teva filed public reports with the SEC and the NYSE;
>
> (d) Teva was eligible to file simplified SEC filings;
>
> (e) Teva regularly communicated with the public through established market communication channels, including through the regular dissemination of news releases on major newswire services, through communications with the financial press, and through other wide-ranging public disclosures; and
>
> (f) Numerous securities and credit analysts followed Teva and wrote reports that were published, distributed, and entered the public domain.

408.    Accordingly, the markets for Teva Securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Teva Securities. Under these circumstances all purchasers of Teva Securities during the Relevant Period suffered similar injury through their purchases at artificially inflated prices. A presumption of reliance therefore applies.

409.    In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that the Exchange Act Defendants had a duty to disclose.

## IV.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**Violation Of Section 10(b) Of The Exchange Act
And SEC Rule 10b-5 Promulgated Thereunder
(Against Teva and the Officer Defendants)**

410.    Plaintiffs repeat and reallege ¶¶1-409 as if fully set forth herein.

411.    This claim is brought by Plaintiffs against Teva and the Officer Defendants for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

412.    As alleged above, during the Relevant Period, the Exchange Act Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

413.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs related to the purchase and/or acquisition of Teva Securities.

414.    Plaintiffs have suffered damages in that, in reliance on the integrity of the market, as well as their direct reliance on Defendants false and misleading statements alleged herein, Plaintiffs paid artificially inflated prices for Teva Securities. Plaintiffs would not have purchased or acquired Teva Securities at the prices they paid, or at all, if they had been aware that those prices had been inflated by Defendants' misleading statements and omissions.

415.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and acquisitions of Teva Securities during the Relevant Period.

416.     By reason of the foregoing, Teva and the Officer Defendants are liable to Plaintiffs for violations of Section 10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

**Violation Of Section 18(a) Of The Exchange Act
(Against Teva and the Officer Defendants)**

417.     Plaintiffs repeat and reallege ¶¶1-416 as if fully set forth herein.

418.     This claim is brought by Plaintiffs against Teva and the Officer Defendants for violation of Section 18(a) of the Exchange Act, 15 U.S.C. § 78r.

419.     As alleged above, during the Relevant Period, Defendants filed or caused to be filed with the SEC Forms 20-F and other documents regarding the Company that contained misrepresented material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

420.     Prior to purchasing Teva Securities, Plaintiffs read and relied upon Teva's SEC filings, including Teva's 2013, 2014, and 2015 Forms 20-F, and the statements contained therein. Plaintiffs' actual "eyeball" reliance on Teva's SEC filings, including Teva's 2013, 2014, and 2015 Forms 20-F, and the representations contained therein specifically includes statements concerning the Company's competitiveness, profits, source of profits, pricing, pricing trends, compliance with antitrust laws, and internal financial and disclosure controls. In accordance with Defendants' representations, Plaintiffs relied upon Defendants statements and assurances as metrics to analyze Teva's current and future operations and associated risks in making decisions whether to invest in Teva or its competitors. Plaintiffs' reliance was therefore reasonable.

421.    Plaintiffs read and relied upon these documents not knowing that they contained materially false statements and omissions. Had Plaintiffs known the true facts, they would not have purchased Teva Securities or would not have purchased the securities at the inflated price they paid.

422.    Defendants' materially false or misleading statements artificially inflated the prices of Teva Securities.

423.    When the truth began to emerge about the false and misleading statements and omissions, the prices of Teva Securities declined significantly and Plaintiffs were damaged.

424.    At the time of their purchases and acquisitions of Teva Securities, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

425.    As to this Count, Plaintiffs expressly disclaims any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made. Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

426.    By reason of the foregoing, Teva and the Officer Defendants are liable to Plaintiffs for violations of Section 18(a) of the Exchange Act.

## COUNT III

### Violation Of Section 20(a) Of The Exchange Act
### (Against the Teva and the Officer Defendants)

427.    Plaintiffs repeat and reallege ¶¶1-426 as if fully set forth herein.

428.    This claim is brought by Plaintiffs pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Officer Defendants for their control of Teva, and also against Teva

for its control of the Officer Defendants (and all of its officers and employees) in connection with the controlled persons' violations of Sections 10(b) of the Exchange Act.

429.    By reason of their high-level positions of control and authority as the Company's most senior executive officers, the Officer Defendants had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.

430.    The Officer Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Teva during the Relevant Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein. The Officer Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. In addition, throughout the Relevant Period, the Officer Defendants each signed SEC filings which contained false and misleading information as set forth above, demonstrating that they possessed the power to control, and did control, the contents of those filings.

431.    Teva exercised control over and directed the actions of its senior managers, directors and agents, including the Officer Defendants, and all of its employees. Teva and the Officer Defendants had the ability to influence, and direct and did so influence and direct, the activities of one another in each's violations of Sections 10(b) of the Exchange Act as alleged herein.

432.    By virtue of their positions as controlling persons of Teva and as a result of their

own aforementioned conduct, Teva and the Officer Defendants violated Section 20(a) of the Exchange Act and are liable to Plaintiffs.

## V. INFLATED PROFIT ANALYSIS

433. Teva did not disclose profits, revenues, or pricing for individual generic drugs, nor was that information otherwise public. As alleged in the amended complaint filed in the Class Action, to determine that the Price-Hike Strategy was actually the driver of Teva's success, the Class Action plaintiffs and their experts performed an independent investigation to calculate and isolate the profit that Teva earned from its Price-Hike Strategy. The investigation comprised multiple distinct econometric analyses, including regression analyses, that ultimately considered thousands of data points.

434. The analysis screened Teva's entire generic drug portfolio during the Relevant Period to identify Wholesale Acquisition Cost ("WAC") increases of at least 50%. The data was accessed via private, subscription-only databases costing tens of thousands of dollars annually. Next, any price increases plausibly connected to supply shortages or other economic anomalies were removed from the set.

435. To isolate Inflated Profit for each drug, the analysis first determined the drug's price per unit had Teva not made the increase. To do so, the drug's specific pricing history was analyzed using a regression analysis that determined the price through the Relevant Period had prevailing drug-specific pricing trends continued. The analysis further considered CPI inflation for prescription drugs and empirical measures of the trend in average pricing for prescription drugs over the past five years.

436. Calculating Inflated Profit, *i.e.*, the difference between Teva's actual revenues (with the price increase) and the revenues that would have been earned at each drug's price without the increase, involved accounting on a month-by-month basis for (i) Teva's sales quantities; and

(ii) the discounts and rebates, unique to each drug, that Teva would provide to customers, which varied over time.

437.    Sales volumes were derived by reference to figures reported in a subscription database. Through another regression analysis, it was confirmed that the price and volume for each drug exhibited no statistically meaningful relationship, meaning that as pricing changed, volume of sales did not change.

438.    Teva's discounts and rebates are unavailable by any means of which Plaintiffs are aware. Thus, the level of discounts and rebates was determined by analyzing, on a month-by-month basis over the Relevant Period, multiple data points from a number of subscription and other industry datasets that reflected average pricing and sales volume data. This analysis was unique for each drug and captured fluctuations over time.

## VI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

439.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed or were purported to exist at the time the statements were made.

440.    To the extent any of the untrue or misleading statements alleged herein can be construed as forward-looking, they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements; the generalized risk disclosures Teva or other Defendants made were not sufficient to shield Defendants from liability.

441.    To the extent the statutory safe harbor otherwise would apply, the Defendants are

liable under the Exchange Act and/or the Securities Act for any untrue or misleading forward-looking statement complained of herein because the person who made each such statement knew that the statement was untrue or misleading when made, or because each such statement was approved by an executive officer who knew that the statement was untrue or misleading when made.

442.     Specifically, the alleged false and misleading guidance issued on July 13, 2016, and January 6, 2017, incorporated an assumption grounded on historically-inaccurate data. Namely, the assumption was that pricing was declining at the same rate as it had during 2015 and the first half of 2016 because, as Olafsson puts it on Teva's July 13, 2016 Preliminary Outlook call, Teva was "assuming ... [the] same pricing assumption as we have had for the first half of the year," because Teva "saw no change in the pricing. We saw a stable environment ... from first quarter into second quarter." Teva's pricing erosion was not, however, "stable." Teva's Inflated Profits had declined by $10 million from Q1 2016 to Q2 2016 and had declined over $100 on YOY basis from Q1 2015 due to an increasingly adverse pricing environment. Moreover, because Teva had received the DOJ and State AG subpoenas, it would be unable to mitigate these declines, as it had in the past, by taking additional price increases.

## VII.   SECURITIES ACT ALLEGATIONS

443.     In this section of the Complaint, Plaintiffs assert strict liability and negligence claims based on Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all persons and entities who purchased or otherwise acquired Teva's (i) ADS registered on the NYSE, (ii) Preferred Shares, and/or (iii) Notes, in domestic transactions, and in, pursuant to, and/or traceable to the Offerings (defined below), and who were damaged thereby. Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange

Act claims.

### A.      Securities Act Parties

444.    Sculptor Capital LP (f/k/a Oz Management LP) and Sculptor Capital II LP (f/k/a Oz Management II LP) (collectively, "Oz Management") are global, diversified alternative asset advisors based in New York, New York. The following investment funds and accounts that are managed and/or advised by Oz Management are Plaintiffs in this action: OZ ELS Master Fund, Ltd., Sculptor Special Funding, LP (f/k/a OZ Special Funding (OZMD), L.P.), Sculptor Enhanced Master Fund, Ltd. (f/k/a OZ Enhanced Master Fund, Ltd.), Gordel Capital Limited, OZ Global Equity Opportunities Master Fund, Ltd., Sculptor Master Fund, Ltd. (f/k/a OZ Master Fund, Ltd.), and Sculptor Global Special Investments Master Fund, LP (f/k/a OZ Global Special Investments Master Fund, L.P.). Plaintiffs acquired and/or sold Teva Securities during the Relevant Period, including ADSs and Preferred Shares acquired in or traceable to the 2015 Offering, and were damaged upon the revelation of the alleged corrective disclosures.

445.    Defendant Teva is incorporated in Israel, and the Company's principal executive offices are located at 5 Basel Street, P.O. Box 3190, Petach Tikva 4951033, Israel. The Company's U.S. wholly-owned subsidiary Teva USA's headquarters are located at 1090 Horsham Road, North Wales, Pennsylvania. Teva's Level III sponsored ADSs representing the Company's common stock are listed on the NYSE, trading under the ticker symbol "TEVA." There are currently over 840 million ADSs issued and outstanding.

446.    Defendant Erez Vigodman ("Vigodman") served as Teva's President and Chief Executive Officer ("CEO") from February 11, 2014 to February 6, 2017, and as a member of Teva's Board of Directors from June 22, 2009 to February 6, 2017.

447.    Defendant Eyal Desheh ("Desheh") served as Teva's Chief Financial Officer ("CFO") from July 2008 to June 30, 2017, with the exception of October 30, 2013 to February 11,

2014, during which time he served as the Company's Interim CEO and Interim President. Desheh also served as Teva's Group Executive Vice President from 2012 to June 30, 2017.

448.    The Defendants referenced above in ¶¶444-447 are sometimes referred to herein as the "Securities Act Defendants."

B.    **The Relevant Offerings**

1.    **The ADS/Preferred Offerings**

449.    On November 30, 2015, Teva filed with the SEC a Form 6-K and press release, announcing that it was commencing two concurrent public offerings totaling approximately $6.75 billion. These offerings consisted of approximately $3.375 billion of its ADS and approximately $3.375 billion of its Preferred Shares and were announced pursuant to a prospectus and related prospectus supplements constituting part of Teva's shelf registration statement on Form F-3 filed with the SEC on November 30, 2015 (the "ADS/Preferred Registration Statement"). Each ADS represents one ordinary share of Teva, and each Preferred Share will automatically convert on December 15, 2018 into 13.3333 to 16 ADS, subject to anti-dilution adjustments. Likewise, on November 30, 2015, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the preliminary prospectus supplement for the ADS Offering and the preliminary prospectus supplement for the Preferred Offering, each dated November 30, 2015.

450.    On December 3, 2015, Teva filed with the SEC a Form 6-K, announcing the pricing of the ADS/Preferred Offerings. That same day, Teva also filed with the SEC, pursuant to Rule 424(b)(5), the final ADS Prospectus (the "ADS Final Prospectus") and final Preferred Prospectus (the "Preferred Final Prospectus"), and, pursuant to Rule 433, a free writing prospectus and pricing term sheet, all dated December 2, 2015.

451.    The ADS Offering and the Preferred Offering are referred to collectively as the "ADS/Preferred Offerings." The ADS/Preferred Registration Statement, along with the base and

preliminary prospectus and related prospectus supplements constituting part of the ADS/Preferred Registration Statement, including the ADS Final Prospectus and the Preferred Final Prospectus, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "ADS/Preferred Offering Materials."

452.    On December 8, 2015, Teva closed the ADS/Preferred Offerings and issued 54 million ADS at $62.50 per ADS and 3,375,000 Preferred Shares (7.00% mandatory convertible preferred shares, nominal (par) value NIS 0.10 per share) at $1,000.00 per share. The Company's net proceeds, after estimated underwriting discounts, commissions, and offering expenses by Teva, were approximately $3.29 billion from the ADS Offering and approximately $3.29 billion from the Preferred Offering, for a total of approximately $6.58 billion.

453.    Certain underwriters of the ADS/Preferred Offerings exercised their options to purchase additional ADS and Preferred Shares to cover overallotments; Teva issued an additional 5.4 million ADS and an additional 337,500 Preferred Shares at the time of such purchases, on January 6, 2016. As a result, Teva received an additional $329 million in net proceeds for the ADS Offering and an additional $329 million in net proceeds for the Preferred Offering, for an aggregate of approximately $3.62 billion for the ADS Offering and an aggregate of approximately $3.62 billion for the Preferred Offering. As a result of the ADS Offering and the Preferred Offering, Teva raised a total of approximately $7.24 billion.

## 2.    The Notes Offering

454.    On July 12, 2016, Teva filed with the SEC a Form 6-K and, under Rule 433, a free writing prospectus dated July 12, 2016, each of which announced a conference call and webcast to provide a preliminary outlook for 2016-2019. On July 13, 2016, Teva filed with the SEC its Post-Effective Amendment No. 1 to its shelf registration statement on Form F-3 (Registration Nos. 333-201984, 333-201984-09), superseding the original base prospectus dated February 9, 2015

(the "Notes Registration Statement") and, under Rule 433, a free writing prospectus in the form of an investor presentation titled "2016-2019 Preliminary Financial Outlook" dated July 13, 2016.

455.   On July 15, 2016, Teva filed with the SEC, under Rule 424(b)(5), a preliminary prospectus supplement for the Notes Offering dated July 18, 2016. Then, on July 19, 2016, Teva filed with the SEC, pursuant to Rule 424(b)(5), its final Notes Prospectus (the "Notes Final Prospectus") and, under Rule 433, two free writing prospectuses, all dated July 18, 2016.

456.   The ADS/Preferred Offerings and the Notes Offering are referred to collectively as the "Offerings." The Notes Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of the Notes Registration Statement, including the Notes Final Prospectus, and the documents incorporated by reference therein, are sometimes referred to herein collectively as the "Notes Offering Materials," and, collectively with the ADS/Preferred Offering Materials, the "Offering Materials."

457.   On July 21, 2016, Teva consummated, through Teva Finance, its special purpose finance subsidiary, the offering of an aggregate of $15 billion of debt securities comprised of (i) $1,500,000,000 of 1.400% Senior Notes due 2018; (ii) $2,000,000,000 of 1.700% Senior Notes due 2019; (iii) $3,000,000,000 of 2.200% Senior Notes due 2021; (iv) $3,000,000,000 of 2.800% Senior Notes due 2023; (v) $3,500,000,000 of 3.150% Senior Notes due 2026; and (vi) $2,000,000,000 of 4.100% Senior Notes due 2046 (collectively, the "Notes" and the "Notes Offering"). The payment of principal and interest was unconditionally guaranteed by Teva. After underwriting discounts and estimated offering expenses payable by the Company, Teva's net proceeds from the Notes Offering were approximately $14.9 billion.

### C.   Teva Filings Incorporated Into The Offering Materials

458.   The ADS/Preferred Registration Statement, the ADS Final Prospectus, and the Preferred Final Prospectus each incorporated by reference various documents that Teva had

previously been filed with the SEC. Specifically, each of those Final Prospectuses incorporated by reference Teva's 2014 20-F, Q1 2015 6-K, Q2 2015 6-K, and Q3 2015 6-K. The incorporated 2014 20-F and Q1, Q2, and Q3 2015 Forms 6-K contained material misstatements and omissions concerning (i) the Price-Hike Strategy and the benefits and risks stemming therefrom; (ii) material trends that were not disclosed under Item 5 of Form 20-F; and (iii) the purported competitiveness of the U.S. generics market and Teva's relationship to that market, as well as other topics discussed below. The statements and omissions in the 2014 20-F, the Q1, Q2 and Q3 2015 6-Ks and the reasons why they are materially misleading are set forth in Section III.C.

459.    The Notes Final Prospectus incorporated by reference various documents that had previously been filed with the SEC. Specifically, the Notes Final Prospectus incorporated by reference the 2015 20-F and the Q1 2016 6-K. The incorporated 2015 20-F and Q1 2016 6-K contained material misstatements and omissions concerning (i) the Price-Hike Strategy and the benefits and risks stemming therefrom; (ii) the purported competitiveness of the U.S. generics market and Teva's relationship to that market; and (iii) material trends that were not disclosed under Item 5 of Form 20-F, as well as other topics discussed below in Section VII.D. The statements and omissions contained in the 2015 20-F and the Q1 2016 6-K and the reasons why they are materially misleading are described above in Section III.C.

**D.    The Offering Materials Contained Material Misstatements And Omissions**

460.    The Offering Materials incorporated Teva's 2014 and 2015 20-Fs, as well as the Company's Q1, Q2, and Q3 2015 6-Ks, and the Company's Q1 2016 6-K. Accordingly, the Offering Materials contained material misstatements and omissions.

**1.    Material Misstatements And Omissions Concerning
The Price-Hike Strategy And The Benefits And Risks
Stemming Therefrom**

461.    The Offering Materials contained material misstatements and omissions concerning

the attribution of the sources of Teva's generic segment's revenues and profit during the Relevant Period. The statements and omissions contained in the 2014 20-F, the Q1, Q2 and Q3 2015 6-Ks and the reasons why they are materially misleading are described in Section III.C.3.

462.     In sum, the various financial disclosures regarding the sources of Teva's generic revenues and profits contained within the incorporated filings were materially misstated because they failed to disclose the Price-Hike Strategy, pursuant to which Teva implemented price hikes on a number of Teva's generic drugs, generating a significant amount of Inflated Profit as a result of those price hikes that was unsustainable, while attributing the source of those profits to other sources and failing to disclose that they were caused by concealed price hikes.

463.     Moreover, as to the incorporated 2015 20-F and the Q1 2016 6-K, those filings also failed to disclose that, starting in the latter part of 2015, Teva was increasingly unable to successfully execute the Price-Hike Strategy. Specifically, the Company could no longer maintain the profits from the price increases as a result of the materialization of the risks concealed by the failure to disclose the Price-Hike Strategy. Those materialized risks included: (i) increased public, legislative, and regulatory scrutiny of generic drug increases that undermined Teva's ability to sustain Inflated Profit from price increases and/or implement further price increases; (ii) increased legislative and law enforcement scrutiny that resulted in legal actions being taken against Teva; (iii) increased competition from other generic manufacturers who undercut Teva's raised prices as they themselves faced increased scrutiny; and (iv) significant disruption caused by the termination of the senior management who was responsible for the strategy, and the attendant resources required to locate and hire suitably qualified replacements.

### 2.     Material Misstatements And Omissions Concerning Known Trends Required To Be Disclosed Pursuant To Item 5 Of Form 20-F

464.     Incorporating Teva's 2014 and 2015 20-Fs, the Offering Materials contained

material misstatements and omissions in that they violated SEC Item 5 of Form F-20 by failing to disclose two known trends. (*See* Section III.C.1) The Securities Act Defendants failed to disclose the trend that Teva's financial success was materially dependent on the Price-Hike Strategy and the attendant price increases on generic drugs that generated significant amounts of Inflated Profit. These price increases generated as much as $2.3 billion in profit for Teva over the Relevant Period. Yet, the existence of this trend and the related risks and uncertainties surrounding its source and sustainability were concealed. Moreover, beginning in February 2016, Defendants failed to disclose the known trend that increased pricing pressure was causing Teva's Inflated Profit generated from the price increases to decrease precipitously, from $218 million in Q3 2015, to $166 million in Q4 2015, to $124 million in Q1 2016, with all then-known financial information indicating future profit deterioration and price erosion.

### 3. Material Misstatements And Omissions Concerning Competition In The U.S. Generics Market

465.   Incorporating Teva's 2014 and 2015 20-Fs, the Offering Materials contained material misstatements and omissions in that they, among other things, purportedly (i) warned investors that one of the primary risks that Teva faced was the "intense" competition in the U.S. generic drug market, and that this competition would force the price of generic drugs down; and (ii) described how Teva's competitive advantage was a "competitive pricing strategy" and the ability to launch new generics. These statements and omissions were materially misstated for all of the reasons described above in Section III.C.2.

### 4. Material Misstatements And Omissions Concerning Teva's Participation In A Price-Fixing Conspiracy

466.   The Offering Materials that incorporated the statements referenced in Section III.E.1 and 3, above, contained material misstatements and omissions in that they failed to disclose that Teva conspired with other generic manufacturers to fix prices, rig bids, and allocate the market

for generic drugs.

## VIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT IV

### Violations Of Section 11 Of The Securities Act
### (Against Teva, Vigodman, and Desheh)

467.   Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act as if fully set forth herein. This Count is based solely on claims of strict liability and/or negligence. For purposes of this claim, Plaintiffs expressly disclaim any allegation of fraud or intentional or reckless misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made. Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

468.   This claim is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k against Teva, Vigodman, and Desheh.

469.   At the time of the 2015 Offering, the ADS/Preferred Offering Materials and the documents incorporated by reference therein contained false statements of material fact and/or omitted material facts that were required to be disclosed or necessary to make the statements contained therein not misleading.

470.   Teva is the issuer of the ADS and Preferred Shares purchased by Plaintiffs pursuant to the ADS/Preferred Offering Materials. Teva is, therefore, strictly liable to these Plaintiffs under Section 11 for the materially untrue statements and omissions contained in the ADS/Preferred Offering Materials.

471.   Vigodman and Desheh, among others, were responsible for the contents and dissemination of the ADS/Preferred Offering Materials, including the Registration Statement and

Prospectus Supplements for the 2015 Offering. Vigodman and Desheh each signed or authorized the signing of such Registration Statement and Prospectus Supplements, and participated in the preparation and dissemination of the Registration Statements and Prospectus Supplements. As a signatory to such documents, Vigodman and Desheh are liable to Plaintiffs for the misstatements and omissions contained within the Registration Statements and Prospectus Supplements pursuant to Section 11 of the Securities Act.

472.    Vigodman and Desheh did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the ADS/Preferred Offering Materials and did not possess reasonable grounds for believing that the statements made therein were not false and/or misleading.

473.    The facts misstated in or omitted from the ADS/Preferred Offering Materials at issue herein would have been material to a reasonable person reviewing the ADS/Preferred Offering Materials.

474.    Plaintiffs purchased or acquired Teva ADSs and Preferred Shares in or traceable to the 2015 Offering pursuant to the materially false and misleading ADS/Preferred Offering Materials. As a direct and proximate result of the misrepresentations and omissions contained in the ADS/Preferred Offering Materials, including in the applicable Registration Statements and Prospectus Supplements, Plaintiffs suffered damages.

475.    At the time of their purchases and acquisitions of the Teva ADSs and Preferred Shares, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

476.    By reason of the foregoing, Teva, Vigodman, and Desheh are liable to Plaintiffs for violations of Section 11 of the Securities Act.

## COUNT V

**Violation Of Section 12(a)(2) Of The Securities Act
(Against Teva, Vigodman, and Desheh)**

477.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. For purposes of this claim, Plaintiffs expressly disclaim any allegation of fraud or intentional or reckless misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made. Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

478.    This claim is brought by Plaintiffs pursuant to Section 12 of the Securities Act, 15 U.S.C. § 77l(a)(2), against Teva, Vigodman, and Desheh.

479.    The Registration Statements and Prospectus Supplements issued in connection with the 2015 Offering were false and misleading and omitted to state material facts required to be stated therein, contained untrue statements of material facts, and omitted to state facts necessary to make the statements made therein not misleading.

480.    Teva, Vigodman, and Desheh were statutory sellers who sold and assisted in the sale of securities to Plaintiffs by means of the defective Prospectus Supplements used in the 2015 Offering and did so for personal gain.

481.    Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths contained in and/or omissions from the Prospectus Supplements at the time they acquired Teva ADSs and Preferred Shares.

482.    As a direct and proximate result of Defendants' violation of Section 12(a)(2) of the Securities Act, Plaintiffs sustained damages in connection with their purchases of securities pursuant to the Prospectus Supplements.

483.    Plaintiffs have the right to rescind and recover the consideration paid for their securities, upon tender of their securities to the Defendants named in this Count. Plaintiffs that have sold their securities seek damages to the extent permitted by law.

484.    At the time of their purchases and acquisitions of Teva ADSs and Preferred Shares, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

485.    By reason of the foregoing, Teva, Vigodman, and Desheh are liable to Plaintiffs for violations of Section 12(a)(2) of the Securities Act.

## COUNT VI

### Violation Of Section 15 Of The Securities Act
### (Against Teva, Vigodman, and Desheh)

486.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. For purposes of this claim, Plaintiffs expressly disclaim any allegation of fraud or intentional or reckless misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made. Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

487.    This claim is brought by Plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against Vigodman and Desheh for their control of Teva, and also against Teva for its control of Vigodman and Desheh (and all of its officers and employees) in connection with the controlled persons' violations of Sections 11 and 12(a)(2) of the Securities Act relating to the 2015 Offering.

488.    Plaintiffs purchased Teva ADSs and Preferred Shares in the 2015 Offering.

489.    During the Relevant Period, Vigodman and Desheh each signed SEC filings which

contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not misleading at the time they were made, demonstrating that each of these persons possessed the power to control, and did control, the contents of those filings.

490.    Vigodman and Desheh possessed the power to control, and did control, directly and/or indirectly, the actions of Teva throughout the Relevant Period. Vigodman and Desheh held executive and/or director positions at Teva, as detailed above. By their positions, Vigodman and Desheh possessed the power and authority to control the contents of Teva's offering materials, financial reports, press releases, and presentations to securities analysts and institutional investors, *i.e.*, the market, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Vigodman and Desheh were also responsible for the running of the Company and the management of its affairs, including decisions to raise and deploy capital, conduct securities offerings and hire underwriters for the offerings.

491.    Teva exercised control over and directed the actions of its senior managers, directors and agents, including Vigodman and Desheh, and all of its employees. Teva, Vigodman, and Desheh had the ability to influence, and direct and did so influence and direct, the activities of one another in each's violations of Sections 11 and 12(a)(2) of the Securities Act in connection with the offer and sale of Teva securities in the 2015 Offering.

492.    By reason of the foregoing, Teva, Vigodman, and Desheh violated Section 15 of the Securities Act and are liable to Plaintiffs.

## IX.    JURY DEMAND

Plaintiff demands a trial by jury.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.  Awarding Plaintiffs compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including all interest thereon;

B.  Awarding Plaintiffs punitive damages against Defendants;

C.  Awarding Plaintiffs injunctive and other equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

D.  Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.  Awarding such other relief as this Court may deem just and proper.

DATED: October 29, 2019                    Respectfully submitted,

**DUFFY LAW, LLC**

By:____/s/_____
Paul F. Thomas (ct01724)
129 Church Street, 3rd Floor
New Haven, CT 06510
Tel.: (203) 946-2000
Fax: (203) 907-1383
paul@duffylawct.com

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

Jonathan D. Uslaner (*pro hac vice*)
Lauren M. Cruz (*pro hac vice* forthcoming)
2121 Avenue of the Stars
Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470
jonathanu@blbglaw.com
Lauren.Cruz@blbglaw.com

-and-

Adam Hollander (ct28069)

1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
adam.hollander@blbglaw.com

*Counsel for Plaintiffs*